DAVID R. ONGARO, State Bar No. 154698
    dongaro@ongaropc.com
EUGENE B. FRID, State Bar No. 321265
    efrid@ongaropc.com
ONGARO PC
1604 Union Street
San Francisco, CA  94123
Telephone: (415) 433-3900
Facsimile: (415) 433-3950

Attorneys for Plaintiff
MARTIFER-SILVERADO FUND I, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIFER-SILVERADO FUND I, LLC,<br><br>              Plaintiff,<br><br>        v.<br><br>ZHONGLI SCIENCE AND TECHNOLOGY GROUP CO., LTD., a Chinese corporation; SUZHOU TALESUN SOLAR TECHNOLOGY CO., LTD., a Chinese corporation; and DOES 1 through 5, inclusive,<br><br>              Defendants. | Case No. 19-cv-04243-YGR<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) FRAUDULENT INDUCEMENT;**<br><br>**(2) FRAUDULENT CONCEALMENT;**<br><br>**(3) NEGLIGENT MISREPRESENTATION; and**<br><br>**(4) CONSPIRACY / AIDING AND ABETTING**<br><br>Jury Trial Requested |

1.  This case involves a conspiracy to defraud a U.S.-based solar project investment company, orchestrated by Chinese-based parent companies who form and use their powerless and purposefully-undercapitalized U.S. subsidiaries to carry out their misdeeds (including breaching three separate contracts for the purchase of commercial-grade solar energy project companies).

2.  The parents sought out and negotiated the contracts on their own behalf, were the only parties capable of funding and performing under the contracts, and were the only parties who would have benefited under the contracts had they not unilaterally caused their breach. The subsidiary who executed the agreements was nothing more than a "front-facing" shell for the parents, substituted in as signatory two days before signing (chosen from three possible subsidiaries/signatories) in order to further shield the parents from any liability in this country.

**Jurisdiction and Parties**

3.  This action is within the original jurisdiction of this Court by virtue of 28 U.S.C. § 1332 and diversity of citizenship, with an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

4.  Venue in this district satisfies the requirements of 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

5.  As detailed below, defendants exercised such pervasive control over their subsidiary – which served only as the parents' "marketing conduit" – that it was a mere instrumentality of the parents, supporting personal jurisdiction over them in this Court based on alter ego and/or agency theories.

6.  Plaintiff Martifer-Silverado Fund I, LLC ("M-S Fund") is a limited liability corporation organized under the laws of the State of Delaware. M-S Fund is a joint venture between Martifer Solar USA and Silverado Power, LLC that was responsible for overseeing the development of a large pipeline of utility-scale solar projects. Although it no longer conducts intrastate business in California, M-S Fund maintained its principal place of business in San Francisco, California.

-2-

7.      Silverado Power, LLC was incorporated in the State of Delaware and, although it no longer conducts intrastate business in California, had its principal place of business in San Francisco, California.  Silverado Power, LLC's members are John Cheney, Hans Isern, and Jim Howell.  Messrs. Cheney and Isern are domiciled in the State of California; Mr. Howell lives in Oregon.  Martifer Solar USA is a dissolved California entity that had its principle place of business in San Francisco.

8.      Defendant Zhongli Science and Technology Group Co., Ltd. ("Zhongli Group")[1] is a Chinese corporation doing business in the United States, including California, through its subsidiaries, with its principal place of business located at No. 8 Changkun Road, Southeast Economic Development Zone, Changshu, Suzhou, Jiangsu, CHINA.

9.      Directly underneath Zhongli Group on the corporate ladder is defendant Suzhou Talesun Solar Technology Co., Ltd. ("Talesun Solar"),[2] another Chinese corporation doing business in the United States, including California, through its subsidiaries, with its principal place of business located at No. 1 Talesun Road, Shajiabang, Changshu, Suzhou, Jiangsu, CHINA.  Talesun Solar is primarily engaged in the manufacture and sale of photovoltaic (*i.e.*, solar) panels which are marketed in China, the United States, and other nations throughout the world.

10.     On information and belief, Zhongli Group, traded on the Shenzhen stock market, is the parent corporation for at least nine technology subsidiaries, including Talesun Solar.  For purposes of this First Amended Complaint, Plaintiff occasionally refers to Zhongli Group and Talesun Solar as the "Parents," and Talesun USA commonly referred to the Parents as "HQ."

11.     Talesun Solar itself has more than a dozen subsidiaries worldwide, including Talesun Solar USA, Ltd. ("Talesun USA") who registered with the California Secretary of State as

---

[1]/ On information and belief, at some point in 2018, Zhongli Science and Technology Group Co., Ltd. changed its name to Jiangsu Zhongli Group Co. Ltd.  For purposes of this First Amended Complaint, Plaintiff refers to this entity as Zhongli Group.

[2]/ On information and belief, Suzhou Talesun Solar Technology Co., Ltd. recently changed its name to Talesun Solar Co. Ltd.  For purposes of this First Amended Complaint, Plaintiff refers to this entity as Talesun Solar.

