1   DAVID R. ONGARO, State Bar No. 154698
        dongaro@ongaropc.com
2   EUGENE B. FRID, State Bar No. 321265
        efrid@ongaropc.com
3   ONGARO PC
    1604 Union Street
4   San Francisco, CA  94123
    Telephone: (415) 433-3900
5   Facsimile: (415) 433-3950

6
    Attorneys for Plaintiff
7   MARTIFER-SILVERADO FUND I, LLC

8
9               UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                SAN FRANCISCO DIVISION

12

13  MARTIFER-SILVERADO FUND I, LLC,          Case No. 4:19-CV-04243-YGR

14              Plaintiff,                    **MEMORANDUM OF POINTS AND
                                             AUTHORITIES IN SUPPORT OF
15          v.                               PLAINTIFF'S OPPOSITION TO
                                             DEFENDANTS' MOTION TO
16  ZHONGLI SCIENCE AND TECHNOLOGY           DISMISS FIRST AMENDED
                                             COMPLAINT**
17  GROUP CO., LTD., a Chinese corporation;
    SUZHOU TALESUN SOLAR                     Date:       May 26, 2020
18  TECHNOLOGY CO., LTD., a Chinese          Time:       2:00 p.m.
    corporation; and DOES 1 through 5, inclusive,  Location:  Floor 4, Courtroom 1
19                                           Judge:      The Hon. Yvonne Gonzalez
                Defendants.                              Rogers
20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

I.     INTRODUCTION...................................................................................................1

II.    STATEMENT OF RELEVANT FACTS .................................................................1

     A.     Defendants Purposefully Directed Their Activities Towards, and Consummated Transactions in, California That Relate Directly to the Claims Asserted in the FAC..................................................................................2

     B.     Talesun USA Was a Mere "Marketing Conduit" for Defendants. .........................5

     C.     The Parents Exercised Manipulative Control Over Talesun USA, Rendering the Latter the Mere Instrumentality of the Former....................................................6

     D.     The Parents Inadequately Capitalized Talesun USA. .............................................6

     E.     *Other* Facts Supporting a Finding that Defendants are Alter Egos.........................7

     F.     The Parents Orchestrated the Destruction of Every Piece of Correspondence and Document Relevant to this Dispute. ..................................................................9

III.   LEGAL ARGUMENT ........................................................................................10

     A.     Legal Standard......................................................................................................10

     B.     This Court Should Exercise Specific Personal Jurisdiction Over Defendants......11

          1.     Defendants Purposefully Availed Themselves of this Forum and Directed Their Fraudulent Conduct to California. .....................................12

          2.     Plaintiff's Claims Arise Out Of Defendants' Forum-Related Activities. .................................................................................................16

          3.     Defendants Cannot Make a Compelling Case that Exercising Personal Jurisdiction Over Them Would be Unreasonable......................16

     C.     DEFENDANTS INJECTED THEIR PRODUCTS INTO CALIFORNIA...........17

     D.     BECAUSE TALESUN USA WAS DEFENDANTS' AGENT, THIS COURT CAN EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS.......................................................................................................18

     E.     *ALTERNATIVELY*, THE COURT MAY EXERCISE JURISDICTION OVER DEFENDANTS AS ALTER EGOS OF THEIR SUBSIDIARY. ...........19

          1.     Plaintiff has Adequately Alleged, and Submitted Evidence That, Talesun USA is a "Marketing Conduit" of Defendants. ..........................19

          2.     Plaintiff has Adequately Alleged, and Submitted Evidence That, Defendants Controlled Talesun USA to Such a Degree as to Render the Latter the Mere Instrumentality of the Former...................................21

          3.     The Parents Inadequately Capitalized Talesun USA. ...............................22

F.      While Unnecessary, Plaintiff Has Also Satisfied the Majority of the Nine Alter Ego Factors Applicable Where One of the Independent Bases Fails...........22

G.      The Court Should Deny Defendants' Rule 12(b)(7) Motion. ..............................23

H.      The Court Should Deny Defendants' Motion Under Rule 12(b)(5). ...................26

I.      The FAC Adequately Pleads Fraud.......................................................................27

J.      Jurisdictional Discovery Is Warranted. ...............................................................28

IV.      CONCLUSION .....................................................................................................29

## TABLE OF AUTHORITIES

### Cases

*Adams v. Allied Signal General Aviation Avionics,*
    74 F.3d 882, 885 (8th Cir. 1996)............................................................................27

*Anglo Irish Bank Corp., plc v. Superior Court,*
    165 Cal. App. 4th 969 (2008) ............................................................................... 11

*Borzeka v. Heckler,*
    739 F.2d 444 (9th Cir.1984)................................................................................. 26

*Butcher's Union Local No. 498 v. SDC Inv., Inc.,*
    788 F.2d 535 (9th Cir. 1986) ............................................................................... 28

*Calder v. Jones,*
    465 U.S. 783 (1984) ............................................................................................. 15

*Chang Young Bak v. Metro–N. R. Co.,*
    No. 12 Civ. 3220, 2013 WL 1248581 (S.D.N.Y. Mar. 26, 2013)........................ 24

*Clinton v. Babbit,*
    180 F.3d 1081 (9th Cir. 1999)............................................................................. 22

*Concat Lp v. Unilever, Plc,*
    350 F. Supp. 2d 796 (N.D. Cal. 2004) ................................................................ 24

*Crucible, Inc. v. Stora Kopparbergs Berglags AB,*
    403 F. Supp. 9 (W.D. Pa. 1975).......................................................................... 19

*Daimler AG v. Bauman,*
    517 U.S. 117 (2014) ............................................................................................. 10

*Davis v. HSBC Bank Nevada, N.A.,*
    691 F.3d 1152 (9th Cir. 2012).............................................................................27

*Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.,*
    276 F.3d 1150 (9th Cir. 2002) ............................................................................. 24

*Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc.,*
    840 F.2d 685 (9th Cir. 1988) ............................................................................... 27

*Doe v. Unocal Corp.,*
    248 F.3d 915 (9th Cir. 2001) ........................................................................ 10, 19

*Dole Food Co., Inc. v. Watts,*
    303 F.3d 1104 (9th Cir. 2002)....................................................................... 10, 16

*Duple Motor Bodies, Ltd. v. Hollingsworth,*
    417 F.2d 231 (9th Cir.1969)................................................................................. 17

*Empire Steel Corp. v. Superior Court,*
    56 Cal.2d 823 (1961)..................................................................................... 11, 14

*Fid. Nat. Title Ins. Co. v. Castle,*
    C 11-00896 SI, 2011 WL 6141310 (N.D. Cal. Dec. 8, 2011)............................. 28

-iii-

*Flynt Distrib. Co. v. Harvey*,
   734 F.2d 1389 (9th Cir. 1984) ................................................................................................. 21

*Garner v. Behrman Bros. IV, LLC*,
   260 F. Supp. 3d 369 (S.D.N.Y. 2017) ..................................................................................... 25

*Haisten v. Grass Valley Medical Reimbursement Fund Ltd.*,
   784 F.2d 1292 (9th Cir. 1986) ........................................................................................... 11, 15

*Harris Rutsky v. Bell & Clements*,
   328 F.3d 1122 (9th Cir. 2003) ................................................................................................. 15

*Healthmarkets, Inc. v. Superior Court*,
   171 Cal. App. 4th 1160 (2009) ................................................................................................ 12

*Hickory Travel Systems, Inc. v. TUI AG*,
   213 F.R.D. 547 (N.D. Cal. 2003) ............................................................................................ 27

*Hitt v. Nissan Motor Co.*,
   399 F. Supp. 838 (S.D. Fla. 1975) .......................................................................................... 19

*Howard v. Everex Sys., Inc.*,
   228 F.3d 1057 (9th Cir. 2000) ................................................................................................. 21

*In re Marriage of Bastian*,
   94 Cal. App. 3d 483 (1978) ..................................................................................................... 18

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ............................................................................................................ 10-11

*Laub v. U.S. Dep't of Interior*,
   342 F.3d 1080 (9th Cir. 2003) ................................................................................................. 28

*Magnecomp Corp. v. Athene Co.*,
   209 Cal. App. 3d 526 (1989) ................................................................................................... 12

*Martel v. County of Los Angeles*,
   56 F.3d 993 (9th Cir. 1995) ..................................................................................................... 28

*Menken v. Emm*,
   503 F.3d 1050 (9th Cir. 2007) ................................................................................................. 16

*Meyers v. Asics Corp.*,
   711 F. Supp. 1001 (C.D. Cal. 1989)] ................................................................................... 5, 10

*NetApp, Inc. v. Nimble Storage, Inc.*,
   Case No. 5:13-CV-05058-LHK (HRL), 2015 WL 400251 (N.D. Cal. Jan. 29, 2015) ............... 5

*Northern Natural Gas Co. v. Superior Court*,
   64 Cal. App. 3d 983 (1976) ........................................................................................ 12, 14, 18

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998) ................................................................................................. 10

*PersonalWeb Techs., LLC v. Google, Inc.*,
   2014 WL 580290 (N.D. Cal. Feb. 13, 2014) ........................................................................... 29

*Plant Food Co-op v. Wolfkill Feed & Fertilizer Corp.*,
   633 F.2d 155 (9th Cir.1980) .................................................................................................... 17

MPA ISO PLAINTIFF'S OPP'N TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 4:19-CV-04243-YGR

*Regie Nationale v. Superior Court*,
  208 Cal. App. 2d 702 (1962) ................................................................................... 19

*Schnabel v. Lui*,
  302 F.3d 1023 (9th Cir. 2002) ................................................................................. 25

*Schwarzenegger v. Fred Martin Motor Co.*,
  374 F.3d 797 (9th Cir. 2004) ................................................................................... 10

*Semegen v. Weidner*,
  780 F.2d 727 (9th Cir. 1985) ................................................................................... 28

*Shute v. Carnival Cruise Lines*,
  863 F.2d 1437 (9th Cir. 1988) ................................................................................. 17

*Slottow v. American Casualty Co.*,
  10 F.3d 1355 (9th Cir. 1993) ................................................................................... 29

*Stewart v. Screen Gems-EMI Music, Inc.*,
  81 F. Supp. 3d 938 (N.D. Cal. 2015) ...................................................................... 22

*Taubler v. Giraud*,
  655 F.2d 991 (9th Cir.1981) ............................................................................. 17, 20

*United States v. Toyota Motor Corp.*,
  561 F. Supp. 354 (C.D. Cal. 1983) .......................................................................... 19