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

a foreign corporation in 2011, and conducted business in the United States on behalf of, and for the sole benefit of, the Parents.

12.     Talesun USA was formed, and served, entirely as a "marketing conduit" for the Parents.  More specifically, Talesun USA was the exclusive importer of Talesun Solar's solar panels into the continental United States.  All advertising and marketing of those panels was handled by Talesun USA, who coordinated distribution and sales logistics in the United States.

13.     As such, in addition to attempting to shield themselves from liability in this country, the Parents used Talesun USA as their marketing conduit and derived substantial economic benefit from Talesun USA's activities.

14.     Attached hereto as Exhibit 1 is an organizational chart which shows the relationships between Zhongli Group, Talesun Solar, the subsidiaries they formed to act as their "purchasers" of the solar project companies (Zhongli Development Holding Ltd. and Zhongli Investment & Development Co.), Talesun Solar USA, and Zhongli New Energy USA Co., LLC (the new marketing arm the Parents formed after winding down Talesun USA's affairs).

15.     The Parents eventually settled on using Talesun USA as their signatory on the three separate contracts underlying this dispute, including a November 28, 2012 Master Membership Interest Purchase Agreement ("MIPA"), a December 31, 2012 Standstill Agreement, and an August 30, 2013 Letter Agreement (collectively, the "Agreements").

16.     At all times herein mentioned, each of the defendants was acting in concert with one another and was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of the other defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other defendants, knowing that their collective conduct constituted a breach of duty owed to plaintiff.

### General Factual Allegations

*The Relevant Individuals*

17.     During the relevant time period, the Parents and Talesun USA had substantial overlap in their officers, directors, and employees.  At all times relevant hereto, Mr. Baixing Wang

-4-

served as Chairman of the Board for Zhongli Group, Talesun Solar, Talesun USA, and, on information and belief, every other one of Zhongli Group's subsidiaries.

18.     During the relevant time period, Mr. Changqing Hu served as Chief Financial Officer for Zhongli Group, Talesun Solar, Talesun USA, and, on information and belief, every other one of Zhongli Group's subsidiaries.

19.     During the relevant time period, Mr. Frank (Fujun) Qi served as an executive officer of both Talesun Solar (Vice President) and Talesun USA (Chief Executive Officer).

20.     During the relevant time period, Mr. Lingqing Gu served as a director of both Talesun Solar and Talesun USA.

21.     During the relevant time period, Mr. Ning (Eric) Ma served as an executive officer of Talesun USA (General Manager).

*The Parents' Interest in Purchasing the Solar Project Companies*

22.     In May 2012, Talesun USA approached M-S Fund concerning the Parents' interest in purchasing M-S Fund's ownership rights in certain commercial-grade solar power projects throughout the State of California.

23.     In August 2012, Eric Ma (General Manager for Talesun USA) delivered a Letter of Intent ("LoI") to purchase 66MW of solar projects from M-S Fund, touting "strong financial capability of Talesun backed by Zhongli Sci-Tech Group [a]s an insurer for the payment."  The LoI, signed by both Mr. Ma and Talesun Solar's Vice President of Sales (Frank Qi), confirmed that Talesun USA "is a wholly-owned subsidiary of [Talesun Solar] which is a member of Zhongli Sci-Tech Group."  On Zhongli Group letterhead, Messrs. Ma and Qi represented that Talesun USA had "allocated dedicated resources to the negotiation and the implementation" of the projects, including "confidence to start the construction of at least 14MWAC projects in Q4, 2012."

24.     As proof of its financial backing, and with no meaningful history or financials of its own, Talesun USA shared with M-S Fund that the Zhongli Group's revenues "in the past three years are . . . $266M, $460M, and $760M respectively."  In this initial LoI, Talesun USA

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

represented that it would "use its own capital to fund the project acquisition.  If necessary, Zhongli Group can provide a Corporate Guaranty for the payment."

25.     On August 27, 2012, Talesun USA signed a second LoI concerning an expanded portfolio of project companies which mirrored the scope of projects eventually covered in the MIPA.  By this point, the total purchase price for the project companies was $30.6M.

26.     At no point in time did Talesun USA ever have funds, or control of funds, sufficient to pay M-S Fund $30.6M.

27.     This second LoI contained the same representations and warranties concerning Talesun USA's financial capabilities, and also included a 30-day exclusivity provision during which M-S Fund agreed to forego other potential opportunities in exchange for Talesun USA's payment of $500,000.

28.     The Parents so undercapitalized Talesun USA that Talesun USA could not even make the $500,000 exclusivity deposit, which was funded entirely by the Parents.[3]  When explaining the delay in sending the deposit, Mr. Ma explained that the Parents confirmed the wire had been initiated from China, but took longer than expected because the Parents had insufficient funds in their "Talesun HK" account (so needed to transfer additional funds from another subsidiary in Singapore).

29.     In late September 2012, Talesun USA admitted it was so undercapitalized that it could not even make a required $175,000 deposit for professional services related to preserving energy tax credits without "applying for such funds from HQ [the Parents]" (admitting that "[i]t is impossible for Talesun USA to pay the money tomorrow morning.").