*Vasquez v. Los Angeles Cnty.*,
  487 F.3d 1246 (9th Cir. 2007) ................................................................................. 27

*Virginia Surety Co. v. Northrop Grumman Corp.*,
  144 F.3d 1243 (9th Cir. 1998) ................................................................................. 24

*VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.*,
  99 Cal. App. 4th 228 (2002) .................................................................................... 12

*Vons Companies, Inc. v. Seabest Foods, Inc.*,
  14 Cal.4th 434 (1996) .............................................................................................. 16

*Whale v. United States*,
  792 F.2d 951 (9th Cir.1986) .................................................................................... 26

*Whittaker v. Otto*,
  188 Cal. App. 2d 619 (1961) ................................................................................... 18

*Yahoo! Inc. v. La Ligue Contre Le Racisme et L' Antisemistisme*,
  433 F.3d 1199 (9th Cir. 2006) ................................................................................. 11

*Zenith Radio Corp. v. Matsushita Elec. Ind. Co.*,
  402 F. Supp. 262 (E.D. Pa. 1975) ........................................................................... 19

**Other Authorities**

Cal. Code Civ. P. § 410.10 ................................................................................. 10, 26

**Rules**

Fed. R. Civ. P. 12(b)(7) ............................................................................................ 22

Fed. R. Civ. P. 19(a).................................................................................................................... 24

Fed. R. Civ. P. 19(b).................................................................................................................... 25

Fed. R. Civ. P. 4(h)(1)(B).............................................................................................................. 27

Fed. R. Civ. P. 4(k)(1)(A).............................................................................................................. 10

MPA ISO PLAINTIFF'S OPP'N TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 4:19-CV-04243-YGR

I.   **INTRODUCTION**

Defendants Zhongli Science and Technology Group Co., Ltd. ("Zhongli Group") and Suzhou Talesun Solar Technology Co., Ltd. ("Talesun Solar") (collectively, "Defendants" or "Parents") have once again moved to dismiss this case on myriad grounds.  Many of those completely miss the mark, including that personal service on their admitted Director/Vice President is somehow insufficient.  Moreover, while the Motion focuses its attention ***entirely*** on challenging alter ego jurisdiction, the First Amended Complaint's ("FAC") factual allegations – bolstered by the evidence submitted herewith – empower this Court to exercise *specific personal jurisdiction* over the Parents on a number of independent grounds, including that they purposefully directed their own unlawful conduct directly into this forum.  To the extent the Court disagrees, it can still assert jurisdiction over the Parents on any one of three stand-alone alter ego triggers available under Ninth Circuit law (without having to balance the traditional nine alter ego factors), including the irrefutable fact that Talesun USA was nothing more than a "marketing conduit" for the Parents to peddle their solar panels in this country.  Finally, it is difficult to imagine how a defunct subsidiary with zero employees, no business operations, no documents, no money, and a solitary board member *who happens to also be an officer for both Parents*, is an "indispensable party" in this case.  The Parents have single-handedly controlled the defense of a parallel state court contract case against Talesun USA (demanding a trial continuance in San Francisco during the Lunar New Year), and would necessarily do the same here.  This argument is a red-herring.  The Court should deny Defendants' Motion in its entirety, or else permit limited jurisdictional discovery so as to avoid the unjust result of rewarding Defendants for their intentional destruction of evidence Plaintiff could have used to bolster its response.

II.   **STATEMENT OF RELEVANT FACTS**

The FAC contains 108 paragraphs of factual allegations, or 49 new paragraphs.  Those allegations are not "bare," but rather emanate from facts taken directly from documents, emails, texts, and depositions submitted herewith.  Defendants' Motion ignores 48 of the FAC's new allegations, focusing solely on disputing the factual allegations contained in paragraph 73 (*see* Motion, at p. 9:24-11:28).  Here are the facts which require denial of this Motion.

**A.      Defendants Purposefully Directed Their Activities Towards, and Consummated Transactions in, California That Relate Directly to the Claims Asserted in the FAC.**

The bulk of the FAC's allegations describe, in detail, Defendants' conduct *specifically directed at Plaintiff in this forum*.  The Court can exercise specific jurisdiction over Defendants based on these facts, alone, without reaching the alter ego and/or agency tests.

Defendants conduct business in California through their U.S. subsidiary, including using the subsidiary to market and sell their Chinese-manufactured solar panels in California.  FAC, ¶¶8-9; Isern Decl., ¶4, Ex. 5; Frid Decl., ¶2, Ex. 1 [Eric Ma depo. at 46:11-19].  Using their U.S. subsidiary as nothing more than a messenger/translator, the Parents sought out and negotiated contracts – on their own behalf – to purchase Plaintiff's interests in numerous to-be-developed utility-grade solar projects as a means to sell more of their solar panels in California.  FAC, ¶¶2, 22.  The Parents were the only parties capable of funding/performing under the contracts, and were the only parties who stood to benefit under the contracts (viewing the purchase as a "venture capital" opportunity, at least according to their U.S. subsidiary).  *Id.*; *see also id.*, ¶69.

The Parents invited Plaintiff's representative to travel from California to Australia for a signing ceremony; Talesun Solar personnel responsible for "taking care of US market order fulfillment" ultimately arranged and paid for Plaintiff's travel expenses.  *Id.*, ¶30; Isern Decl., ¶6, Ex. 1.  At the signing ceremony, attended by the Chairman of both Defendants (Mr. Baixing Wang), the Chairman executed the MOU on behalf of one of the Parents (Talesun Solar); at dinner the night before, he repeatedly touted to Chinese government officials in attendance the success the California solar projects would bring to the Parents, including the sale of Chinese panels that Talesun Solar would be providing for their construction.  FAC, ¶¶31-32; Isern Decl., ¶¶7-10, Exs. 2-3.  The Parents then issued a press release touting their agreement to purchase "overseas PV power plant construction" projects from Plaintiff (as a conduit to selling more of their solar panels in the U.S).  FAC, ¶33; Isern Decl., ¶11, Ex. 4.

From the inception, the Parents controlled the contract negotiations as Talesun's lawyers (Reed Smith LLP) could make no decisions/commitments without the Parents' approval.  FAC,

¶33.  The Parents also engaged their own special counsel who oversaw and was actively engaged in the negotiations with Plaintiff's counsel based in San Francisco.  *Id*., ¶35.

The "signatory" musical chairs the Parents played with these contracts reveals that the Parents were, in fact, the real counterparty.  At the outset, the Parents intended to use Talesun USA as the signatory.  *See* ¶¶5, 6, Exs. 4, 5; FAC, ¶22-23.  The Parents later informed Plaintiff that they intended to form a new subsidiary to serve as signatory/buyer of the projects.  *Id*., ¶36; Howell Decl., ¶11, Ex. 10.  Shortly thereafter, the Parents formed a *different* subsidiary in Delaware for the sole purpose of signing the contracts.  FAC, ¶37; Howell Decl., ¶12, Ex. 11.  Later, based on the Parents' representations, Plaintiff provided California utility company SoCal Edison with a deck showing that Defendant Zhongli Group (and two of its *other* subsidiaries) would be the collective owners of the solar projects.  *Id*., ¶17, Ex. 16; FAC, ¶41.  One day before the scheduled closing date, the Parents pivoted yet again, substituting in Talesun USA as the signatory on the agreements.  *Id*., ¶43; Howell Decl., ¶13, Ex. 12. When the roulette wheel stopped spinning, Talesun USA admitted to SoCal Edison that it was nothing more than a "front face" for the entire transaction (explaining why all of the due diligence/financials provided to SoCal Edison necessary came *from the Parents*).  FAC, ¶50; Howell Decl., ¶22, Ex. 21.

When Plaintiff asked Talesun USA whether it had interest in purchasing additional solar projects, Talesun USA's General Manager, Eric Ma, responded that he would have to check whether *the Parents* were interested.  *Id., ¶*14, Ex. 13; FAC, ¶38.  When Plaintiff attempted to procure consent from the California utilities to transfer the projects to one of the Parents' *other* U.S. subsidiaries, the utilities insisted upon, and the Parents' provided, their own due diligence materials (because the subsidiary had none of its own).  *Id*., ¶39; Howell Decl., ¶¶15, 17, Exs. 14, 16.

As the execution date neared, the Parents provided instructions as to when they could issue the required letter of credit and fund the required purchase price.  *Id.*, ¶18, Ex. 17; FAC, ¶42.  Mr. Ma traveled to China for the transaction's "official closing," reporting that he'd send a status update after he met with the Parents' Chairman.  *Id*., ¶52; Howell Decl., ¶24, Ex. 23.

1   As the deal collapsed, Mr. Ma reported that he was working with the Parents' counsel

2   and "top managers" on a "counteroffer" to help salvage the transaction.  *Id.*, ¶26, Ex. 25; FAC,

3   ¶54.  In negotiations, Mr. Ma admitted that Talesun USA "has least control and decision making

4   on these issues," that the Parents have "very least flexibilities to accommodate your

5   requirements," and that Talesun USA had no power to help break the impasse.  *Id.*, ¶55; Howell

6   Decl., ¶27, Ex. 26.  When pressed whether the subsidiary could make an upcoming payment, Mr.

7   Ma responded that the Parents had instructed him not to send any cash.  *Id.*, ¶29, Ex. 28; FAC,

8   ¶58.  Shortly thereafter, Talesun Solar's Vice President, Sales (Frank Qi), who also served as

9   Talesun USA's figurehead CEO, confirmed that the Parents "fully understood these projects and

10   [are] ready for start-up project movement."  *Id.*, ¶59; Howell Decl., ¶32, Ex. 31.

11   When asked whether his company intended to perform, Mr. Ma admitted he had no

12   answer from the Parents since the top managers were at an off-site in China.  *Id.*, ¶62; Howell

13   Decl., ¶30, Ex. 29. After yet another breach, Defendants' experienced deal counsel admitted that

14   he had spoken with Mr. Ma who had no clue whether the deal would close, that Talesun USA's

15   figurehead CEO "may not know either," and that U.S. contractual commitments don't have the

16   same meaning to "the Mainland folks" (*i.e.*, the Parents).  Frid Decl., ¶9, Ex. 8; FAC, ¶63.

17   Following the Parents refusal to perform, Mr. Ma immediately introduced Plaintiff to a

18   third party who he thought "might help reduce the losses" caused by the Parents' conduct.  *Id.*,

19   ¶64; Howell Decl., ¶31, Ex. 30.  Later, Mr. Ma informed Plaintiff that he had heard from the

20   Parents concerning settlement, but it was difficult to get ahold of their top managers and,

21   moreover, there was no way to get funds out of China during a holiday.  *Id.*, ¶33, Ex. 32; FAC,

22   ¶67.  Mr. Ma later conceded that he had been pestering the Parents for answers, but still had no

23   idea "what on earth is the agreement that HQ will approve?" or when the Parents might provide

24   the capital necessary to purchase the project companies.  *Id.*, ¶68; Howell Decl., ¶34, Ex. 33.