*The Parents Tout Their Impending Purchase of the Solar Project Companies*

30.     In the fall of 2012, Talesun Solar invited M-S Fund member Hans Isern to attend a signing ceremony in Melbourne, Australia, to be attended by Mr. Wang (Zhongli Group's founder

---

[3]/ Talesun USA processed the exclusivity deposit "via its HQ"; M-S Fund eventually received the $500,000 wire initiated by Junling Duan from Talesun Solar's finance department. The wire came from an entity called "Talesun Solar Hong Kong Limited," which entity shares the same physical address in China as Zhongli Group.

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

and Chairman).  The trip was scheduled and arranged by Fiona Lin, support personnel for Talesun Solar who, based in China, describes her duties as "taking care of US market order fulfillment." In advance of the signing ceremony, Ms. Lin had the second LoI translated into Chinese and changed the signatory to Talesun Solar.

31.     Mr. Isern did, in fact, travel to Australia to meet with Chairman Wang, and the Parents arranged for and paid for Mr. Isern's travel expenses.  On October 9, 2012, Mr. Isern went to dinner with Mr. Wang, Mr. Qi, and two Chinese government officials (the Governor of the Shanghai Province and the local mayor) as well as other Zhongli-Talesun representatives.  At the dinner, Mr. Wang and Mr. Qi repeatedly toasted to the partnership and touted the success that solar project companies would bring the Parents, including the panels that Talesun Solar would be providing for their construction.

32.     During the signing ceremony, Chairman Wang executed a Memorandum of Understanding mirroring the terms of the second LoI.  Chairman Wang signed the MOU on behalf of an entity called "Zhongli Talesun Solar Co. Ltd." (now known as Suzhou Talesun Solar Technology Co., Ltd., aka defendant Talesun Solar).

33.     On October 10, 2012, the Parents issued a press release touting their agreement to purchase "overseas PV power plant construction" from M-S Fund as a conduit to selling more PV modules (panels) manufactured by the Parents.

*The Parents Controlled the Negotiations*

34.     During further due diligence, Talesun Solar provided M-S Fund with three years of financial reports for Zhongli Group, expressly suggesting that the Parents' financial reports would serve as a better indicator of Talesun USA's available capital.  Talesun USA also provided M-S Fund with financials for Talesun Solar.  Prior to entering into the agreements, M-S Fund reviewed and relied on these financials along with Talesun USA's express promises of financial backing from the Parents.

35.     Following Mr. Isern's trip to Australia to meet the Chairman, the parties began negotiating the core terms of the actual purchase agreement for the solar project companies. Orrick Herrington & Sutcliffe represented M-S Fund's interests, and it became clear during

-7-

negotiations that Reed Smith LLP was negotiating on behalf of the Parents as they could make no decisions or commitments without the Parents' approval.  The Parents also engaged their own, separate counsel (Derek Dahlstrom) who oversaw and was actively engaged in the negotiations.

36.     In early October 2012, the Parents informed M-S Fund that they would form a new subsidiary – Zhongli Development Holding Ltd. – to serve as the "buyer" of the projects.

37.     By October 16, 2012, the Parents changed their minds yet again; rather than purchase the project companies through Zhongli Development Holding Ltd., they now wanted to substitute in a new signatory called "Zhongli Investment and Development Company" which they had just formed in Delaware for that very purpose.

38.     In early November 2012, M-S Fund inquired as to whether Talesun was interested in purchasing additional project companies; Mr. Ma responded that he would need to check with the Parents as to their interest.

39.     In early November 2012, M-S Fund attempted to procure consent from the California utilities, including SoCal Edison, to transfer the project companies to one of the Parents' U.S. subsidiaries.  Since Talesun USA has no meaningful financials to provide, the utilities insisted upon reviewing, and the Parents' provided, due diligence materials and financials for the Parents.

40.     On November 7, 2012, although Talesun USA was no longer to serve as the signatory on the purchase agreement, Mr. Ma was still involved in the negotiations and shared that since Zhongli Group is a public company in China, the Parent's Board would have to meet to officially approve a purchase of this size ($30.6M).

41.     On November 8, 2012, M-S Fund provided SoCal Edison with a post-acquisition organization chart (attached hereto as Exhibit 2) showing the project companies were to be owned, collectively, by Zhongli Group and its two subsidiaries (Zhongli (Singapore) Investment Holdings Pte. Ltd. and Zhongli Investment & Development Group).

42.     On November 23, 2012, Mr. Ma reported that he had received additional instructions from the Parents as to when they could issue the required letter of credit and fund the required purchase price.

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

43.     On November 25, 2012, one day before the scheduled closing date, the Parents changed their mind yet again and informed M-S Fund that they now wanted "Talesun Solar USA Ltd." to execute the transaction documents, not "Zhongli Investment and Development Company" which had previously been the intended signatory.