25   Talesun USA later shared that the Parents had approved some settlement terms and

26   offered their feedback on others (including that the Parents "have high expectations as they see

27   this as venture capital to a certain extent").  *Id.*, ¶35, Ex. 34; FAC, ¶69.  Talesun USA later

28   confirmed that (1) all decisions concerning settlement were being made by the Parents, (2) it had

-4-

1   no idea whether the Parents would, in fact, perform any of the settlement terms they were

2   proposing, and (3) based on the Parents' behavior, Talesun USA had "essentially zero

3   confidence on Talesun's execution capabilities."  *Id*., ¶70; Howell Decl., ¶36, Ex. 35.  When the

4   Parents proposed yet a different set of settlement terms, Talesun USA again cautioned that it

5   doesn't know whether the Parents would even honor the terms they proposed, with Talesun

6   USA's director admitting:  "I myself will not really believe them."  *Id.*, ¶39, Ex. 38; FAC, ¶72.

7        Mr. Ma does not know why the Parents failed to honor their obligations under the

8   agreements, because that decision was made "above his head."  *Id*., ¶75; Ma depo. at 113:24-

9   114:3.  After being threatened with litigation in California, the Parents wound down Talesun

10   USA, formed another subsidiary to serve as their new marketing in California, appointed another

11   Talesun Solar executive to serve as its figurehead CEO, and purposefully destroyed every

12   document and communication relevant to this dispute.  FAC, ¶76; *see* Section 2.F, below.

13        Talesun USA also functions as the Parents' representative agent in that it performed

14   marketing services that were sufficiently important to the Parents that if they did not form Talesun

15   USA to perform those services, the Parents would have performed those services themselves.

16   FAC, at ¶84.  As described above, the Parents also exercised nearly absolute control over Talesun

17   USA's activities, rendering Talesun USA merely an incorporated department of the Parents.  *Id*.

18        **B.      Talesun USA Was a Mere "Marketing Conduit" for Defendants.**[1]

19        Talesun USA was formed, and served, entirely as a "marketing conduit" for the Parents,

20   including serving as the exclusive importer of Talesun Solar's solar panels into the continental

21   U.S., handling all advertising and marketing of those panels in the U.S., and coordinating

22   distribution and sales logistics in the U.S.  FAC, ¶12; Ma depo. at 46:11-19; Isern Decl., ¶¶4, 9,

23

24        [1] As discussed below, while some Courts analyze the "marketing conduit" prong under the
     specific jurisdiction test [*see Meyers v. Asics Corp.*, 711 F. Supp. 1001 (C.D. Cal. 1989)], others
25   analyze it under the alter ego umbrella.  *See John Doe v. Unocal Corp.,* 248 F.3d 915, 926-27
     (9th Cir. 2001); *see also NetApp, Inc. v. Nimble Storage, Inc.*, 2015 WL 400251, Case No. 5:13-
26   CV-05058-LHK (HRL) (N.D. Cal. Jan. 29, 2015).  Here, the Court can do both, since the
     Parents' use of their U.S. subsidiary to boost sales of their own solar panels in the U.S. is at the
27   heart of this dispute (*i.e.*, entering into the purchase agreements to deliberately place their
     products into California's commercial-grade solar projects).
28

13.  The majority of Talesun Solar's panels are imported into Oakland, Long Beach, and Los Angeles.  Frid Decl., ¶11, Ex. 11. The Parents derived substantial economic benefit from Talesun USA's forum-based activities.  FAC, ¶13; Isern Decl., ¶4, 8-11, Exs. 3, 4.

### C.   The Parents Exercised Manipulative Control Over Talesun USA, Rendering the Latter the Mere Instrumentality of the Former.

In addition to the facts outlined above, the Parents' absolute control over Talesun USA and bad faith in their dealings with Plaintiff is evident by the admissions of their own lawyer:

> "[Eric] called.  He has no news except that as of 4 pacific he is not in funds.  I believe that he is telling us the truth, that is, he doesn't know why or when. He can't arrange a call with Frank his boss and your client; that would only be initiated by Frank. Anyway Eric is speaking with Frank at 5 pacific to try to convey, again, the urgency and at my suggestion receoive [*sp*] from Frank instructions as to whether this deal will be closed and when. Eric said he would do that but that Frank may not know either. It is very frustrating. My sense is that the Mainland folks don't understand the number of postponements and think that what they are doing is getting ready for the first closing (in their minds) and further that deadlines (by which you and I live day to day) don't have the same meaning to them. I have learned that contracts are considered to be more instruments of process than agreements of performance."

Frid Decl., ¶9, Ex. 8; FAC, ¶63.

### D.   The Parents Inadequately Capitalized Talesun USA.

In early letters of intent, Talesun USA represented that it would use its own capital to fund the more than $30M acquisition price.  FAC, ¶24; Howell Decl., ¶¶ 5, 6, Exs. 4, 5.  In the MIPA, Talesun USA represented that it had sufficient liquid capital (or committed sources of capital) to timely perform under the contract.  *Id*., ¶2, Ex. 1; FAC, ¶¶47, 87.

The Parents so undercapitalized Talesun USA that it could not make a $500,000 required deposit.  *Id*., ¶28; Howell Decl., ¶7, Ex. 6.  Talesun USA admitted it would be impossible for the subsidiary to make another $175,000 deposit required for a professional service provider.  *Id*., ¶9, Ex. 8; FAC, ¶29.  When the Parents wired a deficient amount for closing, Talesun USA admitted it could not make up the $46,160 shortfall.  *Id*., ¶49; Howell Decl., ¶21, Ex. 20. Talesun USA could provide neither Plaintiff nor the utilities any separate financials concerning its business, deferring to the Parents' financials at every turn.  *Id*., ¶¶10, 22, Ex. 9, 21; FAC, ¶34.

In the separate lawsuit concerning Talesun USA's breach of contract, Talesun USA failed to produce a single financial record (consistent with its representation to the utilities that such records don't exist).  Frid Decl., ¶7.  Representatives from both Parents confirmed that their U.S. subsidiaries are underfunded from the start – some receiving as little as $1,000 initial capital contributions (clearly insufficient to meet recurring operating expenses).  *Id.*, ¶¶79-80. Frid Decl., ¶5, Ex. 4 [Sheng depo. at 141:25-143:22].

### E.    *Other* Facts Supporting a Finding that Defendants are Alter Egos.

Zhongli Group is the parent of Talesun Solar, which in turn is the parent of Talesun USA. FAC, ¶¶8-11; Howell Decl., ¶¶5, 6, Exs. 4, 5.  The Parents and Talesun USA had substantial overlap in their officers, directors, and employees.  *Id.*, ¶17; FAC, ¶14, Ex. 1. Baixing Wang served as Chairman of the Board for all three entities, and Changqing Hu served as Chief Financial Officer for all three entities.  *Id.*, ¶17-18; Ma depo. at 167:12-22.[2] Frank Qi served as an executive officer of both Talesun Solar (Vice President) and Talesun USA (CEO). Frid Decl., ¶3, Ex. 2 [Lingqing Gu depo. at 209:13-21; 210:9-10; FAC, ¶19.  Lingqing Gu served as director for both Talesun Solar and Talesun USA.  *Id.*, ¶20; Gu depo. at 26:8-18.

Throughout the contract negotiations, the Parents and Talesun USA touted the Parents' "strong financial capability" and resources as an insurer for all amounts due under the contracts, promising a corporate guaranty for those payments.  FAC, ¶¶23-24; Howell Decl., ¶2, Ex. 1. Talesun USA provided Plaintiff with audited financials for Talesun Solar as evidence that they would be able to satisfy the Parent Guaranty component of that agreement.  *Id.*, ¶57; Howell Decl., ¶22, Ex. 21; Frid Decl., ¶4, Ex. 10; Howell Decl., ¶15, Ex. 14.

Lingqing Gu, an officer of Defendant Talesun Solar who was ordered to testify as the person most knowledgeable for subsidiary Talesun Solar USA [Gu depo. at 26:8-18; 46:19-22], provided a wealth of information, including that:

- He never heard of Talesun Solar USA (Gu depo. at 265:8-12);

---

[2]/ Concerning his role as both a member of Talesun USA's board and its CFO, Mr. Hu testified that he "does not get involved in the actual stuff" and that he "is just a title."  FAC, ¶74; Frid Decl., ¶4, Ex. 3 [Changqing Hu depo. at 83:16-84:6].

- He has never seen a single financial document concerning Talesun USA (at 60:1-61:8; 62:4-12), including any bank statements, checks, or evidence of any bank accounts (38:18 – 40:22);

- He did not know whether Talesun USA generated any revenue from 2011-2013 (59:21-25), and had no evidence that Talesun USA (as opposed to the Parents) made any of the payments actually paid under the contracts (232:11-233:1);

- He did not know whether Talesun USA and Zhongli Talesun reported their financials together or separately (60:1-10);

- He had no evidence or facts that Talesun USA kept separate books and records from the Parents (279:13-280:12);

- As of 2019, Talesun USA had no officers, employees, or bank account (51:4-17; 52:12-14; 261:14-19), and has and no employees since July 2014 (56:5-9);

- Talesun USA and Talesun Solar share the same executive office address in China (179:25-180:5);

- Frank Qi serves as both CEO of Talesun USA and VP, Sales for Talesun Solar (209:13-21; 210:9-10);

- Changqing Hu served as Talesun Solar's CFO and also as chairman for Talesun USA (255:3-10).