44.     On November 27, 2012, Mr. Ma shared that "our board approved the deal!" and that "we can . . . close some projects for total $1MM right after the signing."  On information and belief, Mr. Ma was referring to Zhongli Group's, not Talesun USA's, board of directors.

45.     On behalf of new signatory Talesun USA, Mr. Ma eventually executed three separate contracts with M-S Fund concerning the sale and purchase of 36 distinct solar project companies.

*Talesun's Contractual Representations, Warranties, and Obligations*

46.     Pursuant to Section 5.1 of the MIPA, Mr. Ma represented that Talesun USA had the authority and power to enter into the MIPA and to perform its obligations without obtaining any further consent or approval from any third party.

47.     Pursuant to Section 5.1.8 of the MIPA, Mr. Ma represented that Talesun USA had sufficient liquid capital (or committed sources of capital) to permit it to timely perform its obligations under the MIPA, that its performance was not subject to any financing contingency, and that it knew of no circumstances or conditions that could reasonably be expected to prevent the contract's performance.

48.     On November 30, 2012, Mr. Ma delivered to M-S Fund an "Officer's Certificate" whereby he confirmed that he was a "duly elected or appointed, qualified and acting officer" who had "been authorized to execute and deliver" the MIPA.  Attached to the Officer's Certificate was a board resolution from Talesun USA which, in relevant part, confirmed that the MIPA and other transaction documents:

> "are hereby ratified, confirmed and approved in all respected on behalf of the Company; and that the officers of the Company, including without limitation Eric Ma, Ph.D. in his capacity as General Manager of the Company, be, and they hereby are, authorized and empowered, on behalf of the Company to execute and deliver, and to carry out and perform the obligations of the Company under the Purchase Agreement [and related

-9-

1  documents."

2  *The Parents Caused Talesun USA to Breach the Agreements*

3       49.     The MIPA required an initial closing payment of $546,160, but the Parents only

4  authorized a wire of $500,000.  On December 3, 2012, Talesun USA admitted it was so

5  undercapitalized that it could not afford to pay the additional $46,160.

6       50.     That same day, SoCal Edison demanded new due diligence materials because the

7  Parents had swapped in a new entity (Talesun USA) as the purchaser.  In response, Talesun USA

8  admitted it was just a "front face" for the entire transaction.

9       51.     Given the Parents' game of musical chairs, M-S Fund was required to update the

10  ownership structure it had previously provided to the California utilities (*see* <u>Exhibit 3</u>).

11       52.     In mid-December 2012, Mr. Ma traveled to China to be with the Parents for the

12  "official closing."  When pressed for an update on Talesun USA's funding, Mr. Ma responded that

13  he'll have an update after meeting Chairman Wang to discuss the closing.

14       53.     On December 26, 2012, Mr. Ma shared that Mr. Qi would work with "our

15  financing department" to try and resolve issues which had arisen regarding Talesun USA's ability

16  to fund/perform under the MIPA.  As Talesun USA had no financing department (or, apparently,

17  money), Mr. Ma was referring to the Parents' financing department.

18       54.     On December 27, 2012, Mr. Ma shared that he and Mr. Dahlstrom (the Parents'

19  deal counsel) were communicating with the Parents' top managers who were working on a

20  "counteroffer" to help salvage the transaction.

21       55.     On December 30, 2012, as the parties were negotiating a "standstill" agreement,

22  Mr. Ma confessed that the Parents controlled the subsidiary to such a degree as to render Talesun

23  USA a mere instrumentality of the Parents:

24           "The USA team including Derek has least control and decision making on
             these issues.  We have adequately explained the situations, the
25           consequences and the implications to HQ [the Parents].  However, it
             seems they have very least flexibilities to accommodate your
26           requirements . . .Personally, I don't think what the USA team can do
             except contributing all our available cash to the deal."
27

28

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

56.     Later that night, Mr. Ma shared feedback from the Parents on the draft Standstill Agreement which he noted the Parents were still reviewing.

57.     On December 31, 2012, as the parties were finalizing the Standstill Agreement which arose from Talesun USA's admitted failure to perform under the MIPA, Talesun USA provided M-S Fund with audited financials for Talesun Solar as evidence that Talesun USA could satisfy the "Parent Guaranty; Collateral or Letter of Credit" component set forth in section 1.1(c) of the Standstill Agreement.  M-S Fund reviewed and relied on these financials as an inducement to entering into the Standstill Agreement.

58.     On December 31, 2012, when asked whether Talesun USA could make a payment required under the Standstill Agreement, Mr. Ma responded:  "Not today.  HQ instructed me not send any cash if we have open items in the agreement."

59.     Mr. Ma eventually executed the Standstill Agreement as Talesun USA's "Authorized Signatory," and unequivocally confirmed under penalty of perjury, as recently as July 2018, that he was not only authorized to execute the Standstill Agreement but had received board approval from both Talesun USA and Talesun Solar before executing this contract (including approval from Frank Qi, who after the contract's execution and breach confirmed that "Talesun HQ top management has fully understood these projects and ready for start-up project movement.").