In the state court matter, these admissions are binding on Talesun USA, and they should likewise be credited here. Eric Ma, General Manager for Talesun USA, testified that Zhongli Group is the ultimate parent of Talesun USA and owned 100% of its stock. Ma depo. at 16:24-17:16; 122:15-19. He also testified that when Talesun USA held board meetings, they were held at Talesun Solar's headquarters in China. *Id*. at 62:16-25. Mr. Ma confirmed that Talesun USA did not make enough money "to make ends meet," and that Talesun Solar regularly gave money to Talesun USA to cover normal operating expenses. *Id*. at 57:20-58:6; 66:17-68:14. He also confirmed that Talesun USA would import and sell solar panels from its immediate parent in China, Talesun Solar, but would delay paying for those panels, retaining sales proceeds to help cover Talesun USA's operating expenses. *Id*. at 34:6-35:8. Mr. Ma testified that even if Talesun USA had sufficient funds in its bank to perform under the contract (it did not), he would still require the Parents' approval to perform (*id*. at 87:15-25; 88:1-91:6) and that Talesun Solar could control even the most minor of its subsidiary's expenditures. *Id*. at 121:6-25. The person most knowledgeable for Talesun USA testified that he had not seen any evidence that Talesun USA had its own bank account. Gu depo. at 40:1-22. Ma confirmed that Talesun USA's activities were woefully insufficient to generate enough money to cover the purchase price required under the contract. Ma depo. at 133:11-22 (which testimony was contrary to the representations and

warranties he made in the MIPA).  He also confirmed that Mr. Changqing Hu, a board member of Talesun USA, simultaneously served as Chief Financial Officer for both Parents.  *Id*. at 167:12-22.

### F.    The Parents Orchestrated the Destruction of Every Piece of Correspondence and Document Relevant to this Dispute.

Accepted as true for purposes of this motion, the facts alleged in the FAC (substantiated by the accompanying declarations of Hans Isern and Jim Howell and the documents and communications attached thereto) are more than sufficient to support a prima facie showing of jurisdiction over Defendants.  Nevertheless, the stronger evidence would be found ***in Defendants' own documents and communications*** with their U.S. subsidiary, demonstrating the level of manipulative control, purposeful under-capitalization, and other factors supporting jurisdiction on purposeful availment, alter ego, and/or agency grounds.  Unfortunately, the Parents have admittedly destroyed every single communication and document relevant to Plaintiff's claims – no exaggeration, they claim to have swapped out every server in the near billion-dollar conglomerate without making any back-ups – enabling them to now argue that Plaintiff's "evidence" is insufficient to hale them into this Court to answer for their deeds.[3]

As Talesun USA's PMK witness shared, after the threat of litigation arose in late 2012, the Parents destroyed – without backing up – every server in the billion-dollar conglomerate without making any back-ups.  Frid Decl., ¶7; Gu depo. at 85:6-17, 87:10-88:22, 91:6-20, 95:4-14, 98:15-20.  And the local hard drives, where evidence of communications would have otherwise resided, were all "broken."  *Id*.  The evidence before the Court on this motion is only the tip of the iceberg, necessitating jurisdictional discovery in the event the Court finds Plaintiff has fallen short of the required prima facie showing.

---

[3]/  The Parents wound-down Talesun USA shortly after breaching all the contracts with Plaintiff, and the subsidiary no longer has employees, officers, or ongoing business. *See* Changqing Hu Decl., Docket 24-2, ¶5; Gu depo. at 46:10-13; 260: 9-12. The Parents, unilaterally controlling the defense of all litigation against the defunct subsidiary since 2016, permitted Talesun USA to produce only 270 pages of meaningless documents in the ongoing contract case (including zero communications). Frid Decl., ¶7.  The MIPA, itself, is more than 300 pages long.  *Id*.

MPA ISO PLAINTIFF'S OPP'N TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 4:19-CV-04243-YGR

1  **III.    LEGAL ARGUMENT**

2          **A.    Legal Standard.**

3          Where, as here, a defendants' motion is based on written materials rather than an

4  evidentiary hearing, a plaintiff need only make a prima facie showing of facts that support a

5  finding of jurisdiction.  *See Dole Food, Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002).  A

6  prima facie showing is made where plaintiff has demonstrated facts which, if true, would support

7  jurisdiction over the defendant.  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).

8  Uncontroverted allegations in the complaint must be accepted as true, and factual disputes

9  created by conflicting evidence are resolved in plaintiff's favor.  *Schwarzenegger v. Fred Martin*

10  *Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal quotation marks and citation omitted).

11          Here, California law governs the Court's jurisdictional analysis.  Fed. R. Civ. P.

12  4(k)(1)(A); *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  Under

13  California's long-arm statute, courts may exercise personal jurisdiction "on any basis not

14  inconsistent with the Constitution of this state or of the United States."  *Daimler AG v. Bauman*,

15  517 U.S. 117, 125 (2014) (*citing* Cal. Code Civ. P. § 410.10).  California courts may, consistent

16  with due process, exercise personal jurisdiction over a non-resident defendant whenever that

17  defendant has at least "minimum contacts" with California such that exercise of jurisdiction

18  "does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v.*

19  *Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citations omitted).  The test

20  is fact-specific and looks to the relationship between the forum state, the defendant, and the

21  litigation in to discern the reasonableness of requiring the party to defend an action here.  *Id.*

22          Unlike general jurisdiction, specific jurisdiction "depends on an affiliatio[n] between the

23  forum and the underlying controversy; principally, activity or an occurrence that takes place in

24  the forum State and is therefore subject to the State's regulation."  *Goodyear Dunlop Tires*

25  *Operations, S.A. v. Brown*, 564 U.S. 915, 919 (internal quotation marks omitted).  As explained

26  below, this Court can exercise specific personal jurisdiction over the Parents.  *See Meyers v.*

27  *Asics Corp.*, 711 F. Supp. 1001, 1003 (C.D. Cal. 1989) (a "court may have specific jurisdiction

28  over a party where its activities in the forum relate to the injury sued upon.").  When determining

if minimum specific jurisdiction exists, the Ninth Circuit considers the following three factors: 1) the non-resident must do some act or consummate some transaction with the forum or resident thereof, or perform some act by which it purposefully avails itself of the privilege of conducting activities in the form, thereby invoking the benefits and protections of its laws; 2) the claims must arise out of or result from its forum-related activities; and 3) the exercise of jurisdiction must be reasonable. *Id.*, citing *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986); *see also Yahoo! Inc. v. La Ligue Contre Le Racisme et L' Antisemistisme*, 433 F.3d 1199, 1205-1206 (9th Cir. 2006); *Fred Martin Motor Co.*, 374 F.3d at 802. That the Parents forced their subsidiary to sign the contracts does not shield their entire course of conduct from analysis. Plaintiff bears burden of satisfying the first two prongs of this test [*id.*], a burden it can easily meet given how the Parents deliberately directed Talesun USA's activities in California. Accordingly, Defendants ultimately must bear the burden of "present[ing] a compelling case" that the exercise of jurisdiction would not be reasonable. *Id.*

**B.     This Court Should Exercise Specific Personal Jurisdiction Over Defendants.**

Although non-resident parent companies are not subject to process based solely on the actions of their subsidiaries, "a parent may still be responsible for *its own actions* directed at the forum." *Asics Corp.*, 711 F. Supp. at 1004 (emphasis added). A parent's actions include, as occurred here, deliberately directing a subsidiary's activities within the forum. Under California law, this test has been succinctly laid out as follows:

> "Ownership of a subsidiary alone does not constitute purposeful availment. Rather, purposeful availment requires some manner of deliberately directing the subsidiary's activities in, or having a substantial connection with, the forum state. *Burger King* stated in dicta, 'We have previously noted that when commercial activities are 'carried on in behalf of' an out-of-state party those activities may sometimes be ascribed to the party, *International Shoe Co. v. Washington,* 326 U.S. 310, 320…, at least where he is a 'primary participant' in the enterprise and has acted purposefully in directing those activities, *Calder v. Jones,* 465 U.S., at [p.] 790.' (*Burger King, supra,* 471 U.S. at p. 479, fn. 22.) Similarly, *Empire Steel Corp. v. Superior Court* (1961) 56 Cal.2d 823, 831 [17 Cal.Rptr. 150, 366 P.2d 502] held that specific personal jurisdiction over a foreign parent corporation was established based on the parent's 'manipulation' and control of its California subsidiary to the detriment of the subsidiary's creditors. Citing these authorities, we recently stated, 'activities that are undertaken on behalf of a defendant may be attributed to that defendant for purposes of personal jurisdiction if the defendant purposefully directed those activities toward the forum state. [Citations.]' (*Anglo*

-11-

*Irish Bank Corp., plc v. Superior Court* (2008) 165 Cal.App.4th 969, 981 [81 Cal.Rptr.3d 535] (*Anglo Irish*).)

Consistent with these authorities and the requirements for purposeful availment explained above, and particularly the 'focus[] on the defendant's intentionality' (*Pavlovich, supra,* 29 Cal.4th at p. 269), we conclude as follows:

> ***A parent company purposefully avails itself of forum benefits through the activities of its subsidiary, as required to justify the exercise of specific personal jurisdiction, if and only if the parent deliberately directs the subsidiary's activities in, or having a substantial connection with, the forum state. Only in those circumstances should the parent company 'reasonably anticipate being haled into court' (World-Wide Volkswagen Corp. v. Woodson, supra, 444 U.S. at p. 297) in the forum state based on the activities of its subsidiary.***

*Healthmarkets, Inc. v. Superior Court*, 171 Cal. App. 4th 1160 (2009) (emphasis added).

While some California courts have suggested that alter ego or agency principles can justify general personal jurisdiction over a non-resident parent, others "have applied the same reasoning to justify the exercise of specific personal jurisdiction." *Id.*, at 1169 (*citing VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 244-46 (2002), *Magnecomp Corp. v. Athene Co.*, 209 Cal. App. 3d 526, 535-39 (1989) (applying state agency principles in finding specific jurisdiction over foreign corporation), *Northern Natural Gas Co. v. Superior Court*, 64 Cal. App. 3d 983, 992-995 (1976) (same). Courts often have difficulty separating these concepts because each theory shares some common elements with the others.

The Court in *Anglo Irish Bank Corp.* properly segregated the analysis:

> "We further conclude that activities that are undertaken **on behalf of a defendant** may be attributed to the defendant for purposes of personal jurisdiction if the defendant purposefully directed those activities at the forum state, <u>regardless of the specific requirements of alter ego or agency</u>, and that state law of alter ego and agency does not determine the constitutional limits to the exercise of specific personal jurisdiction."

*Anglo Irish Bank Corp.*, 165 Cal. App. 4th at 974, 981. Based on the facts set forth above and as further explained below, Plaintiff has made a prima facie showing that specific personal jurisdiction exists here because Defendants deliberately directed their business activities towards, and controlled their subsidiary's activities in, California.