60.     On December 31, 2012, Talesun USA's outside counsel at Reed Smith LLP forwarded M-S Fund a scan of check #1580, signed by Mr. Ma and drawn on the Wells Fargo bank account for Talesun USA, for $10,971,416.50, which check Reed Smith LLP was to hold in escrow as the closing payment required under the Standstill Agreement.  On information and belief, at no point did Talesun USA have funds in its account (assuming it did, in fact, have an account) sufficient to cover the check presented to M-S Fund by Reed Smith LLP.

61.     During the following week, M-S Fund pressed on why Talesun USA could not wire payments required under the Standstill Agreement; Mr. Ma confirmed that the Parents (not he) had control over funds in Talesun USA's account.

62.     On January 8, 2013, when pressed as to whether the Parents would in fact close under the Standstill Agreement, Mr. Ma admitted he had "no update from HQ" since all of the Parents' top managers were at an off-site meeting in China.

63.     On January 9, 2013, Talesun's counsel described his frustration trying to get any commitments/performance from his clients in China, confirming that Talesun USA has no control whatsoever over its affairs:

> "[Eric] called.  He has no news except that as of 4 pacific he is not in funds.  I believe that he is telling us the truth, that is, he doesn't know why or when. He can't arrange a call with Frank his boss and your client; that would only be initiated by Frank. Anyway Eric is speaking with Frank at 5 pacific to try to convey, again, the urgency and at my suggestion receoive [*sp*] from Frank instructions as to whether this deal will be closed and when. Eric said he would do that but that Frank may not know either. It is very frustrating. My sense is that the Mainland folks don't understand the number of postponements and think that what they are doing is getting ready for the first closing (in their minds) and further that deadlines (by which you and I live day to day) don't have the same meaning to them. I have learned that contracts are considered to be more instruments of process than agreements of performance.
>
> This is a long way of saying that my gut tells me that Silverado should wait one or two more days before seeking termination or remedies."

64.     On January 10, 2013, when it became clear that the Parents had no intention of performing under the Standstill Agreement, Mr. Ma (Talesun USA's General Manager) introduced M-S Fund to another third party investor who he thought might help mitigate the damage caused by the Parents' refusal to honor their commitments under the MIPA and Standstill Agreement. Mr. Ma commented that his "intention is to help reduce the losses."

65.     On January 11, 2013, Mr. Qi, writing on behalf of Talesun Solar, apologized to M-S Fund because the Parents kept changing the terms of the deal, and promised that the Parents are "ready for start-up project movement now."

66.     Talesun USA ultimately failed to perform its obligations under all three Agreements.

-12-

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

*Subsequent Settlement Negotiations Confirmed that Talesun USA was
Merely a Conduit for the Parents' Business Interests*

67.     On February 10, 2013, Mr. Ma informed M-S Fund that he had heard from the Parents concerning settlement, but there was "no way to get fund out of China during the holiday." He also shared that "it's very difficult to get on hold of the top managers to learn the proposal and make decision.  I have no choice but to wait."

68.     On February 19, 2013, Mr. Ma informed M-S Fund that he had attempted, unsuccessfully, to procure certain information from the Parents, including (1) when they might provide the capital necessary to purchase the project companies and (2) "what on earth is the agreement that HQ will approve?"

69.     On February 27, 2013, after talking with the Parents, Mr. Chen (Talesun USA's director) shared that the Parents had approved some of the proposed settlement terms, then offered the Parents' feedback on other terms (including, in the context of an interest rate, that the Parents have "high expectations as they see this as venture capital to a certain extent.").

70.     In late February 2013, Mr. Chen confirmed that the Parents, not Talesun USA, were dictating settlement terms (*i.e.*, "HQ is very adamant on two fronts"; "I think if you give Talesun HQ the 'put option,' getting May 1st in the loan part should be okay."; "The final point lies with finance at Talesun HQ now"; "Jim, as I talked over the phone today, there is no commitment or resolution at Talesun [the Parents] to pay every payment on time.").  When asked whether the Parents had any intention of performing the settlement terms being negotiated, Talesun USA's director responded:  "I actually simply do not know."  When in mid-March Chairman Wang retracted yet another promise to perform, Talesun USA's director reacted "Jim, this is completely a shit on my head" and that he has "essentially zero confidence on Talesun's execution capability."

71.     On March 16, 2013, Mr. Ma shared that he had thought of a solution to resolve the parties' dispute, but needed to discuss it with Mr. Qi first then, if he's on board, "will go to the HQ to represent it to Mr. Wang on Monday (China time)."

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

72.     On March 18, 2013, the Parents proposed new settlement terms.  When asked whether the Parents would honor the terms they proposed, Talesun USA's director responded:  "I sincerely don't know.  I myself will not really believe them."  Ultimately, Talesun USA's director told M-S Fund that if the Parents would not honor their contractual commitments to M-S Fund, he would help M-S Fund find another, more committed buyer.