### 1.    Defendants Purposefully Availed Themselves of this Forum and Directed Their Fraudulent Conduct to California.

-12-

As set forth above in Section II.A, the Parents *specifically directed their conduct at Plaintiff in this forum*.  Bolstered by the evidence submitted herewith (and described above in Section II), the FAC alleges, among other things, that (1) the Parents established their subsidiary in California for the purpose of marketing and selling Talesun Solar's Chinese-manufactured solar panels in California [FAC, ¶¶8-9]: (2) in furtherance of that goal, they sought out and controlled the negotiation of contracts to purchase over $30M in commercial-grade solar projects from Plaintiff (to be developed in California using Talesun Solar's panels) [*id*. ¶¶2, 22, 35]; the Parents viewed this as a "venture capital" opportunity [*id.* ¶69]; (3) the Parents paid to fly Plaintiff to Australia for a signing ceremony, signed an MOU under their own name, and bragged to Chinese government officials and in a press release that they were directly purchasing California solar projects and building them using Talesun Solar's panels [*id.* ¶30-33]; (4) after forming several subsidiaries to sign the real contracts on their behalf, the Parents ultimately directed their existing marketing conduit, Talesun USA, to sign the agreements [*id*. ¶¶15, 36-37, 43]; (5) because Talesun USA was largely insolvent, and was prohibited from spending what little money it had, the Parents wired all payments to Plaintiff, in California, under the MIPA [id. ¶¶28, 29, 58, 61]; (6) because Talesun USA had no meaningful financials to share and was merely a "front facing" shell, the Parents supplied their own financials and due diligence materials to California's power companies to induce them to permit title of the project companies to transfer to Talesun USA [*id.* ¶¶39, 41, 50]; (7) Talesun USA's manager travelled to the Parents' headquarters in China for the closing (which is also where all Talesun USA board meetings were conducted) [*id.* ¶52]; (8) as the Parents refused to perform – viewing their contractual obligations in this country as "optional" (according to their own lawyer) – they attempted to negotiate new, different terms with Plaintiff, using Talesun USA as their messenger/translator [*id.* ¶¶54, 55, 59, 62-63, 67-68]; (9) reduced to nothing more than a limp puppet, the subsidiary's frustration boiled over as Talesun USA's representatives shared that they had no clue whether the Parents would perform, had "zero confidence" in the Parents' execution capabilities, and ultimately had no explanation as to why the Parents caused Talesun USA to breach the agreements [*id.* ¶¶70, 72, 75]; (10) because the Parents' conduct caused

-13-

1  Plaintiff to suffer losses in this forum, Talesun USA attempted to help mitigate the damage by

2  introducing Plaintiff to third parties it thought "might help reduce the losses" [*id.* ¶64]; (11)

3  threatened with litigation, and to minimize risk to their enterprise, the Parents essentially wound

4  down Talesun USA, formed a new California-based subsidiary called Zhongli New Energy

5  Group Co. Ltd to serve as their new "marketing conduit," and orchestrated the destruction of

6  every communication and document relevant to this dispute.  Isern Decl., ¶13.

7      The only fact that could possibly bolster the conclusion that the Parents have

8  purposefully directed their business activities at Plaintiff *in California* would be if the Parents

9  had signed the actual contracts themselves, but that's the whole point of their fraudulent scheme,

10  including forming subsidiaries for the sole purpose of avoiding liability, themselves, for their

11  eventual and absolute disregard for the U.S. legal system.  *See Empire Steel Corp. v. Superior*

12  *Court*, 56 Cal.2d 823, 831 (1961) (finding specific personal jurisdiction over non-resident

13  defendant who did not execute the contract in question but orchestrated its inception, noting that

14  "this jurisdiction has a manifest interest in providing a forum for local creditors injured by

15  alleged frauds effected through a California subsidiary") (internal citation omitted).

16      In *Empire Steel*, the non-resident defendant caused its California subsidiary to enter into

17  agreements with plaintiff, and its fraudulent scheme – orchestrated from Texas – caused plaintiff

18  to suffer the consequences within California.  There, our Supreme Court held that specific

19  personal jurisdiction over a foreign parent company was established based on the parent's

20  "manipulation" and control of its California subsidiary to the detriment of the subsidiary's

21  creditor.  Evidence supported the inference that "Empire knowingly caused its California

22  subsidiary to make the contracts in suit while [the subsidiary] was in fact insolvent but had the

23  appearance of financial responsibility."  *Id.* at 832.  The Supreme Court ruled that an alter ego

24  finding was *unnecessary* to assert specific jurisdiction.  *Id.* at 835 ("the essential thing is merely

25  whether the corporations are present within the state, whether they operate through an

26  independent contract, agent, employee, *or in any other manner.*").  The Court noted that a

27  parent's purposefully causing its subsidiary to engage in forum contacts may constitute

28  purposeful availment by the parent even where the separateness of the corporations is maintained

-14-

1    and alter ego liability does not exist.  *Id.*; *citing Northern Natural Gas Co. v. Superior Court*, 64

2    Cal. App. 3d 983, 994-995 (1976).  The facts in this case are equally, if not more, compelling

3    than the factors which forced Texas-based Empire Steel to defend its actions in California.

4           Applying similar principles, the Court in *Anglo Irish Bank* affirmed the assertion of

5    specific jurisdiction over foreign companies who agents merely *visited* California for the purpose

6    of soliciting business from our residents for foreign company's benefit.  *Anglo Irish Bank Corp*.,

7    165 Cal. App. 4th at 984.  *Anglo Irish Bank* noted that "activities that are undertaken on behalf of

8    a defendant may be attributed to that defendant for purposes of personal jurisdiction if the

9    defendant purposefully directed those activities toward the forum state."  *Id*., at 981.  Here, more

10   than simply visiting California, the Parents established a subsidiary in San Jose for the central

11   purpose of marketing and selling their solar panels, and it is beyond dispute that every single

12   activity Talesun USA undertook in this case, including signing the contracts as directed by the

13   Parents, was "undertaken on behalf of" the Parents.  The same result – asserting specific

14   jurisdiction over the foreign actors – should follow.  *See id*., at 985 ("we conclude that [the

15   foreign entities] purposefully directed their activities at California residents by and through the

16   individuals who visited California on their behalf."); *contra Healthmarkets*, 171 Cal. App. 4th

17   1160, 1164 (declining to assert personal jurisdiction on similar grounds where plaintiff submitted

18   zero evidence of "purposeful availment").

19          That the Parents have carefully avoided stepping foot in California regarding this botched

20   transaction does not help their cause:  "within the rubric of purposeful availment, the [Supreme]

21   Court has allowed the exercise of jurisdiction over a defendant whose only 'contact' with the

22   forum state is the 'purposeful direction' of a foreign act having effect in the forum state."  *Harris*

23   *Rutsky v. Bell & Clements*, 328 F.3d 1122 (9th Cir. 2003), *citing Haisten v. Grass Valley*

24   *Medical Reimbursement Fund Ltd.*, 784 F.2d 1292, 1397 (9th Cir. 1986) (*citing Calder v. Jones*,

25   465 U.S. 783, 789 (1984)).  Like the London-based defendant in *Harris Rutsky* who specifically

26   sought out a business relationship with a California resident, exercising specific personal

27   jurisdiction over the Parents is appropriate because they specifically sought out and negotiated a

28   business relationship with Plaintiff which required performance – including the purchase and

construction of utility-scale solar projects – in California.  *See Harris Rutsky*, 328 F.3d at 1134 (there is little question that B&C "purposefully availed itself of the benefits and privilege of conducting activities in California.").  The Parents knew, of course, that Plaintiff was based in California – and so knew their conduct was expressly aimed at this forum.  *See Bancroft & Masters, Inc.*, 223 F.3d at 1087 ("express aiming" requirement satisfied where defendant targeted its alleged misconduct at plaintiff whom defendant knows resides in the forum state).  Moreover, during the relevant time period, Plaintiff's principal place of business was in San Francisco, and the brunt of the harm was therefore felt in California.  *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1114 (9th Cir. 2002) ("[W]hen a forum in which a plaintiff corporation has its principal place of business is in the same forum towards which defendants expressly aim their act, the 'effects' test permits that forum to exercise personal jurisdiction.").

## 2. Plaintiff's Claims Arise Out Of Defendants' Forum-Related Activities.

A controversy is related to or arises out of a defendant's forum contacts if there is "a substantial connection between the forum contacts and the plaintiff's claims."  *See Vons Companies, Inc. v. Seabest Foods, Inc.*, 14 Cal.4th 434, 452 (1996) (noting that the forum contacts need not be the proximate or "but for" cause of the injuries).  The fraud and conspiracy claims alleged in the FAC arise out of the Parents' forum-related activities; but for their direct efforts to purchase California solar projects from Plaintiff so they could both sell more solar panels in this country and roll the dice with a "venture capital"-type investment, Plaintiff would not have been fraudulently duped into agreeing to sell a major portion of its industry-leading solar portfolio to them.  *See Asics Corp.*, 711 F. Supp. 1001, 1006 (noting the Ninth Circuit's "liberal approach" in interpreting the second element of the specific jurisdiction test, and finding it satisfied where the alleged patent infringement would not have occurred but for sales of the foreign parent's shoes in California "and its activities related to those sales.").

## 3. Defendants Cannot Make a Compelling Case that Exercising Personal Jurisdiction Over Them Would be Unreasonable.

Because Plaintiff has met its burden on the first two elements, Defendants must establish that exercising jurisdiction over them would be unreasonable.  *Menken v. Emm*, 503 F.3d 1050,

1057 (9th Cir. 2007).  Courts consider seven factors as to whether jurisdiction is reasonable:  (1) the extent of purposeful injection; (2) the burden on defendant to defend the suit; (3) the extent of conflict with the sovereignty of defendant's state; (4) the forum state's interest in the dispute; (5) the most efficient forum for resolution; (6) the importance of the chosen forum to plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.  *Asics Corp*, 711 F. Supp. 1001, 1007, *citing Shute v. Carnival Cruise Lines*, 863 F.2d 1437, 1442-1445 (9th Cir. 1988).   Here, the extent of the Parents' purposeful injection into California, by both its own actions and those of its agent/subsidiary, is significant.  The burden of defending this suit will be marginal, as the Parents are already paying for and controlling the defense of two ongoing lawsuits in this forum.  Frid Decl., ¶10, Ex. 9.  Moreover, refusing jurisdiction in cases like this "would subject our citizens to the predatory tactics of foreign corporations without providing them with any opportunity for redress."  *Magnecomp Corp*., 209 Cal. App. 3d at 538-539 ("where tortious acts are committed against California citizens, we should liberally construe and interpret jurisdictional principles to accomplish substantial justice for California citizens."), *citing Northern Natural Gas Co.,* 64 Cal. App. 3d at 995.  Finally, to the extent Defendants establish the dubious proposition that the PRC provides an adequate alternative forum for this dispute, such would not be "efficient" given that Defendants are already defending numerous related cases in Northern California.  The majority of factors establish the reasonableness of asserting jurisdiction over Defendants here.  *See Asics*, 711 F. Supp. 1001, 1007 (finding jurisdiction reasonable where cause of action arose here, which was apparently the only state where the foreign parent had sufficient contacts to establish jurisdiction, and where California had an interest in preventing patent infringement within its borders).