73.     In depositions on the underlying contract claim, Mr. Ma and Mr. Lingqing Gu (whom the Parents had ordered to sit as Talesun USA's PMK witness) confirmed that:

        a.     Chairman Wang owns the equity issued in both the Parents and Talesun USA;

        b.     the Parents and Talesun USA had overlapping directors, officers, and employees;

        c.     Talesun USA acted as a mere shell/conduit for the Parents' affairs;

        d.     Talesun USA was constantly underfunded and could not pay its obligations as they came due (including paying the $500,000 exclusivity deposit, the $175,000 retainer for energy tax credit services, the $46,160 underpayment on the first close, or the $30.6M required to close under the MIPA and nearly $11M required to close under the Standstill Agreement);

        e.     Talesun USA disregarded corporate formalities (including maintaining no separate financials, holding no regularly-scheduled board meetings, and taking interest-free loans from the Parents without any supporting documentation);[4]

        f.     the Parents exercised pervasive control over Talesun USA, dictating every facet of the subsidiary's business;

        g.     the Parents controlled Talesun USA to such a degree as to render the subsidiary a mere instrumentality of the Parents, including giving Talesun USA no actual decision-making authority concerning its affairs; and

---

[4]/ Remarkably, Mr. Gu, testifying on behalf of Talesun USA, confirmed that he had never seen any separate financials for Talesun USA, he wasn't sure whether Talesun USA maintained its own bank account, he couldn't identify any of Talesun USA's board members, and he didn't know whether Talesun USA held board meetings.

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

h.    the Parents ordered the destruction of every document (including email communication) related to the Parents' business dealings with Talesun USA and M-S Fund.

74.    When questioned about his role as Talesun USA's Chief Financial Officer and a member of its board of directors, Mr. Changqing Hu (who is also an officer for the Parents) confirmed that he does "not get involved in the actual stuff," and that "I am just a title."

75.    In July of 2018, Mr. Ma testified under oath that for the Agreements he executed with M-S Fund, he requested, and received, approval from both Talesun USA's and Talesun Solar's boards (including, ultimately, the approval of Mr. Wang); he specifically received approval to enter into the Standstill Agreement from both the Talesun USA and Talesun Solar boards; and he does not know why the Parents failed to honor their obligations under the Agreements, because that decision was made "above his head."

76.    On information and belief, after breaching the Agreements, the Parents took steps to effectively wind down Talesun USA and formed a new subsidiary, Zhongli New Energy USA Co., LLC ("ZNE") to serve as their new marketing arm in the United States.  ZNE shared office space, employees, and officers with Talesun USA.  As they did with Talesun USA and Mr. Qi, the Parents appointed a Talesun Solar executive (Hao Sheng) to serve as a figure-head CEO of ZNE. Mr. Sheng testified that, like Talesun USA, ZNE was undercapitalized from its inception, taking undocumented loans from the Parents to operate.

*The Parents' Fraudulent Scheme is Exposed*

77.    On or about January 24, 2019, Talesun USA submitted a declaration from Mr. Changqing Hu, a member of its board of directors, asserting for the first time that Mr. Ma possessed neither express nor implied authority to bind Talesun USA to anything (including the MIPA).  Mr. Hu's declaration also stated that Mr. Ma lacked authority of any kind to execute the Standstill Agreement, and that – contrary to Mr. Ma's representations – the Talesun USA board did not authorize him to execute the Standstill Agreement.

78.    At no point prior to 2019 had Talesun USA or any of its related entities or representatives claimed that Mr. Ma lacked authority to bind Talesun USA or to enter into the MIPA or Standstill Agreement, including transaction counsel for Talesun USA and the Parents

-15-

who engaged in significant negotiations with M-S Fund concerning Talesun USA's failure to perform under the Agreements.

79.     In July 2019, a representative from Talesun Solar confirmed that Zhongli Group's U.S. subsidiaries are underfunded from the start (some receiving as little as $1,000) and are simply instruments of the Chinese parents, operating solely for their benefit.

80.     In July 2019, a representative from Zhongli Group confirmed that the Zhongli Group's U.S. subsidiaries are simply instruments of the Chinese parents, operating solely for their benefit.

81.     In this case, Zhongli Group and Talesun Solar used their U.S. subsidiary to advance their own interests, and the subsidiary operated only for the parents' benefit.

82.     Zhongli Group's and Talesun Solar's parental control over Talesun USA pervaded all dealings in this forum, and Talesun USA was merely an agent through which the Chinese parent corporations conducted business in the United States and, in this instance, California.  The separate corporate status of Talesun USA was formal only, without any semblance of individual identity.

83.     On information and belief, a unity of interest and ownership between Zhongli Group, Talesun Solar, and Talesun USA exists, such that any individuality and separateness between these entities has ceased.  They share the same executive leadership and employees and the Chinese parents exercise control and dominion over Talesun USA with a disregard for the separate legal status of this entity and as a result, an attempt to defraud creditors like MS-Fund. As described above, the Parents formed and used the Talesun USA as a mere shell/conduit to conduct their own affairs, inadequately capitalizing and disregarding corporate formalities for their subsidiary in the process.  Adherence to the fiction of Talesun USA as a separate entity distinct from Zhongli Group and Talesun Solar would permit an abuse of the corporate privilege and would sanction fraud and promote injustice.