## C.    DEFENDANTS INJECTED THEIR PRODUCTS INTO CALIFORNIA.

The Ninth Circuit has "long recognized that a company which injects its products into a forum is subject to jurisdiction."  *Duple Motor Bodies, Ltd. v. Hollingsworth,* 417 F.2d 231, 235 (9th Cir.1969); *Taubler v. Giraud,* 655 F.2d 991 (9th Cir.1981); *Plant Food Co-op v. Wolfkill Feed & Fertilizer Corp.,* 633 F.2d 155 (9th Cir.1980).  Here, the Parents sought out a business relationship with Plaintiff in order to boost the sales of their Chinese-made solar panels *in*

-17-

1    *California*; in fact, after they signed the MOU, the Parents issued a press release bragging that

2    their agreement to purchase Plaintiff's California solar projects was a conduit to help them sell

3    more solar panels.  FAC, ¶33; Isern Decl., ¶¶9, 11, Ex. 4.  The fact that as part of the underlying

4    transaction with Plaintiff, Defendants intended to ship their solar panels directly into this forum

5    differentiates this case from others where a finding of an alter ego relationship was necessary to

6    exert personal jurisdiction.  *See*, *e.g.*, *Asics Corp*., 711 F. Supp. at 1005-6 (C.D. Cal. 1989)

7    (finding purposeful availment where Japanese parent marketed and sold its products in California

8    through distributor/subsidiary which it created for that purpose).

9          **D.      BECAUSE TALESUN USA WAS DEFENDANTS' AGENT, THIS COURT CAN EXERCISE PERSONAL JURISDICTION OVER DEFENDANTS.**

10         Where "a foreign corporation uses a wholly owned subsidiary as a mere agent or

11   instrumentality of the foreign parent corporation, then the state may exercise jurisdiction over the

12   foreign corporation."  *Northern Natural Gas Co*., 64 Cal. App. 3d at 994; *see also In re*

13   *Marriage of Bastian*, 94 Cal. App. 3d 483, 487-488 (foreign pension trust subject to jurisdiction

14   where trust, through its agents, injected itself into California).  Civil Code section 2295 defines

15   an agent as "one who represents another, called the principal, in dealings with third persons."

16   An agency relationship may be proven through "the acts of the parties and their oral and written

17   communications."  *Whittaker v. Otto*, 188 Cal. App. 2d 619, 622-623 (1961).

18         While Defendants destroyed every communication they ever had with their U.S.

19   subsidiary concerning their collective dealings with Plaintiff, the communications we do have

20   leave no doubt that Defendants utilized Talesun USA as their agent for their business dealings in

21   the U.S., including their dealings with Plaintiff.  *See* Howell Decl., Exs. 6, 7, 8, 9, 11, 12, 13, 14,

22   16, 17, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38.  Talesun USA's

23   general manager confirmed the agency relationship when testifying that his main job duty was to

24   help the parent company achieve its goals "in the USA market."  Ma. depo. 46:11-19.  This

25   Court can independently assert jurisdiction over Defendants because Talesun USA was at all

26   relevant times acting as their agent in this case.  *See Magnecomp Corp.*, 209 Cal. App. 3d 526

27   (asserting personal jurisdiction over Japanese corporation where alleged trade secret thief was

28

-18-

1   acting as its agent in California); *see also Northern Natural Gas Co.*, 64 Cal. App. 3d 983

2   (asserting jurisdiction over foreign defendant not on alter ego grounds but because subsidiary

3   had acted "as its agent or instrumentality").

### E.   *ALTERNATIVELY*, THE COURT MAY EXERCISE JURISDICTION OVER DEFENDANTS AS ALTER EGOS OF THEIR SUBSIDIARY.

4

5   As explained above, because specific personal jurisdiction exists over Defendants based

6   on *their own conduct in this forum*, the Court need not conduct an alter ego analysis in order to

7   "pierce the corporate veil" for jurisdictional purposes.  Nevertheless, the Ninth Circuit has made

8   clear that alter-ego grounds may exist <u>without</u> conducting the heightened nine-factor analysis so

9   long as: (1) the parent uses the subsidiary "as a marketing conduit" and attempts to shield itself

10  from liability based on its subsidiary's activities; (2) the parent dictates "[e]very facet [of the

11  subsidiary's] business – from broad policy decisions to routine matters of day-to-day operation";

12  <u>or</u> (3) the subsidiary is inadequately capitalized.  *John Doe v. Unocal Corp.,* 248 F.3d 915, 926-

13  27 (9th Cir. 2001).  Plaintiff can satisfy at least two of these three independent tests.

### 1.   Plaintiff has Adequately Alleged, and Submitted Evidence That, Talesun USA is a "Marketing Conduit" of Defendants.

14

15

16  "[W]here a parent uses its subsidiary 'as a marketing conduit' and attempts to shield itself

17  from liability based on its subsidiaries' activities, piercing the corporate veil is appropriate and

18  the alter-ego test is satisfied."  *Unocal Corp.,* 248 F.3d at 926-27; *see also United States v.*

19  *Toyota Motor Corp.*, 561 F. Supp. 354, 359-360 (C.D. Cal. 1983) ("[t]here is no obstacle to

20  jurisdiction over the foreign parent if it uses its subsidiary as a marketing conduit."), *citing*

21  *Crucible, Inc. v. Stora Kopparbergs Berglags AB*, 403 F. Supp. 9 (W.D. Pa. 1975); *Zenith Radio*

22  *Corp. v. Matsushita Elec. Ind. Co.*, 402 F. Supp. 262 (E.D. Pa. 1975); *Hitt v. Nissan Motor Co.*,

23  399 F. Supp. 838 (S.D. Fla. 1975); *and Regie Nationale v. Superior Court*, 208 Cal. App. 2d 702

24  (1962).  Here, this Court can exert personal jurisdiction over the Parents because – as expressly

25  alleged in the FAC – Talesun USA was nothing more than a "marketing conduit" for them.

26  In *Toyota Motor*, the court denied Toyota's motion to dismiss finding that a parent

27  corporation in Japan could be subject to personal jurisdiction here where its California subsidiary

28  (1) was the exclusive importer of the parent's vehicles, (2) the subsidiary handled all distribution

-19-

of the parent's vehicles in the United States, and (3) the parent derived "substantial economic benefit" from the subsidiary's activities. *Toyota Motor Corp.*, 561 F. Supp. at 356. Here, Plaintiff has specifically alleged that Talesun USA was formed, and served, entirely as a "marketing conduit" for the Parents. FAC, ¶12. More specifically, Plaintiff also alleged that (1) Talesun USA was the exclusive importer of Talesun Solar's solar panels into the continental United States (until the Parents wound it down and formed a replacement subsidiary), (2) all advertising and marketing of those panels was handled by Talesun USA, who coordinated distribution and sales logistics in the United States, and (3) the Parents derived substantial economic benefit from Talesun USA's activities in this forum. *Id*., ¶¶12-13. Talesun USA's General Manager confirmed these facts when describing his role as training teams to make panel sales, overseeing the marketing of the Parents' panels, and basically "helping the other parent company to achieve their goals in the USA market." Ma. depo. at 46:11-19; Isern Decl., ¶4. The benefits the Parents would receive from Talesun USA's activities in this forum were also significant, as touted by the Parents' own statements and press release. *Id*., ¶¶8-12, Exs. 4-5 (describing the Parents' agreement to flip the solar project companies to CGN in China).

In holding that nearly identical allegations, standing alone, sufficed to survive a motion to dismiss, the *Toyota Motor* court noted that "[t]he fact that [the parent's] products reach the United States market through a wholly-owned subsidiary, rather than directly from the parent corporation, is inconsequential for due process purposes. Instead, due process is satisfied so long as [the parent] knew and intended that its vehicles would be sold here, and it actively promoted those sales." *Toyota Motor Corp.*, 561 F. Supp. at 359, *citing Taubler v. Giraud*, 655 F.2d 991, 994 (9th Cir. 1981) (reversing district court's dismissal for lack of personal jurisdiction, and finding specific jurisdiction over French defendants who deliberately targeted the California market and knew and intended that their products would be sold here). While Plaintiff need not establish dispositive facts at this early stage, it has established that the Parents knew and intended that their solar panels would be sold in California [Isern Decl., ¶¶8-9, 11, Ex. 4], that it actively promoted those sales through Talesun USA who coordinated distribution in the U.S. [Ma. depo. at 46:11-19], and that the Parents derived economic benefit from Talesun USA's activities here.

1

2. **Plaintiff has Adequately Alleged, and Submitted Evidence That, Defendants Controlled Talesun USA to Such a Degree as to Render the Latter the Mere Instrumentality of the Former.**

2

3       The Court must examine unity of interest to determine whether "the parent controls the

4    subsidiary to such a degree as to render the latter the mere instrumentality of the former." *Unocal*,

5    248 F.3d at 926.  Here, Plaintiff has alleged, and submitted evidence establishing, that the Parents'

6    involvement in Talesun USA's affairs went far beyond oversight typical of an independent

7    subsidiary.  Specific to the underlying transactions, to call Talesun USA a mere instrumentality of

8    the Parents would be an affront to drum sets and clarinets around the world.  Talesun USA's

9    representatives literally admitted they were powerless to act, were absolutely controlled by "the

10   Chairman" and "HQ," and could do nothing without Parental approval (including, for example,

11   paying a $46,000 shortfall in the Parents' deposit).  On the best days, Talesun USA acted as a

12   dutiful messenger/translator for the Parents; on the worst days, Talesun USA gave up, exasperated

13   and embarrassed at the fact that the Parents required it to execute the agreements with Plaintiff

14   then did everything in their power to screw them up.  *See* Howell Decl., ¶36, Ex. 35 (Talesun USA

15   director explaining to Plaintiff that "this is completely a shit on my head" after Chairman Wang

16   retracted yet another of the Parents' promises to perform).  The degree of control the Parents'

17   exerted over Talesun USA was crystallized in the words of their own exasperated lawyer, who

18   shared his opinion during ongoing settlement negotiations that (1) Talesun USA's General

19   Manager has no clue what's going on ("he doesn't know why or when" but will explain the

20   urgency to the Parents); (2) the Parents don't live by the same rules as the lawyers, including

21   honoring deadlines in their agreements; and (3) the Parents consider contracts "more instruments

22   of process than agreements of performance."  *See* Frid Decl., ¶9, Ex. 8.  Where the Court need

23   only find that Plaintiff has established a prima facie case for exercising jurisdiction over the

24   Parents, that decision should be easy.  *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1069 n. 17

25   (9th Cir. 2000) ("Because it appears, at the pleading stage, that Gatcombe is merely a shell that is

26   entirely controlled by Wong's International, we disregard Gatbcombe's separate identity for

27   personal jurisdiction purposes."); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1393 (9th

28

MPA ISO PLAINTIFF'S OPP'N TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 4:19-CV-04243-YGR

Cir. 1984) (alter ego jurisdiction is appropriate over a foreign parent who totally controls the actions of the subsidiary).