84.     Talesun USA also functions as the Parents' representative agent in that it performed marketing services that were sufficiently important to the Parents that if they did not form Talesun USA to perform those services, the Parents would have undertaken to perform those

-16-

services themselves.  As described above, the Parents also exercised nearly absolute control over Talesun USA's activities, rendering Talesun USA merely an incorporated department of the Parents.

**COUNT I**
**(Fraudulent Inducement – Against All Defendants)**

85.     MS-Fund re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 84 of this First Amended Complaint.

86.     Defendants fraudulently induced M-S Fund to enter into the Agreements through intentional misrepresentations and intentional omissions of key facts.  Defendants had a duty to disclose the facts that they omitted from their communications with plaintiff because (a) they made representations but did not disclose facts which materially qualified the facts disclosed, or which rendered their disclosures likely to mislead; (b) the undisclosed facts were know or accessible only to defendants; and (c) they actively concealed discovery of the facts from plaintiff.

87.     Through their U.S. subsidiary Talesun USA, Zhongli Group and Talesun Solar made a number of affirmative representations which were intended to induce M-S Fund to enter into the Agreements, including that (a) Talesun USA had the authority and power to enter into the MIPA, (b) Talesun USA could perform its obligations under the MIPA without obtaining any further consent or approval from any third party, (c) Talesun USA had sufficient liquid capital (or committed sources of capital) to permit it to timely perform its obligations under the MIPA, (d) Talesun USA's performance was not subject to any financing contingency, (e) Talesun USA knew of no circumstances or conditions that could reasonably be expected to prevent the performance under the MIPA; and (f) Mr. Ma had full authority to execute the MIPA, Standstill, and Letter Agreements on behalf of Talesun USA.

88.     Defendants also intentionally concealed their position that Mr. Ma lacked authority, generally, to bind Talesun USA, and specifically to bind Talesun USA to the Agreements. Defendants also intentionally concealed their position that neither Mr. Ma nor Talesun USA could conduct material business in the U.S. without Chairman Wang's authorization and approval.

89.     Defendants made these intentionally false and/or misleading representations to plaintiff, and concealed material facts from plaintiff, so that plaintiff would enter into the Agreements and expend significant funds to develop the solar projects that were subject to the MIPA.  Plaintiff did not know that defendants' representations and omissions were false and/or misleading.  Plaintiff believed these false and/or misleading representations and omissions to be true and complete, and reasonably and justifiably relied upon them.  Had plaintiff known the true facts that defendants concealed from plaintiff, it would not have entered into the Agreements and would not have rendered performance thereunder.

90.     M-S Fund now knows that these representations were false.  For example, according to Mr. Ma, Talesun USA required approval from its Chinese parent corporations to conduct meaningful business in the U.S., including the expenditure of funds required to perform under the Agreements.  And although Mr. Ma claimed to have received the necessary approvals to execute the Agreements, he (and Talesun USA) received no support (financial or otherwise) from Zhongli Group or Talesun Solar required for Talesun USA to perform its obligations under the Agreements.

91.     Defendants either knew these representations were false when made, or made them recklessly and without regard for their truth.

92.     Defendants intended that M-S Fund rely on these representations, and M-S Fund reasonably did so in entering into the Agreements.

93.     As a result of entering into the Agreements, M-S Fund incurred significant expenses – including remediating problems caused by defendants' fraud – in an amount to be proven at trial.

**COUNT II**
**(Fraudulent Concealment – Against All Defendants)**

94.     MS-Fund re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 93 of this First Amended Complaint.

95.     Defendants intentionally concealed their position that Mr. Ma lacked authority, generally, to bind Talesun USA, and specifically to bind Talesun USA to the Standstill

-18-

Agreement.  Defendants also intentionally concealed their position that neither Mr. Ma nor Talesun USA could conduct material business in the U.S. without Chairman Wang's authorization and approval.  Defendants also intentionally concealed that Talesun USA had insufficient funds, or control over such funds, required to perform under the Agreements.

96.     M-S Fund did not know of the concealed facts at the time it entered into the Agreements.

97.     Defendants intended to deceive M-S Fund by concealing the facts.

98.     Had the omitted information been timely disclosed, M-S Fund reasonably would have behaved differently (for example, by negotiating directly with the Parents rather than Mr. Ma and by insisting that the Parents themselves execute the Agreements).

99.     M-S Fund was harmed by defendants' concealment of facts, and defendants' concealments were a substantial factor in causing its harm.

## COUNT III
### (Negligent Misrepresentation – Against All Defendants)

100.    MS-Fund re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 99 of this First Amended Complaint.

101.    Plaintiff's and defendants' business dealings constitute a special relationship in that defendants had sole possession of the knowledge regarding their capital resources and use of that capital.  Plaintiff had no way to asses defendants' capital and willingness to spend it to perform under the Agreements, as this information was purely within the purview of defendants.