### 3. The Parents Inadequately Capitalized Talesun USA.

As described above in Section II.D, the Parents took great measures to undercapitalize their subsidiary, rendering it unable to pay – by itself – any of the amounts that came due during the parties' relationship.  Moreover, Mr. Ma admitted that the subsidiary he oversaw "didn't make enough money to make ends meet."  Ma depo. at 57:20-58:6.  While the Parents didn't produce a single financial for Talesun USA in the underlying contract case or to the utilities, they accidentally let financials slip through for the subsidiary they formed to replace Talesun USA after winding it down (Zhongli New Energy USA).  In deposition, the PMK for this new entity confirmed that for an initial capital contribution of $1,000, the Parents took 100% ownership of the subsidiary's stock.  Sheng depo., at 141:1-20 (also testifying that notwithstanding the $1,000 capital contribution, the subsidiary was spending between $10-20,000/month).  While jurisdictional discovery would lock this down, Plaintiff has pled/established facts sufficient to establish alter ego jurisdiction over the Parents on the singular basis of undercapitalization.

### F. While Unnecessary, Plaintiff Has Also Satisfied the Majority of the Nine Alter Ego Factors Applicable Where One of the Independent Bases Fails.

Because Plaintiff has satisfied a prima facie case for jurisdiction on at least one of the independent alter ego grounds discussed above, the Court need not consider the overarching nine-factor test applied when those factors are absent.  *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 954 (N.D. Cal. 2015).  Nevertheless, Plaintiff has still satisfied the majority of those factors, including (1) the holding out by the Parents that they are liable for the subsidiary's debts [Howell Decl., ¶¶ 2, 5-6, Exs. 1, 4-5], (2) use of the same offices and employees [Gu depo. at 255:3-10; Ma depo. at 23: 9-19, 167:12-22], (3) use of one as mere shell or conduit for the affairs of the other [*see* above, Section II.A, II.B, II.C], (4) inadequate capitalization [*see* above, Section II.D], (5) disregard of corporate formalities [*see* Gu depo. *passim*], (6) lack of segregation of corporate records [*Id.*], and (7) identical directors and officers. [*See* No. (2) above; FAC ¶ 14, Ex. 1]

-22-

**G.      The Court Should Deny Defendants' Rule 12(b)(7) Motion.**

Defendants also seek dismissal pursuant to Fed. R. Civ. P. 12(b)(7) on the basis that Talesun USA is an indispensable party to this lawsuit.  The moving party bears the burden of persuasion in arguing for dismissal under Rule 19.  *Clinton v. Babbit*, 180 F.3d 1081, 1088 (9th Cir. 1999).  Defendants submit no compelling argument as to how Talesun USA – an admittedly empty shell with no employees, no money, no evidence relevant to this case, and no business operations since at least 2015 – satisfies any of the required elements under Rule 19(a)(1).

Distinguishing this case from those where a subsidiary's absence could lead to severe prejudice, here, Talesun USA was never anything more than a local marketing department for the Parents and were always treated as such.  The absurdity of arguing Talesun USA is a necessary/indispensable party in this case is evidenced by admissions made by Defendants' counsel when seeking a continuance of the related state court matter where *only Talesun USA (and its replacement, U.S. subsidiary) are parties*:

> MS. PIPKIN:  I sent a proposed schedule to Mr. Ongaro, counsel for Plaintiff, last night.  <u>And because of the Lunar New Year holiday, my clients are located in China, so they are closed</u>.  The schedule that we proposed involved starting -- and, of course, this is subject to the Court's availability.
> . . .
> MS. PIPKIN:  No, Your Honor.  As I mentioned, we have an issue with <u>our clients being closed for Lunar New Year, which means I cannot communicate with them about any important matters under Rule 1.4 of the professional rules of conduct as I am required to do, so I am constrained from doing really anything until my clients reopen on January 31st</u>.

Frid Decl., ¶10, Ex. 9.  Talesun USA sent no representatives to attend its own trial, and its defense for that entire case was orchestrated by, and paid for, by the Parents.  The indispensable party argument carries no weight when a victory yields nothing more than an empty chair at trial.

Defendants also string cite cases where the subsidiary was alleged to be the "primary participant" in the underlying action.  *See* Motion, at p. 16:8-21 ("Here, plaintiff's complaint leaves no doubt that Talesun USA is a primary participant in the facts that give rise to plaintiff's claims.").  As described in detail above, however, Talesun USA's primary role in this dispute was to serve as messenger/translator for the Parents, who precisely controlled their subsidiary's every

move, eventually leaving both the subsidiary and the Parents' counsel exasperated in their dealings with Plaintiff.  If anything, Talesun USA was a *passive* participant as it awaited constant instructions from China.  And the only reason Plaintiff's interactions were "almost entirely with the absent subsidiary" (Motion, at 17:5-6) was because the Parents limited their designated signatory's role to doing nothing more than passing along messages and apologizing.

Defendants' attempt to dismiss this case under Rule 12(b)(7) is also ironic given that to avoid liability for their actions, Defendants wound up Talesun USA in 2014, terminated all employees, and destroyed all evidence related to this matter.  *See* Hu Decl., Dkt 24-2, ¶5 ("Talesun USA is not currently conducting business."); *see* Section II.F.  In the contract case, the Parents ordered their officer, Lingqing Gu, to serve as Talesun USA's PMK witness (who testified he never even heard of Talesun USA, let alone worked for the company).

Under Fed. R. Civ. P. 19(a), a court must consider efficiency and fairness growing out of the particular circumstances of the case and determine whether to require a particular party be joined to the action.  *Virginia Surety Co. v. Northrop Grumman Corp.*, 144 F.3d 1243, 1248 (9th Cir. 1998).  Here, given that Talesun USA is a defunct entity with no witnesses, documents, or money, there is simply no reason this case cannot proceed only against the Parents.

Moreover, while it is undisputed that the Parents, at the last minute, ordered Talesun USA to execute the underlying agreements on their behalf, that Talesun USA did what it was told does not render it an indispensable party because this is <u>not</u> a breach of contract case.  *Concat Lp v. Unilever, Plc*, 350 F. Supp. 2d 796 (N.D. Cal. 2004), *citing Virginia Surety Co.*, 144 F.3d at 1248 (noting that "in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."); *cf Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 276 F.3d 1150, 1157 (9th Cir. 2002) ("[A] party to a contract is necessary, and if not susceptible to joinder, indispensable to litigation seeking to decimate that contract."); *Clinton*, 180 F.3d at 1088 ("[A] district court cannot adjudicate an attack on the terms of a negotiated agreement without jurisdiction over the parties to that agreement.").

According to the Advisory Committee Notes to Rule 19(a), "a tortfeasor with the usual 'joint-and-several' liability is merely a permissive party to an action against another with like

1   liability." 28 U.S.C. App. P. 595.  "Courts have held that since a tortfeasor who is found liable can

2   seek contribution from a joint tortfeasor, defendants are not prejudiced by the failure to join all

3   tortfeasors in one action." *Chang Young Bak v. Metro–N. R. R. Co.,* No. 12 Civ. 3220, 2013 WL

4   1248581, at *4 (S.D.N.Y. Mar. 26, 2013); *see also Concat Lp*, 350 F. Supp. 2d at 801 (where this

5   court denied defendant's motion to dismiss tort action under 12(b)(7) where any prejudice of

6   proceeding without the alleged "indispensable" third party could be mitigated by imposing

7   traditional tort remedies – *i.e.*, requiring indemnification if necessary).

8          Rather, despite Defendants' mischaracterization of this case as sounding in contract

9   (Motion, at 20:5-6), this case alleges only fraud orchestrated and perpetrated directly by the

10  Parents, which fraud happened to be discovered when the Parents' representatives were deposed,

11  and submitted declarations, in the ongoing contract case against Talesun USA.  This action

12  therefore sounds in tort where courts routinely deny Section 12(b)(7) motions.  *See Garner v.*

13  *Behrman Bros. IV, LLC*, 260 F. Supp. 3d 369, 382 (S.D.N.Y. 2017) (like here, defendant cited a

14  series of cases where subsidiaries were deemed necessary parties where the subsidiary and parents

15  were alleged to be separate legal entities and the parent's liability was based only on the

16  subsidiary's wrongdoing).  Here, the Parents and Talesun USA are alleged to be the same, not

17  different, entities, and, more importantly, the Parents' liability arises from their own misconduct

18  directed at this forum.  *See id.* (distinguishing cases which did not involve allegations against a

19  parent based on "the parent's own wrongdoing").

20         Moreover, because they misconstrue this as a "contract" case, Defendants misrepresent

21  that "Plaintiff seeks the same remedy, for the same state-law breach of contract claims alleged

22  here, in its state court action."  Motion, at 20:3-4.  That is obviously not true; the FAC seeks tort

23  damages (including consequential and punitive damages) that are not recoverable on the contracts.

24         Dismissal is a somewhat drastic remedy and is only appropriate when "a person who is

25  required to be joined if feasible cannot be joined."  Fed. R. Civ. P. 19(b).  Here, both of the

26  Parents are already in this lawsuit and, as they have done throughout the parallel state court

27  contract action where they are not even parties, they will absolutely control the defense of this

28  action with or without Talesun USA's involvement (a necessary by-product of the fact that they

-25-

1   have reduced Talesun USA to an empty shell with no employees, documents, or business

2   operations, with only a single board member remaining who's also an officer of the Parents and

3   who's already been deposed.)  Moreover, because the Parents and Talesun USA share the same

4   counsel, Talesun USA's interests (if any, given its defunct status) are well-protected in this case,

5   though it is nearly impossible to divine what "prejudice" this shell company with no assets could

6   incur by not being a party.  *See Schnabel v. Lui*, 302 F.3d 1023 (9th Cir. 2002) (noting that

7   defendants have not explained how party having no assets could be "indispensable," given Rule

8   19(a)(1)'s requirement that to be indispensable, "complete relief" cannot be afforded without the

9   party's joinder).  Talesun USA' very purpose of existence, after all, was to serve only as a

10  marketing conduit though which the Parents would conduct business in this country.