102.    Plaintiff specifically informed defendants that performance under the Agreements was of paramount importance to plaintiff, and defendants represented to plaintiff that they were capable of and committed to performing under the Agreements despite having no reasonable grounds to do so.  Specifically, the representations alleged to be false and/or misleading by omission in Counts I and II are incorporated by reference herein, and serve as the basis of plaintiff's negligent misrepresentation as well.  Defendants had unique knowledge regarding their representations to plaintiff.

103.    Defendants knew or should have known that plaintiff would rely upon the accuracy of their representations in entering into the Agreements and continuing to do business with defendants and depend on their performance.  On information and belief, defendants intended that plaintiff rely upon their representations.  Plaintiff did in fact rely upon false and/or misleading representations, described above, in deciding to contract with defendants and continuing to do business with defendants following their initial failure to perform.

104.    Defendants had no reasonable grounds for believing the information they provided to plaintiff, including their capability and willingness to perform under the Agreements, was correct.  Their conduct was at least grossly negligent.  Plaintiff reasonably relied on defendants' assurances and suffered financial loss as a result of their inability to live up to those assurances.

**COUNT IV**
**(Conspiracy / Aiding and Abetting)**

105.    MS-Fund re-alleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 104 of this First Amended Complaint.

106.    Defendants and each of them shared a common plan to defraud M-S Fund.

107.    Defendants and each of them took overt actions in furtherance of this common plan.  Plaintiff is informed and believes and based on such information and belief alleges that defendants aided and abetted each other in furtherance of this common plan.  The formation and operation of this common plan resulted in significant damage to M-S Fund and the unjust enrichment of defendants.

108.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring M-S Fund, and acted with an improper and evil motive amounting to malice, in conscious or reckless disregard of M-S Fund's rights.  Because the acts complained of herein were carried out with defendants' knowledge, in a deliberate, cold, callous, and intentional manner, for the purpose of injuring and damaging M-S Fund, M-S Fund is entitled to recover punitive damages as allowed by law in an amount to be determined at trial.

1

2

## <u>PRAYER FOR RELIEF</u>

3    WHEREFORE, Plaintiff demands judgment be entered against defendants, and each of

4  them, and in plaintiff's favor, as follows:

5    A.    Awarding compensatory and consequential damages to be determined at trial but in

6  no event less than $30,000,000;

7    B.    Awarding punitive damages in an amount to be determined at trial but in no event

8  less than $90,000,000;

9    C.    Awarding costs and disbursements in this action;

10   D.    Awarding prejudgment and post judgment interest; and

11   E.    Awarding plaintiff such additional and further relief as the Court may deem just

12  and proper.

13                    **DEMAND FOR JURY TRIAL**

14    Plaintiff hereby demands that this matter be tried before a jury.

15  Dated:  April 10, 2020                **ONGARO PC**

16
                                   By:    /s/  *David R. Ongaro*
17                                         David Ongaro

18                                   Attorneys for Plaintiff
                                     MARTIFER-SILVERADO FUND I, LLC
19

20

21

22

23

24

25

26

27

28

-21-

FIRST AMENDED COMPLAINT
Case No. 19-cv-04243-YGR

# EXHIBIT 1

**HEADQUARTERS**

JIANGSU **ZHONGLI** GROUP CO., LTD.

"**ZHONGLI** GROUP"

**ZHONGLI** SCIENCE & TECHNOLOGY GROUP CO., LTD.

SHENZHEN EXCHANGE #2309

(5.4 B MARKET CAP)

WEBSITE: WWW.ZHONGLI.COM

CHAIRMAN: BAI XING WANG

CFO: CHANGQING HU

**FORMED AS BUYER**

**ZHONGLI** DEVELOPMENT HOLDING LTD.
10/11/12

---------------------------

**ZHONGLI** INVESTMENT & DEVELOPMENT CO.
10/16/12

**MANUFACTURING SUB**

SUZHOU TALESUN SOLAR

**ZHONGLI** TALESUN SOLAR CO., LTD.

TALESUN SOLAR CO., LTD.

WEBSITE: WWW.TALESUN.COM

CHAIRMAN: BAI XING WANG

**VP, SALES & MARKETING: FRANK QI**

**CFO: CHANGQING HU**

**LINGQING GU (DIRECTOR)**

**"TALESUN SOLAR USA LTD."**

(USA SALES)

CEO: FRANK QI

CFO: CHANGQING HU

DIRECTOR: LINGQING GU

OFFICER & BOD: ERIC MA

**ADDRESSES**

**UNDERFUNDED FROM THE SAME SOURCE**

**STILL SELLING IN U.S. UNDER THE TALESUN SOLAR NAME TODAY**

**ASSETS**

**EMPLOYEES**

**ZHONGLI** NEW ENERGY

USA CO. LLC

(USA SALES)

9/8/15

# EXHIBIT 2

# Organizational Chart



All material is confidential. ©2011 Silverado Power, LLC. All rights reserved.

SP000011879



EXHIBIT 3

# Organizational Chart



All material is confidential. ©2011 Silverado Power, LLC. All rights reserved.



SP000010003