11          **H.      The Court Should Deny Defendants' Motion Under Rule 12(b)(5).**

12          Defendants concede that Plaintiff personally served Changqing Hu with a summons and

13  complaint during his deposition as they must given the amended proof of service.  Dkt. 20, 22;

14  Frid Decl. ¶4, Ex. 3 at 170:16-25 ("Hu depo.").  Defendants quibble, however, with the amended

15  proof of service as it inadvertently checks the third box, indicating Mr. Hu was "designated by

16  law" as Defendants' agent for service of process, while actually filling in the correct information

17  for the first box indicating personal service.[4]  Motion, at 14:20-24.

18          Service on a corporation is effective if the papers are delivered "to the president, chief

19  executive officer, or other head of the corporation, a vice president, a secretary or assistant

20  secretary, a treasurer or assistant treasurer, a controller or ***chief financial officer***, a general

21  manager, ***or*** a person authorized by the corporation to receive service of process."  Cal. Code Civ.

22  P. § 416.10. (emphasis added).  At the time of service, Mr. Hu confirmed his role as a board

23

24          [4] The "substantial compliance doctrine" excuses minor technical defects in service of
    process under certain circumstances when (a) the party that had to be served personally received
25  actual notice, (b) the defendant would suffer no prejudice from the defect in service, (c) there is a
    justifiable excuse for the failure to serve properly, and (d) the plaintiff would be severely
26  prejudiced if his complaint were dismissed.  *Whale v. United States*, 792 F.2d 951, 953 (9th
    Cir.1986) (*quoting Borzeka v. Heckler*, 739 F.2d 444, 446–48 (9th Cir.1984).  To the extent the
27  Court deems checking an extraneous box on the proof is a "minor technical defect," it is
    excusable under the substantial compliance doctrine.

28

1    member for defendant Talesun Solar [Hu depo. at 162:9-18] and a vice president for defendant

2    Zhongli Group [*id*. at 146:1-146:6] (in addition to simultaneously serving as the only board

3    member for subsidiary Talesun Solar USA [*id*. at 126:19-22; 127:2-6; 169:6-9; and 171:17-21]).

4    Defendants cannot – indeed, they do not – dispute that Mr. Hu was their high-ranking officer.

5         Moreover, service of process "may be upheld where made upon an individual who is not

6    an employee but **so integrated with the organization that he will know what to do with the**

7    **papers** … [so] as to render it fair, reasonable and just to imply the authority on his part to receive

8    service." *Direct Mail Specialists, Inc. v. Eclat Computerized Technologies, Inc.*  840 F.2d 685,

9    688 (9th Cir. 1988) (emphasis added); Fed. R. Civ. P. 4(h)(1)(B).  Mr. Hu is clearly a managing

10   or general agent of Defendants, so intertwined within the different Zhongli corporate parent and

11   subsidiary entities that he knew exactly what to do with the papers when served.  *See* Frid Decl.,

12   ¶4, Ex. 10 (Hu biography from Talesun Solar annual report).

13        Finally, at the time of service, Mr. Hu was the only board member remaining for

14   subsidiary Talesun USA.  Hu depo. at 126:19-22; 127:2-6; 169:6-9.  Thus, service was also

15   appropriate on Mr. Hu in that capacity alone.  *See Adams v. Allied Signal General Aviation*

16   *Avionics,* 74 F.3d 882, 885 (8th Cir. 1996) ("[I]f the parent corporation completely dominates the

17   subsidiary and they operate as a single entity, each may be treated as a de facto agent for service

18   of process on the other."); *see also Hickory Travel Systems, Inc. v. TUI AG,* 213 FRD 547, 553

19   (N.D. Cal. 2003) (plaintiff must demonstrate that subsidiary functions either as parent's agent or

20   as its alter ego).  Because service of process was sufficient, the Court should deny Defendants'

21   Motion to Dismiss pursuant to Rule 12(b)(5).

22        **I.       The FAC Adequately Pleads Fraud.**

23        Defendants provide just sixteen words in support of their flimsy Rule 12(b)(6) argument.

24   Motion, at p. 11:19-20.  Here, the Court must accept Plaintiff's allegations as true and construe

25   them in the light most favorable to the plaintiff.  *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246,

26   1249 (9th Cir. 2007).  "The elements of a cause of action for fraud in California are: (a)

27   misrepresentation (false representation, concealment, or nondisclosure ); (b) knowledge of falsity

28   (or 'scienter'); (c) intent to defraud, *i.e.,* to induce reliance; (d) justifiable reliance; and (e)

1   resulting damage." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1163 (9th Cir. 2012)

2   (quotation omitted).  To the extent the Court elects to do Defendants' work for them, it will see

3   that the FAC adequately pleads the specifics of Defendants' fraudulent conduct.

4        The FAC alleges exactly when Defendants made numerous misrepresentations and the

5   specifics of those misrepresentations.  *See, e.g.*, FAC, ¶¶23-24, 46-48, and 60.  It then summarizes

6   these misrepresentations in Count I (¶87), and summarizes key facts which Defendants concealed

7   from Plaintiff in Counts I (¶88) and II (¶95).  The FAC also alleges that Defendants made these

8   representations (and concealed certain facts) with an intent to induce Plaintiff's reliance (¶89, 97),

9   that Defendants knew these representations were false when made (¶91), and that "prior to

10  entering into the Agreements, M-S Fund reviewed and relied on these financials along with

11  Talesun USA's express promises of financial backing from its Chinese parent companies." *See*

12  *id.*, at ¶¶34, 57; *see also* ¶¶89, 92, 98 (pleading reliance).  Finally, Plaintiff suffered damage

13  because it relied on Defendants' misrepresentations/omissions.  *See id.*, ¶93, 99, 104.

14       Fraud allegations "must be specific enough to give defendants notice of the particular

15  misconduct which is alleged to constitute the fraud (or mistake) . . . so that they can defend

16  against the charge and not just deny that they have done anything wrong." *Fid. Nat. Title Ins. Co.*

17  *v. Castle,* C 11-00896 SI, 2011 WL 6141310, at *5 (N.D. Cal. Dec. 8, 2011) (quotation omitted).

18  Plaintiff's FAC is not so vague or broad so as to fail to provide Defendants with fair notice of the

19  allegations.  Accordingly, the Court should deny Defendants' Motion under Rule 12(b)(6).

20       **J.**     **Jurisdictional Discovery Is Warranted.**

21       To the extent the Court is inclined to dismiss this case, it has broad discretion to permit

22  Plaintiff to conduct limited jurisdictional discovery.  *Laub v. U.S. Dep't of Interior*, 342 F.3d

23  1080, 1093 (9th Cir. 2003) ("discovery should ordinarily be granted where pertinent facts bearing

24  on the question of jurisdiction are controverted or where a more satisfactory showing of the facts

25  is necessary."), *quoting Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th

26  Cir. 1986).  Prejudice is established if there is a reasonable probability that the outcome on a

27  motion would have been different had discovery been allowed.  *Martel v. County of Los Angeles*,

28  56 F.3d 993, 995 (9th Cir. 1995) (en banc).  In *Laub*, jurisdictional discovery was affirmed where

1    plaintiff established a reasonable probability that the outcome on a factual motion might be

2    different if it were permitted discovery into a "detailed accounting of all transactions undertaken

3    by the Defendants." *Laub*, 342 F.3d at 1093.  Here, Plaintiff can only imagine the level of

4    absolute domination and control that would be evident in the Parents' direct communications with

5    their subsidiary, evidence relevant to nearly every issue raised in Defendants' Motion.  As in

6    *Laub*, Plaintiff has established actual and substantial prejudice from being denied the opportunity

7    to take this discovery from Parents.  *See also Harris Rutsky & Co.*, 328 F.3d at 1135 (finding that

8    the district court abused its discretion in denying plaintiff's motion for jurisdictional discovery).

9          Moreover, where purposeful undercapitalization provides an independent ground for

10   asserting alter ego jurisdiction over the Parents, it would be manifestly unjust to grant

11   Defendants' Motion when they have steadfastly refused to produce financials.  *See*, *e.g.*, *Slottow*

12   *v. American Casualty Co.*, 10 F.3d 1355, 1360 (9th Cir. 1993) (noting the applicability of alter

13   ego doctrine where parent undercapitalized subsidiary in effort to avoid liability; finding

14   inadequate capitalization where entity's "initial capitalization" was $500,000, which was

15   "woefully inadequate" relative to the entity's liabilities of at least $10 million).  While Plaintiff

16   has pled the facts it can concerning Talesun USA's specific assets (or lack thereof) and liabilities,

17   the Parents have gone to great measure to frustrate discovery in the related contract case.  Unlike

18   in state court, however, the duty to preserve relevant evidence arises in this court "once a party

19   reasonably anticipates litigation."  *PersonalWeb Techs., LLC v. Google, Inc.*, 2014 WL 580290, at

20   *2 (N.D. Cal. Feb. 13, 2014).  Discovery into the Parents' communications with Talesun USA is

21   key evidence on this Motion, and the Court should be reluctant to grant the relief sought without

22   permitting reasonable discovery into the veracity of the Parents' fishy destruction story.

23   **IV.    CONCLUSION**

24         For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its

25   entirety.  To the extent the Court requires additional allegations consistent with the facts

26   referenced herein, leave to amend is warranted.

27

28

1    DATED:  May 8, 2020                 **ONGARO PC**

2
                                         By:  ___/s/  *David R. Ongaro*_____
3                                             David Ongaro

4                                        Attorneys for Plaintiff
                                         MARTIFER-SILVERADO FUND I, LLC
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MPA ISO PLAINTIFF'S OPP'N TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 4:19-CV-04243-YGR

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

At the time of service,  I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is 1604 Union Street, San Francisco, CA 94123.

On <u>May 8, 2020</u>, I served a true copy of the following document described as**:**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

on the interested parties in this action as follows:

**BY E-FILING:** By electronically serving the document(s) listed above via CM/ECF on the recipients designed on the Transaction Receipt located on the CM/ECF website.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 8, 2020, at San Francisco, California.

*/s/ Christine M. Gill*
Christine M. Gill

MPA ISO PLAINTIFF'S OPP'N TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT
Case No. 4:19-CV-04243-YGR