DAVID R. ONGARO, State Bar No. 154698
 dongaro@ongaropc.com
EUGENE B. FRID, State Bar No. 321265
 efrid@ongaropc.com
ONGARO PC
1604 Union Street
San Francisco, CA 94123
Telephone: (415) 433-3900
Facsimile: (415) 433-3950

Attorneys for Plaintiff
MARTIFER-SILVERADO FUND I, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| MARTIFER-SILVERADO FUND I, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ZHONGLI SCIENCE AND TECHNOLOGY GROUP CO., LTD., a Chinese corporation; SUZHOU TALESUN SOLAR TECHNOLOGY CO., LTD., a Chinese corporation; and DOES 1 through 5, inclusive,<br><br>Defendants. | Case No. 4:19-CV-04243-YGR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: August 17, 2021<br>Time: 2:00 p.m.<br>Location: Floor 4, Courtroom 1<br>Judge: The Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................... 1

II.    PROCEDURAL HISTORY ...................................................................................... 2

III.   FACTUAL BACKGROUND .................................................................................... 4

     A.     Defendants' Actively Concealed Their Scheme to Defraud M-S Fund. ................. 4

     B.     Notwithstanding Defendants' Efforts, M-S Fund Recently Discovered Their Fraudulent Scheme Through Their Actions in the State Court Case. ................. 10

     C.     M-S Fund's First Amended Complaint. ............................................................... 12

IV.   ARGUMENT .......................................................................................................... 14

     A.     Defendants' Motion is for Summary Judgment, Not JOTP. ................................. 14

     B.     Defendants' Limitations Defense is Not Appropriate for Summary Judgment. .......................................................................................................... 16

          1.     Defendants Have Not Established Undisputed Material Facts Sufficient to Grant Their Motion. .......................................................... 17

          2.     M-S Fund's Claim of Equitable Estoppel and Tolling Should Proceed to Trial. ....................................................................................... 21

     C.     If the Court is Inclined to Grant Defendants' Motion, Leave to Amend is Warranted. ........................................................................................................... 22

     D.     If the Court is Inclined to Grant Defendants' Motion, Plaintiff Requests an Opportunity to Conduct Limited Discovery and Submit Further Briefing Pursuant to Rule 56(d). ...................................................................................... 23

V.     CONCLUSION ....................................................................................................... 26

# TABLE OF AUTHORITIES

*April Enterprises, Inc. v. KTTC,*
    147 Cal. App. 3d 805 (1983) ................................................................. *passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................... 15

*Baker v. Beech Aircraft Corp.,*
    39 Cal. App. 3d 315 (1974) .......................................................................... 21

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... 14

*Cansino v. Bank of Am.,*
    224 Cal. App. 4th 1462 (2014) ..................................................................... 22

*Carter v. Stanton,*
    405 U.S. 669 (1972) ....................................................................................... 15

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ....................................................................................... 24

*Cleveland v. Internet Specialties W., Inc.,*
    171 Cal. App. 4th 24 (2009) ......................................................................... 16

*Cline v. Reetz-Laiolo,*
    329 F.Supp.3d 1000 (N.D. Cal. 2018) ......................................................... 23

*Conerly v. Westinghouse Elec. Corp.,*
    623 F.2d 117 (9th Cir.1980) .......................................................................... 22

*Continental Maritime v. Pacific Coast Metal Trades,*
    817 F.2d 1391 (9th Cir. 1987) ...................................................................... 25

*Culver City v. State Bd. Of Equalization,*
    29 Cal. App. 3d 404 (1973) .......................................................................... 22

*E-Fab, Inc. v. Accountants, Inc. Servs.,*
    153 Cal. App. 4th 1308 (2007) ............................................................... *passim*

*El Pollo Loco, Inc. v. Hashim,*
    316 F.2d 1032 (9th Cir. 2003) ...................................................................... 20

*Fleming v. Pickard,*
    581 F.3d 922 (9th Cir. 2009) ........................................................................ 14

*Fox v. Ethicon Endo-Surgery, Inc.,*
    35 Cal.4th 797 (2005) ............................................................................. *passim*

*Garrett v. San Francisco,*
    818 F.2d 1515 (9th Cir. 1987) ...................................................................... 24

*Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church,*
    887 F.2d 228 (9th Cir. 1989) ........................................................................ 14

*Guerrero v. Gates,*
    442 F.3d 697 (9th Cir.2006) .......................................................................... 21

*Gutierrez v. Mofid,*
    39 Cal.3d 892 (1992) ..................................................................................... 17

*Hal Roach Studios, Inc. v. Richard Feiner & Co.,*
    896 F.2d 1542 (9th Cir.1989) ........................................................................ 14

*Hexcel Corp. v. Ineos Polymers, Inc.*,
  681 F.3d 1055 (9th Cir. 2012) ................................................................... 23

*Hobart v. Hobart Estate Co.*,
  26 Cal.2d 412 (1945) ...................................................................... *passim*

*In re Air Crash off Point Mugu, California*,
  145 F.Supp.2d 1156 (N.D. Cal. 2001) ........................................................ 15

*Jolly v. Eli Lilly & Co.*,
  245 Cal.3d 1103 (1988) ............................................................................ 24

*Lawson v. JPMorgan Chase Bank, N.A.*,
  No. C14-5133 RJB, 2014 WL 12561148 (W.D. Wash. Apr. 16, 2014) .................... 23

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) .................................................................. 22

*Merck & Co., Inc. v. Reynolds*,
  559 U.S. 633 (2010) ................................................................................. 20

*Norgart v. Upjohn Co.*,
  21 Cal.4th 453 (1999) .............................................................................. 20

*Ralph Andrews Productions, Inc. v. Paramount Pictures Corp.*,
  222 Cal. App. 3d 676 (1990) .................................................................... 16

*Rivera-Torres v. Rey–Hernández*,
  502 F.3d 7 (1st Cir. 2007) ........................................................................ 24

*Sharaf v. Starbuzz Tobaco, Inc.*,
  79 Fed. App'x 618 (9th Cir. 2018) ............................................................ 16

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013) .................................................................... 22

*Sun Savings & Loan Ass'n v. Dierdorff*,
  825 F.2d 187 (9th Cir.1987) ..................................................................... 15

*Trask v. Franco*,
  446 F.3d 1036 (10th Cir. 2006) ................................................................. 24

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*,
  1 Cal.3d 586 (1970) ................................................................................. 15

*United States v. Garan*,
  12 F.3d 858 (9th Cir. 1993) ...................................................................... 22

*VISA Int'l Serv. Ass'n v. Bankcard Holders*,
  784 F.2d 1472 (9th Cir.1986) ................................................................... 25

*Vu v. Prudential Prop. & Cas. Ins. Co.*,
  26 Cal.4th 1142 (2001) ............................................................................ 22

## I.     INTRODUCTION

Simply stated, had Defendants timely informed either their General Manager, Eric Ma, or anybody remotely connected with plaintiff Martifer-Silverado Fund I, LLC ("MSF") that Mr. Ma lacked authority to execute the contracts memorializing this $30.6M commercial solar deal, we wouldn't be here today.  In this alternate universe, MSF would have either insisted that *somebody other than Mr. Ma* sign, or would have eschewed Defendants' payment for exclusivity and just sold its project portfolio to another of their multiple suitors.  Having thus avoided Defendants' trap, MSF would either still be in business today or its principals enjoying their early retirement.[1]

Moreover, had Defendants informed MSF that Mr. Ma lacked authority to bind the company on whose board he sat *at any point prior to December 2016*, MSF would have certainly filed a fraud claim in addition to the breach of contract claims they filed against Talesun at that point (just before the statute ran on those contract claims).  Yet that didn't happen, either.

But for Defendants' intentional misrepresentations concerning Mr. Ma's authority – bolstered by their actions at every turn – MSF would have avoided Defendants like the plague. Defendants cannot now benefit from a procedural defense that exists only because they fraudulently concealed key facts until January 28, 2019, when they served a declaration from their CFO in order to avoid a summary judgment motion on the contracts.

On this record, the Court should deny Defendants' Motion outright, or else treat it for what it is – a *premature* motion for summary judgment, which the Court can either deny because (1) Defendants have put forth zero undisputed facts warranting the relief sought, or (2) MSF is entitled to take discovery, already propounded, necessary to oppose this motion.  But if the Court is inclined to grant Defendants' Motion, it should grant leave to amend so that MSF can more expressly allege that Defendants' fraudulent concealment *prevented MSF from discovering their scheme* during the customary, three-year limitation period governing fraud claims.  Amendment seems unnecessary, however, given the explicit details already alleged in the FAC.  *See* ¶¶77-78.

---

[1]/  The evidence at trial will show that MSF was ultimately forced to dump these profitable solar projects which were the subject of these contracts, along with the rest of its assets, for virtually nothing, as the MSF was in a significantly distressed state because of Defendants' conduct; the purchaser then flipped these projects as a major component of a $1.6<u>B</u> sale.

## II.    PROCEDURAL HISTORY

***This Case.***  On January 28, 2019, in an effort to avoid summary judgment on one of the underlying contracts, Defendants' first revealed their position that Eric Ma, General Manager of their U.S.- subsidiary, did not possess authority to execute the transaction documents.  *See* Declaration of Eugene B. Frid ("Frid Decl."), ¶32, Ex. 29 ["Hu Decl."].  Mr. Hu, who during the relevant time period served as Chief Financial Officer for *both* Defendants and the U.S.-subsidiary,[2] also declared that "Mr. Ma was never a member of the Board of Directors of Talesun," contrary to Mr. Ma's express testimony under oath.  *Compare* Ex. 29, at ¶3 ("Mr. Ma was never a member of the Board of Directors of Talesun"), *with* Frid Decl., ¶8, Ex. 5 ("Ma depo."), at 18:3-19:67 (Mr. Ma testified that he was on Talesun's board, but was removed when "the company tried to shut down").

 Less than six months after receiving Mr. Hu's declaration, and after conducting an investigation into Defendants' duplicitous actions and dubious interrelationships – *where their officers don't even know who they work for or whether they're officers* – M-S Fund filed this lawsuit for fraud.  *See* ECF #1 [July 24, 2019 Complaint].  This motion represents Defendants' ***fourth*** attempt to avoid being held accountable for their fraudulent actions.

After granting MSF leave to amend its original Complaint, the Court denied Defendants' ***second*** Motion to Dismiss on September 11, 2020.  ECF #45.  In its Order, the Court noted that: (i) the manner in which Defendants used their U.S. subsidiary to execute deals *for their own benefit* established sufficient contacts with this forum [*id.* at 2:26-28], (ii) Defendants failed to refute the allegation that they wired all payments to M-S Fund on behalf of their U.S. subsidiary [*id*. at 3:1-7], and (iii) the subsidiary relied on Defendants' resources "to execute the deal" [*id*.].  The Court also (iv) credited M-S Fund's allegation that Talesun USA was merely the "front face" of the transaction, with Defendants providing the "financial backing" and guarantees of

---

[2]/  *See* Frid Decl., ¶40, Ex. 32 ["Hu depo."], at 143:14-144:25.  Curiously, when shown a document in deposition describing him as the U.S.-subsidiary's Chief Financial Officer, Mr. Hu testified he had "no idea" that he held this title for the subsidiary, then acknowledged that although he held "just a title," he did not know anything about the business.  *See id.* at 91:10-92:22.  His testimony was similar for his ceremonial title of "CFO" of Defendant Suzhou Talesun Solar.  *Id*. at 105:22-106:15.

performance [*id.* at 3:10-13], and (v) noted that Defendants represented to California's power companies and M-S Fund that, in fact, ***they*** were the financial backers and ultimate owners of the projects [*id.* at 3:21-23, 8:1-5]. For purposes of this Motion, where the Court must construe allegations in MSF's favor, the transaction at issue in this case had 2 counterparties: MSF on one side, and the Talesun entities (including Defendants and their subsidiary) on the other.[3]

On October 15, 2020, the Court denied Defendants' Motion for Leave to File a Motion for Reconsideration of the Court's Order denying Defendants' second Motion to Dismiss. ECF #56. On November 24, 2020, the Court denied Defendants' Motion to Stay this case. ECF #67. Having now failed to get this case dismissed, stayed, reconsidered, transmogrified, or otherwise painted green, Defendants now burden the Court with a misnamed motion that cherry-picks two specific allegations from the voluminous FAC and argues the entire case should be dismissed because MSF should have known of their fraudulent scheme as soon as Defendants first breached the contracts in late December 2012. As explained below, Defendants expended significant time and energy, and roughly $1M, to actively mislead MSF and California's utilities while concealing their scheme from everyone (including – it appears – Mr. Ma himself) only to let their guard down in the face of a summary judgment motion in the State Court case.

***The State Court Case.*** As the Court is aware, MSF sued Defendants' U.S.-subsidiary for breach of contact in San Francisco Superior Court in late December 2016 ("State Court case"). On December 23, 2020, Judge Karnow rejected Defendants' belated motion to throw that case out on statute of limitations grounds. *See* Frid. Decl., ¶2, Ex. 1. After the first four days of trial in late February 2021, Defendants' lawyers moved for a continuance because they were short-staffed. *Id.*, ¶3. That trial was supposed to resume, and conclude, earlier this month, but this, too, was delayed when Defendants' lawyers requested another continuance because Defendants

_____

[3]/ For purposes of satisfying Talesun's contractual representations and warranties – which play a large role in Defendants' Motion – the evidence will show that MSF treated all Talesun entities as one (including Defendants and their U.S.-subsidiary). This was consistent with Defendants' acknowledgment that they were the ultimate purchasers, and would be the owners, of the project companies. MSF also knew that Defendants were constantly changing the name of their "signatory" on the MIPA up until the closing date; what MSF did not know at the time was that these tactics were part of a scheme to defraud MSF and to attempt to shield themselves from liability in this country for the fraud they perpetrated through their subsidiary.

apparently failed to file and pay their subsidiary's taxes with the Franchise Tax Board (causing the FTB to forfeit the subsidiary's status). *Id.*, ¶4. This case is relevant now because it was Defendants' actions, in orchestrating the defense of claims against their U.S.-subsidiary, which first disclosed evidence of their scheme in using their U.S.-subsidiary to commit fraud (and to shield them from any liability for such fraud) in the State of California.

## III.    FACTUAL BACKGROUND

### A.    Defendants' Actively Concealed Their Scheme to Defraud M-S Fund.

At trial in the State Court case, Defendants' lawyers have doubled-down on the argument that the MIPA, Standstill Agreement, and Letter Agreement are unenforceable because Eric Ma lacked authority to bind their U.S.-subsidiary (Talesun USA). *See, e.g.*, Frid Decl., ¶5, Ex. 2 [Talesun's trial brief], at 2:24-25 ("Fully aware that the Talesun USA representative with whom it had been dealing lacked the authority to enter into transactions of this size and scale . . ."). The claim that MSF – being advised by sophisticated deal counsel (Orrick) – *knew* Mr. Ma lacked authority to execute these contracts in 2012 and 2013, yet signed them anyway, is belied both by (1) common sense and (2) every piece of contemporaneous evidence from the relevant timeframe.

Here's what the evidence will show either when this case goes before a jury or this defense is properly presented under Rule 56:

*Defendants Actively Led MSF to Believe (and, in Fact, Represented) that Mr. Ma Possessed Authority to Sign the MIPA.* On August 3, 2012, Mr. Ma emailed MSF an executed Letter of Intent ("LOI") to acquire certain projects in the MIPA portfolio. *See* Frid Decl., ¶6, Ex. 3. Frank Qi – who simultaneously served as VP, Sales for Defendant Zhongli Talesun and CEO of the U.S.-subsidiary – was not only copied on this email but he *executed the original Letter of Intent*. *See id.*, ¶7, Ex. 4. We thus have Defendants executing the LOI which preceeded, and laid the foundation for, the MIPA.

While Talesun USA paid MSF a $500k exclusivity deposit on these projects, the money came from Defendant Zhongli Talesun (*i.e.*, "HQ"). *See* Ma depo. at 65:23-66:10; 72:8-74:5. Talesun USA's board eventually authorized Mr. Ma to execute an extension of the

LOI/exclusivity period. *Id*. at 75:7-23; 81:15-82:3; 94:15-18. We thus have Defendants paying half a million dollars on the contract that they recently alleged Mr. Ma was not authorized to sign.

In October 2012, <u>*Defendants*</u> flew MSF member Hans Isern to Australia to tout <u>*their*</u> plan to purchase solar project companies from MSF. *See id*., ¶9, Ex. 6. On this trip, <u>*Defendants*</u> orchestrated a dog and pony show that included dinner with key Chinese government officials, the Chairman of Defendant Zhongli Science & Technology (Baixing Wang), and Mr. Isern, and hosted a well-publicized signing ceremony for a Memorandum of Understanding (which agreement formed the basis of the MIPA and was signed by Defendants' Chairman, Mr. Wang). *See id*., ¶10, Ex. 7. Defendants issued a press release covering the signing ceremony entitled "Zhongli Talesun oversees projects signing ceremony." *See id*., ¶11, Ex. 8; Ma depo. at 164:13-165:7 (Chairman of the Board of Defendant Zhongli Science & Technology pictured with Mr. Isern in Australia). We thus have Defendants executing the MOU which mirrored the MIPA after flying MSF to Australia for a signing ceremony touting their plan to purchase these solar projects.

Mr. Ma served as General Manager of Talesun USA (Ma depo. at 15:17-19), reporting to Mr. Qi (who, unbeknownst to Mr. Ma, held the ceremonious title of "CEO" of Talesun USA).[4] *Id*. at 16:7-16. As General Manager, Mr. Ma was a duly-elected officer of Talesun USA [Frid Decl., ¶12, Ex. 9] who also served on Talesun USA's board during the relevant period along with two other representatives from the Defendants (Mr. Qi and Mr. Hu). Ma depo. at 18:3-19:8; 161:4-162:10. Defendant Zhongli Talesun always controlled Talesun USA's board. *Id*. at 22:14-23:8. Because the other two board members lived in China, Mr. Ma attended board meetings in at the Talesun HQ in China (*id*. at 62:8-18, 63:14-17)) and confirmed that the board kept regular minutes (none of which were produced in discovery of the State Court case since they were destroyed along with all other relevant documents). *Id*. at 23:9-25:9.

_____

[4] While serving as Talesun USA's figurehead CEO, Mr. Qi's real job was VP Global Sales, Zhongli Talesun Technology Corp Limited (in China), the corporate parent who owned 100% of Talesun USA. Ma depo. at 124:3-5; 16:24-17:7; 17:17-22; 122:10, 15-19. Mr. Ma didn't even recall that his boss, in fact, held the CEO title for Talesun USA, claiming "another guy" held that title. *Id*. at 16:7-16. He later recalled, after reviewing a Letter of Intent executed by Mr. Qi, that Mr. Qi in fact held the CEO title for Talesun USA. *Id*. at 53:4-24.

As the subsidiary's GM and board member, Mr. Ma possessed authority to enter into contracts on Talesun's USA's behalf up "to a certain level" and often did so. *Id*. at 19:19-20:18. Above that level, Mr. Ma simply needed to procure board approval to execute contracts. *Id*. at 89:6-24; 90:12-18. Insofar as MSF was aware, Mr. Ma was also one of the authorized signatories for large checks. *Id*. at 29:15-21; *see also* Frid Decl., ¶13, Ex. 10 [Talesun USA check for $10,971,416.50, signed by Eric Ma and deposited with Reed Smith to hold in escrow].

Mr. Ma was in constant contact/receiving instructions from HQ on this deal (with "HQ" referring to Defendant Zhongli Talesun). Ma depo. at 71:13-23; 77:17-78:18. In correspondence dated November 7, 2012, Mr. Ma confirmed that Talesun USA was "working on all documents now for the Board review" (referring to the Zhongli Talesun board). *See* Frid Decl., ¶14, Ex. 11. On November 23, 2012, Mr. Ma further confirmed, in writing, that "a board meeting will be held on Nov. 27 to finally review and approve the deal." *Id*., ¶15, Ex. 12; Ma depo. at 134:21-135:4. Two days later, Mr. Ma reported that "we were able to obtain more updates from Talesun HQs regarding the board approval . . ." *See* Frid Decl., ¶16, Ex. 13. Following the November 27 board meeting, Mr. Ma was excited to report that "our board approved the deal!" – referring to the Zhongli Talesun board approving the MIPA. *See id*., ¶17, Ex. 14 ("Hi Jim, our board approved the deal!"); Ma depo. at 82:9-12. Thus, according to Mr. Ma (who executed the MIPA), both Zhongli Talesun and Talesun USA's boards approved the MIPA. *Id*. at 82:20-22; 82:25-83:3; 83:24-85:2 (further confirming that Zhongli Talesun had to also approve the deal). Mr. Ma in fact attended a Zhongli Talesun BoD meeting in late 2012 to finally approve the terms of the MIPA, and testified that Zhongli Talesun approved the MIPA as reflected in board minutes that, at some point, he possessed in his email but no longer exist. *Id*. at 79:6-80:7. He was also in China to oversee the MIPA closing. *Id*. at 109:8-110:17.

On this authority, Mr. Ma then executed the MIPA on November 28, 2012. *Id*. at 94:3-21 ("Q: And you had authority to sign the MIPA on behalf of Talesun Solar; right? A: I was authorized. Q: You're also authorized by Zhongli Talesun to sign the agreement; right? A: Yes, I

got the Board approval for that, yeah.").  Defendants then paid an additional $500k (now $1M, total) to close on the first tranche of nine solar sites.[5]

That Defendants knew about and approved the MIPA is evident in Mr. Ma's testimony that his boss, Mr. Qi, confirmed that Defendant Zhongli Science & Technology approached banks in China to inquire about the required $35M letter of credit (an illogical use of time if they believed the contracts, and required obligations, were unenforceable).  Ma depo. at 198:1-11.  In correspondence with MSF, Mr. Ma shared that "the headquarters always prepare closing date at 20s of December."  *Id*. at 80:18-81:4.

**_Defendants Led MSF to Believe (and, in Fact, Represented) that Mr. Ma Possessed Authority to Sign the Standstill Agreement._**  Following the MIPA breach in late December 2012, nobody from Talesun ever claimed that they failed to perform because Mr. Ma lacked authority to execute the contract (and therefore the contract was invalid to begin with).  To the contrary, Mr. Ma confirmed that "HQ top managers are fully informed" of the ongoing settlement negotiations.  *See* Frid Decl., ¶18, Ex. 15.  Talesun's counsel, Ferd Convery at Reed Smith, was instructed to prepare the Standstill Agreement by his clients to memorialize the settlement before MSF was free to shop its project elsewhere.  *Id*., ¶19, Ex. 16 ("This draft was prepared at the direction of Talesun Solar and its special counsel").  Defendants reviewed and negotiated the terms of the Standstill, not once claiming Mr. Ma lacked authority to sign the MIPA which agreement they worked tirelessly over the Christmas break to salvage.[6]  *Id*., ¶20, Ex. 17.  Following a phone call with Mr. Qi and "another gentleman," Mr. Ma received board approval, from both Talesun USA and Zhongli Talesun, to execute the Standstill Agreement.  Ma depo. at 150:16-151:11; 149:3-25.

**_Defendants Led M-S Fund to Believe Mr. Ma Possessed Authority to Sign the Letter Agreement._**  Following Talesun's breach of the Standstill Agreement, Defendants remained involved in negotiating a potential settlement.  *See* Frid Decl., ¶21, Ex. 18 ("[The Chairman's

_____

[5]/ If Mr. Ma didn't have authority to sign the MIPA, why did Defendants' pay $1M on the unenforceable contract?

[6]/ Obviously, had anybody from Talesun claimed that Mr. Ma lacked authority to sign the MIPA while they were re-negotiating its payment/timing terms, the parties would **not** have let Mr. Ma sign the Standstill Agreement.

Special Counsel], [Mr. Qi], and our other Chinese colleagues have expressed their comments" on potential settlement terms); *see also id*. at ¶22, Ex. 19.  Never during the parties' settlement negotiations did Talesun, its counsel, or Defendants' "special counsel" assert that Mr. Ma lacked authority to execute the Letter Agreement.

**The Contracts Themselves Confirmed that Mr. Ma Possessed Authority to Execute.**  The MIPA contained representations and warranties confirming Mr. Ma's authority to execute the contract and that he required no further approvals to execute.  *See id.,* ¶23, Ex. 20, at §§5.1.2, 5.1.4.  Given their acknowledgment that Talesun USA was just the "front face" for the transaction, with the Parents touting to MSF, the Chinese press, and California utilities the reality that *they* were, in fact, the entities purchasing and owing these solar project companies, the reps and warranties in the MIPA clearly concerned *third-party* approvals, not internal or parent-level approvals that Mr. Ma was working diligently to procure – and which he claimed to have procured – in the days leading up to the MIPA's execution.

**Defendants Delivered an Officer's Certificate Confirming Mr. Ma's Authority.**  A standard practice for commercial deals of this size, the MIPA required that Talesun provide a signed Officer's Certificate, on the closing date, confirming that the signatory had "authority to execute and enter into this Agreement and any other Buyer Transaction Documents."  *See id.* at §3.1.4.8.  As required, Talesun provided an Officer's Certificate confirming Mr. Ma's authority to enter into the MIPA and other documents related to the "transactions contemplated thereby."  *See id.,* ¶24, Ex. 21, at Recital (e), Exhibit B; *see also* Recital (g) ("confirming that Mr. Ma "is duly elected or appointed, qualified and acting officer, as indicated, of Buyer holding the office(s) set forth opposite his name.  Each such officer or authorized signatory has been authorized to execute and deliver on behalf of Buyer the Transaction Documents…").  The attached board resolution confirmed that the Talesun USA board (controlled by Defendant Zhongli Talesun) reviewed, approved, and authorized Mr. Ma to execute the MIPA.  *See id*.

**Experienced, Respected Transactional Counsel Released Signatures.**  In response to a direct inquiry from Talesun's corporate counsel (Ernie Ocampo at Reed Smith), Mr. Ma authorized Reed Smith to "please release Talesun's signature" on the MIPA.  *See id.,* ¶25, Ex.

22.  A few days later, Reed Smith again confirmed "Talesun is signed off" on additional closing documents, authorizing the release of Talesun's signatures on additional closing docs.  *See id.,* ¶26, Ex. 23.  Reed Smith also confirmed, in writing, that Defendants had reviewed and approved Mr. Ma's execution of the Standstill Agreement.  *See id.,* ¶27, Ex. 24 ("Talesun has approved my last draft and will sign today").  Moreover, Defendant Zhongli Talesun had its own U.S.-based lawyer involved in negotiating/overseeing these transactions.  Ma depo. 142:16-143:21.

**Prior to 2019, Defendants Never Once Claimed Mr. Ma Lacked Authority.**  Given Talesun's failure to perform under the agreements, the record in the State Court Case is replete with emails and texts where the parties are negotiating to try and salvage this transaction.  Frid Decl., ¶41.  The parties' respective lawyers also exchanged numerous letters advancing various positions on behalf of their clients.  *Id.*  Not once in any of these communications did Talesun ever claim that Mr. Ma lacked authority to sign these contracts.  *Id.*  For example, on February 1, 2013, Talesun's lawyer sent a four-page letter to MSF's lawyer making various arguments under the MIPA.  *See id.,* ¶28, Ex. 25.  The letter does not mention Mr. Ma's lack of authority, instead advancing various contract arguments which assume the MIPA was validly formed.  *See id.*  Later, in July 2013, Talesun sent another letter demanding performance under *another* agreement that Mr. Ma had signed in late 2012 (the Development Services Agreement, which concerned the development of the projects Talesun was obligated to purchase).  *See id.,* ¶29, Ex. 26.  That same month, Talesun sent another letter concerning a path forward "with the nine projects Talesun acquired from Martifer-Silverado last year."  *See id.,* ¶30, Ex. 27.  In demanding performance under contracts Mr. Ma executed, and by referring to their partial payment as having effectuated a closing on projects *under the MIPA*, Talesun actively concealed its position that Mr. Ma lacked authority to execute these contracts.

Given these facts, including express confirmation of Mr. Ma's authority to execute the relevant agreements, the jury should have no problem determining that MSF had no knowledge of Defendants' scheme to defraud it prior to recently learning specific facts concerning Defendants' conduct (and positions) during the State Court case.

### B. Notwithstanding Defendants' Efforts, M-S Fund Recently Discovered Their Fraudulent Scheme Through Their Actions in the State Court Case.

When M-S Fund filed its breach of contract action against Talesun USA in December 2016, it had no inkling that the Chinese parent companies (*i.e.*, Defendants) had fraudulently induced M-S Fund into signing the MIPA in the first place. But as discovery in the contract case progressed, it became clear that Talesun USA was nothing more than an empty shell with no employees, documents, or assets, controlled entirely by Defendants, from China, like a puppet with two broken strings.

The specter of Defendants' fraudulent scheme was first raised in MSF's mind when witnesses – including former General Manager Eric Ma **who signed the contracts** and Talesun USA's so-called PMK witness who worked for, and was prepped by, Defendants – could offer zero explanation for why Talesun USA failed to perform any of its obligations under the agreements. *See* Ma depo. at 176:8-180:25; 195:21-196:19; *see also* Frid Decl., ¶31, Ex. 28 [July 19 and 20, 2018 deposition of Ma Lingqing Gu] ("PMK depo.") at 156:16-157:11; 159:10-161:11; 238:10-22; 239:4-240:14. More specifically, Talesun USA's PMK testified as follows:

> Q: Why didn't Talesun follow through on its promises made in this master membership interest purchase agreement, dated November 28th, 2012?
>
> A: I don't know.

PMK depo. at 136:2-7. Mr. Ma offered similar enlightening testimony:

> Q: What happened, why the deal did not go forward?
>
> A: I don't know. Really, I don't know.

Ma depo. at 113:24-114:3. Thus, on July 18 and 19, 2018, MSF learned for the first time that the U.S.-subsidiary who executed the relevant contracts on Defendants' behalf had no idea why it didn't perform under the contracts. This testimony was consistent with Talesun's verified discovery responses in the State Court case, admitting Talesun had no idea why it breached the contracts. That seemed odd.

Defendants' fraudulent scheme to use their U.S.-based subsidiary to shield them from liability for their commercial actions in this country came into sharper focus in January 2019 when Defendants' CFO (Changqing Hu, whom Defendants simultaneously appointed to serve as

CEO and Chairman of Talesun USA *unbeknownst to him*) submitted a declaration in the state court case contending that Mr. Ma lacked authority to sign for the lunch check (let alone to execute multi-million dollar commercial agreements in the United States). Frid Decl., ¶32, Ex. 30. Such testimony from the Parents unequivocally contradicted Mr. Ma's earlier testimony described above (including that he not only had full authority to bind Talesun USA and execute the agreements but that Defendants had authorized him to do so). *Compare* Hu's Declaration (claiming that despite his GM title and earlier testimony, Mr. Ma had no authority whatsoever to bind Talesun USA) with Ma depo. at 90:25-91:5; 94:15-18; 95:6-21; 125:11-126:21; 149:4-25. Such testimony also contradicted the facts described above which gave MSF no reason to suspect that Mr. Ma lacked requisite authority to execute these contracts, especially given his seat on Talesun's board (which seat, Mr. Hu claimed in his declaration, <u>did not exist</u>).

The details of Defendants' utter contempt for the U.S. legal system – including orchestrating the destruction of every single document relevant to their collective dealings with MSF,[7] ordering one of their officers to serve as Talesun USA's purported "PMK" witness though he claims to have never heard of that entity,[8] and altering other evidence during the course of the PMK deposition – are set forth, and substantiated, in a voluminous Motion in Limine filed in

---

[7]/ According to Talesun USA's PMK witness (who was an officer of Defendants, but never worked for, and claims to have never heard of, Talesun USA), Talesun USA no longer possessed a single email or other communication concerning the largest solar deal in its history because, according to *Defendants'* in-house lawyer, *Defendants* intentionally destroyed this critical evidence. *See* PMK depo. at 98:15-20 ("Q. Okay. And so when you tell me that you went to IT and they said the servers had been destroyed, was that Ms. Mao who told you that? A. Yes. Q. The lawyer? A. Yes."). According to Talesun USA's PMK witness, at some point in time which the company can't recall, Defendants destroyed all of their corporate servers without creating a single back-up of their historical documents and communications. *See id.*, at 85:6-17 (Talesun failed to issue an evidence preservation notice); 91:6-20 (all documents were gone because they swapped servers); 95:4-14 ("We tried to produce [documents], but we could not find them.").

[8]/ Ma Lingqing Gu confirmed he was ordered to serve as Talesun USA's PMK witness by *Defendants'* CFO (Changqing Hu) and that he was prepped for deposition by *Defendants'* in-house counsel. PMK depo., at 15:6-17:15; 37:19-24; 46:19-22. Mr. Gu also stated that he'd never even heard of Talesun USA (the entity which he'd been ordered to testify on behalf of): *See id.*, at p. 265:8-12 ("Q. Who is Talesun Solar USA Ltd.? A. I don't know. Q. Have you ever heard of that company before? A. Not sure.").

1    advance of the original trial date in the State Court case.  *See* Exhibit 8 to Frid. Decl. submitted in

2    support of MSF's Opposition to Motion to Stay [ECF #60 in this case].  For purposes of opposing

3    Defendants' Motion for Judgment on the Pleadings, MSF reiterates Defendants' discovery

4    transgressions here because MSF could have obviously discovered Defendants' fraudulent scheme

5    much sooner than January 2019 had Defendants not destroyed every email they sent to, or

6    received from, their U.S.-subsidiary concerning these transactions, or ordered intentionally

7    uneducated witnesses[9] to testify on behalf of their subsidiary in the State Court case.

8    **C.    M-S Fund's First Amended Complaint.**

9         The First Amended Complaint [ECF #33] contains a number of allegations that are

10   sufficient to deny Defendants' Motion, including specific allegations of recently-discovered facts

11   (all within three years of MSF's initiation of this action on July 24, 2019):

12   • The parents sought out and negotiated the contracts on their own behalf, were the only parties
         capable of funding and performing under the contracts, and were the only parties
13       who would have benefited under the contracts had they not unilaterally caused their
         breach [¶2];

14   • Talesun USA was formed, and served, entirely as a "marketing conduit" for the Parents
15       [¶12].  As such, in addition to attempting to shield themselves from liability in this
         country, the Parents used Talesun USA as their marketing conduit and derived substantial
16       economic benefit from Talesun USA's activities [¶13];

17   • During the relevant time period, the Parents and Talesun USA had substantial overlap in
         their officers, directors, and employees.  At all times relevant hereto, Mr. Baixing Wang
         served as Chairman of the Board for Zhongli Group, Talesun Solar, Talesun USA, and,
18       on information and belief, every other one of Zhongli Group's subsidiaries [¶17];

19   • Defendants represented that Talesun USA had "allocated dedicated resources to the
         negotiation and the implementation" of the projects, including "confidence to start the
20       construction of at least 14MWAC projects in Q4, 2012" [¶23]; this representation was
         bolstered by delivery of financial records for the Parents [¶¶24, 34, 57] (this
21       representation turned out to be false, as the Parents had no intention of funding their U.S.-
         subsidiary's express contractual obligations);

22

23       [9] For example, Talesun USA's PMK witness didn't know why Talesun USA executed the
         MIPA [PMK depo., at 255:25-256:3], didn't know whether it was Talesun USA's intent to defraud
24       MS-Fund when it signed the MIPA [*id*., at 237:21-238:8]; didn't know whether Talesun USA
         intended to follow through on its obligations under the MIPA [*id*., at 159:10-20], and was "not
25       sure" whether Talesun USA performed its obligations under the MIPA [*id*., at 112:21-25, 113:9-
         16, 114:25-115:9, 115:21-116:1, 117:24:118:12].  His testimony was equally as absurd as to the
26       Standstill and Letter Agreements, which Talesun USA claims it never saw before [*id.*, at 149:1-3;
         150:5-10; 256:5-8] and consequently knew nothing about [*id*., at 138:15-139:10; 149:1-3; 150:5-
27       10], including why Talesun USA failed to perform its obligations under those agreements [*id*., at
         153:21-154:1; 256:10-19; 250:9-12; and 155:24-156:21].
28

-12-

- On November 27, 2012, Mr. Ma shared that "our board approved the deal!" [¶44], consistent with the contractual rep and warranty that Mr. Ma had authority and power to sign the MIPA [¶46] as confirmed by the Officer's Certificate [¶48] (according to the Parents, these representations were false, as the Parents now claim Mr. Ma lacked authority to proceed with the deal);

- In an email recently received from MSF's deal counsel in connection with his trial preparation in the State Court case, Talesun's counsel shared his belief that his clients never considered these contracts as binding agreements requiring performance but rather as "instruments of process" (the email makes no claim that Mr. Ma lacked authority, but instead asks MSF to wait a few days before seeking to terminate the contracts and pursue remedies for breach) [¶63];

- In depositions on the underlying contract claim (all taken within the applicable limitations period), Mr. Ma and Mr. Lingqing Gu (whom Defendants had ordered to sit as Talesun USA's PMK witness) confirmed that:

  o Chairman Wang owns the equity issued in both the Defendants and Talesun USA;

  o Defendants and Talesun USA had overlapping directors, officers, and employees;

  o Talesun USA acted as a mere shell/conduit for Defendants' affairs;

  o Talesun USA was constantly underfunded and could not pay its obligations as they came due (including paying the $500,000 exclusivity deposit, the $175,000 retainer for energy tax credit services, the $46,160 underpayment on the first close, or the $30.6M required to close under the MIPA and nearly $11M required to close under the Standstill Agreement);

  o Talesun USA disregarded corporate formalities (including maintaining no separate financials, holding no regularly-scheduled board meetings, and taking interest-free loans from Defendants without any supporting documentation);

  o Defendants exercised pervasive control over Talesun USA, dictating every facet of the subsidiary's business;

  o Defendants controlled Talesun USA to such a degree as to render the subsidiary a mere instrumentality of the Parents, including giving Talesun USA no actual decision-making authority concerning its affairs; and

  o Defendants ordered the destruction of every document (including email communication) related to their business dealings with Talesun USA and MSF [¶73].

  o When questioned about his role as Talesun USA's Chief Financial Officer and a member of its board of directors, Mr. Changqing Hu (who is also an officer for the Parents) confirmed that he does "not get involved in the actual stuff," and that "I am just a title" [¶74];

  o In July of 2018, Mr. Ma testified under oath that he requested, and received, approval from Defendants' to proceed with this deal, and that he does not know why Defendants failed to honor their obligations under the agreements because that decision was made "above his head" [¶75];

  o After breaching the agreements, Defendants took steps to wind down Talesun USA and formed a new subsidiary, Zhongli New Energy USA Co., LLC ("ZNE") to serve as their new marketing arm in the United States. ZNE shared office space, employees, and officers with Talesun USA. As they did with Talesun USA and Mr. Qi, Defendants appointed a Talesun Solar executive (Hao Sheng) to serve as a figure-head CEO of ZNE. Mr. Sheng testified that, like Talesun USA, ZNE was undercapitalized from its inception, taking undocumented loans from the Defendants to operate [¶76];

○ On <u>January 24, 2019</u>, Talesun submitted a declaration in the State Court case from Mr. Changqing Hu, a member of its board of directors, asserting for the first time that Mr. Ma possessed neither express nor implied authority to bind Talesun USA to anything (including the MIPA). Mr. Hu's declaration also stated that Mr. Ma lacked authority of any kind to execute the Standstill Agreement, and that – contrary to Mr. Ma's representations – neither Talesun USA's nor Defendants' boards authorize him to execute the agreements [¶77];

○ At no point prior to 2019 had Defendants or their U.S.-subsidiary (or any of their legal representatives) claimed that Mr. Ma lacked authority to bind Talesun USA or to enter into the MIPA or Standstill Agreement [¶78];

○ In July 2019, representatives from both Defendants (Zhongli Group and Talesun Solar) confirmed that Defendants' U.S. subsidiaries are underfunded from the start (some receiving as little as $1,000) and are simply instruments of the Chinese parents, operating solely for their benefit [¶¶79-80]; and

○ Defendants intentionally concealed their position that Mr. Ma lacked authority, generally, to bind Talesun USA, and specifically to bind Talesun USA to the Agreements [¶88].

## IV.  ARGUMENT

### A.  Defendants' Motion is for Summary Judgment, Not JOTP.

Defendants ask the Court to rule, as a matter of law, that MSF reasonably should have discovered Defendants' fraudulent scheme as soon as their subsidiary failed to perform under the MIPA.  But the Court cannot fairly make this determination without considering a mountain of evidence outside the pleadings, much of which evidence Defendants' have yet to produce.

Rule 12(c) allows a party to move for judgment on the pleadings ("JOTP") after the pleadings are closed but early enough so as to not delay trial.  *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).  JOTP is proper "when there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Id.*; *see also Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1989) (the moving party must "clearly establish[] on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law.").  In determining whether a moving party has satisfied this standard, a court treats the opposing party's allegations as true, and construes them in the light most favorable to that party.  *Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989) (citation omitted).  JOTP is appropriate when a complaint does not plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When considering a JOTP, if the Court reviews matters outside the pleadings, the motion should be treated as a motion for summary judgment. Fed. R. Civ. P. 12(c); *see Carter v. Stanton*, 405 U.S. 669 (1972) (where matters outside the pleadings were presented to, and not excluded by, the court, the court was required to treat the motion as one for summary judgment and to dispose of it under Rule 56). Dismissal is proper only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Sun Savings & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir.1987).

From a procedural standpoint, this early motion mirrors the case *In re Air Crash off Point Mugu, California,* 145 F.Supp.2d 1156 (N.D. Cal. 2001). There, plaintiff's access to facts was hindered by the destruction of evidence. Defendant airline filed an early motion for judgment on the pleadings concerning plaintiffs' claim for pre-impact emotional distress. The court, accepting the complaint's allegations as true, denied the JOTP as premature and noted that defendant can raise the same argument later in a motion for summary judgment where it will be considered under Rule 56's requirements. *Id*. at 1163. This Court should reach the same result.

That this JOTP rests entirely on Defendants' *statute of limitations* defense reinforces that this is, in fact, a motion for summary judgment. The California Supreme Court has repeatedly held that statute of limitations defense presents factual questions for the jury. *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 810 (2005) ("*Fox*") ("Resolution of the statute of limitations issue is normally a question of fact."); *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal.3d 586, 597 (1970) ("There are no hard and fast rules for determining what facts or circumstances will compel inquiry by the injured party and render him chargeable with knowledge. It is a question for the trier of fact") (internal citation omitted); *Hobart v. Hobart Estate Co.*, 26 Cal.2d 412, 440 (1945) ("When the facts are susceptible to opposing inferences, whether a party has notice of circumstances sufficient to put a prudent man upon inquiry as to a particular fact, and whether by prosecuting such inquiry, he might have learned such fact, are

themselves questions of fact to be determined by the jury or the trial court") (internal quotations and citations omitted). Thus, "[s]ummary judgment is not appropriate unless only one reasonable inference can be drawn from undisputed facts." *Cleveland v. Internet Specialties W., Inc.*, 171 Cal. App. 4th 24, 33 (2009); *April Enterprises, Inc. v. KTTC*, 147 Cal. App. 3d 805, 833 (1983) (whether plaintiff exercised reasonable diligence in discovering his injury "is a question of fact for the court or jury to decide."); *Ralph Andrews Productions, Inc. v. Paramount Pictures Corp.*, 222 Cal. App. 3d 676, 682 (1990) (same). It is thus not surprising that most of the limitations cases cited in Defendants' JOTP are decided at the summary judgment stage. *See*, *e.g.*, *Sharaf v. Starbuzz Tobaco, Inc.*, 79 Fed. App'x 618 (9th Cir. 2018) (affirming district court's grant of summary judgment on limitations defense).

As set forth above, voluminous facts support MSF's allegation that it did not discover Defendants' fraudulent scheme – including their get-out-of-jail-free card (*i.e.*, Mr. Ma lacked authority to execute the underlying contracts) – until Defendants' actions in the contract case brought them to light within one year of MSF's filing of this action.

## B. Defendants' Limitations Defense is Not Appropriate for Summary Judgment.

Courts often talk in terms of the statute of limitations being "tolled" while plaintiff is unable to discover the cause of action, while at other times courts state the cause of action does not "accrue" until discovery. While "accrual" and "equitable tolling" are two different concepts, the result is the same. *See Fox*, *supra*, 35 Cal.4th at 803 (California Supreme Court, at one point, states that the statute of limitations "will be tolled until such time as a reasonable investigation would have revealed its factual basis," then later states that the discovery rule "postpones accrual of" the claim). At this stage, the Court should reject Defendants' limitations defense under both theories because MSF has adequately alleged that it did not discover Defendants' fraudulent scheme until it learned the facts, described above, in 2018-2019. The Court must accept these allegations as true. Moreover, given the conflicting state of the evidence – *i.e.*, did Mr. Ma have authority, as he testified, or did he not? Did Mr. Ma serve on Talesun's board of directors, as he testified, or did he not? – MSF is entitled to present these arguments and facts at trial.

**1.     Defendants Have Not Established Undisputed Material Facts
Sufficient to Grant Their Motion.**

Fraud claims are subject to a three-year statute of limitations. *See* Code Civ. Proc. §
338(d).  A plaintiff must bring a claim within the limitations period after accrual of the cause of
action.  *Fox*, 35 Cal. 4th at 806.  An exception to the general rule of accrual is the "discovery
rule" which "postpones accrual of a cause of action until the plaintiff discovers, or has reason to
discover, the cause of action."  *Id.* at 807.  A plaintiff has reason to discover a cause of action
when he or she "has reason at least to suspect a factual basis for its elements."  *Id.*; *see also
Gutierrez v. Mofid*, 39 Cal.3d 892, 897 (1992) ("[T]he uniform California rule is that a
limitations period dependent on discovery of the cause of action begins to run no later than the
time the plaintiff learns, or should have learned, the facts essential to his claim[.]").

Here, Defendants argue that MSF knew or should have known of their fraudulent scheme
prior to July 24, 2016.  In support of its argument, Defendants highlight a series of emails and
texts they argue put MSF on notice that: (i) the subsidiary may need funding from its parents to
perform, as alluded to in the LOI which touted Defendants' willingness to provide such support;
(ii) Defendants used their own financials to satisfy California utility's due diligence
requirements; and (iii) the subsidiary relied on Defendants' internal finance department for
support.  JOTP, at 17:2-17; 18:1-15.  None of these "facts" remotely flagged for MSF
Defendants' scheme to defraud it, nor would they put a reasonable person on notice that
Defendants had zero intention of performing under the contracts they were negotiating.  And
certainly none of these "facts" informed MSF that Mr. Ma lacked authority to execute these
contracts.  Summary judgment is inappropriate on these grounds.

Whether it was reasonably discoverable that Defendants had zero intention of performing
under the contracts by having one of their subsidiaries execute them (and then by having a
representative who lacked authority execute them, on top of that) is a question of fact for the jury.
That is particularly true where *before signing the MIPA*, MSF and its counsel conducted a
thorough investigation as part of their due diligence on the Talesun entities which satisfied them
both that Mr. Ma had authority to execute these contracts.  Indeed, given the facts outlined above,

a reasonable jury should find that MSF had no reason to know of its fraud claims prior to its recent discoveries and subsequent investigation. Likewise, reasonable jurors could reach different conclusions on whether facts which establish multiple breaches of contract should have raised a suspicion as Defendants' fraudulent scheme as alleged in this case. *See E-Fab, Inc. v. Accountants, Inc. Servs*., 153 Cal. App. 4th 1308, 1322 (2007) (holding that when analyzing a limitations defense, "[t]he first step in the analysis requires us to segregate plaintiff's claims . . . recognizing that each may accrue at a different time"); *April Enters.*, *supra*, 147 Cal. App. 3d at 823 (limitations argument failed where defendant "confuse[d] two different theories of action"). At worse, a material fact issue remains regarding whether MSF should have been on notice of Defendants' fraudulent scheme prior to July 24, 2016. But it seems likely, given Defendants' contemporaneous actions, Talesun's affirmative representations, and Mr. Ma's own belief that he possessed authority, that a jury will conclude that MSF had no reason to doubt Mr. Ma's authority until January 2019. *See Hobart*, *supra*, 26 Cal.2d at 438 ("The statute commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry."). As the Supreme Court noted in *Hobart*:

> "The courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been defrauded against those who defraud him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with a discovery in advance of actual knowledge on his part."

*Id.* at 439 (reversing judgment finding fraud claim to be time-barred; "jury could have found that [defendant's] representations were of such a nature as to lull plaintiff into a sense of security or state of inaction").

The weight of the evidence concerning Mr. Ma's authority, including Defendants' affirmative representations about Mr. Ma's authority and contemporaneous actions which affirmed the validity of the contracts (including paying the $500k exclusivity deposit and later admitting that they in fact purchased some of the projects *under the MIPA*), precludes entry of summary judgment on Defendants' limitations defense. That's because their JOTP rests entirely on the dubious assertion that MSF should have ignored the actual events in 2012-2013 and

magically discerned that Defendants and/or their U.S.-subsidiary were lying the entire time as the parties' wasted millions of dollars and countless hours negotiating and salvaging a commercial transaction that was, allegedly, doomed from the outset. But Defendants do not proffer any "fact" showing MSF's knowledge – *prior to July 24, 2016* – of Defendants' fraudulent scheme in using their U.S.-subsidiary as a shell to commit fraud in their commercial dealings in California, let alone any undisputed fact sufficient to justify granting their JOTP. *See Fox*, *supra*, 35 Cal.4th at 808 (plaintiff's knowledge that they have been injured, by itself, does not start the clock; rather, plaintiff must also be aware that the injury was caused by another's wrongdoing).

For example, if the U.S.-subsidiary still does not know, today, why it failed to perform under the contracts [*see* PMK testimony], surely MSF cannot be held, as a matter of law, to have known that Defendants failed to perform because Mr. Ma "lacked authority" to pursue this deal, as first disclosed in January 2019 (an excuse noticeably absent from the parties' voluminous and contemporaneous demand letters/settlement communications). And how can the Court find, as a matter of law, that MSF knew Mr. Ma lacked authority to execute the contracts *prior to* receiving Mr. Hu's declaration, given ***Mr. Ma himself believed he had authority***, Defendants executed both the LOI and MOU underlying the MIPA, Defendants wired $500k to procure exclusivity on this deal then issued a press release touting their (not their subsidiary's) purchase of these projects, then Defendants wired another $500k for partial performance *under the contract they now disclaim as invalid?* Mr. Ma's unambiguous testimony from July 2018,[10] coupled with the patently absurd testimony from the subsidiary's PMK witness and Defendants' CFO in 2019,[11] clued MSF in on the fraud that Defendants' had perpetrated against MSF (and are continuing to perpetrate on the U.S. legal system). In short, Defendants' limitations argument fails at this stage because it relies on the demonstrably false premise – refuted by Defendants' own actions – that MSF knew, or should have known, of their fraudulent scheme prior to July 24, 2016. *See*

---

[10]/ As summarized above, Mr. Ma testified that he preserved documents so didn't know why they weren't produced; that he sat on Talesun's board and had authority to execute the contracts; and that he had no idea why Talesun failed to perform its obligations under the contracts.

[11]/ Neither Mr. Gu nor Mr. Hu knew the offices they held for various of Defendants' entities and neither could testify as to why Talesun failed to perform its obligations under the contracts under which it had already *partially*-performed.

*Fox*, *supra*, 35 Cal.4th at 813 (if a plaintiff's reasonable and diligent investigation discloses only one kind of wrongdoing when plaintiff's injury was actually caused by tortious conduct of a wholly different sort, the discovery rule postpones accrual of the statute of limitations on the newly-discovered claim); *see also E-Fab*, *supra*, 153 Cal. App. 4th at 1323 (delayed discovery may result in different accrual dates for different causes of action against different defendants depending on what was discovered when).

Given these facts, as alleged in the FAC, MSF is entitled to the benefit of the discovery rule which delays accrual until MSF had knowledge of the facts concerning Defendants' fraudulent conduct. *See El Pollo Loco, Inc. v. Hashim*, 316 F.2d 1032, 1039 (9th Cir. 2003) ("plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed . . . [and] defendants should not be allowed to knowingly profit from their injuree's ignorance"). Because Defendants kept their "authority" argument in their back pocket until needed to defeat MSF's summary judgment motion in the State Court case (even concealing it from Mr. Ma himself), MSF could not have discovered such facts any sooner than January 28, 2019, when they reviewed the gotcha declaration from Defendants' CFO (Changqing Hu) alleging – for the first time ever – that the contracts are unenforceable because Mr. Ma lacked authority to execute them. *See Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010) (statute does not begin to run until plaintiff discovers, or a reasonably diligent plaintiff would have discovered, "facts constituting the violation . . . irrespective of whether the . . . plaintiff understood a reasonably diligent investigation.").[12]

This case is also factually distinct from *Norgart v. Upjohn Co.*, 21 Cal.4th 453 (1999), cited throughout Defendants' JOTP, because there, the plaintiff testified that he "suspected that 'something wrong' had happened to [decedent] to cause her death" before the statute ran, but

---

[12]/ While Defendants argue MSF was obligated to discover facts supporting the fraud claim as soon as it realized Talesun breached the contract in 2012 (*see* Motion, at 23-24), they fail to establish exactly what sorcery MSF could have conjured up to discover that Defendants wired $1M to perform on a contract that they'd later claim fails because their subsidiary's General Manager lacked authority to sign it, contrary to every single representation and action they took prior to January 2019. *See Fox*, *supra*, 35 Cal.4th at 811 ("a diligent plaintiff's investigation may only disclose an action for one type of tort . . . and facts supporting an entirely different type of tort action . . . may, through no fault of the plaintiff, only come to light at a later date.").

filed suit "five years too late." Here, that Talesun failed to perform its obligations under the contracts did not provide any meaningful clues into the fraud Defendants perpetrated by having their U.S.-subsidiary's General Manager execute the contracts on their behalf.

Summary judgment on Defendants' limitations defense is thus properly denied because Defendants' alleged "facts" in support of their argument are highly disputed and rely on unreasonable inferences. *See Cleveland*, *supra*, 171 Cal. App. 4th at 33 (reversing grant of summary judgment on limitations issue where opposing inferences could be drawn concerning plaintiff's discovery of fraudulent circumstances). Moreover, when analyzing a limitations defense, "[t]he first step in the analysis requires us to segregate plaintiff's claims . . . recognizing that each may accrue at a different time." *E-Fab*, *supra*, 153 Cal. App. 4th at 1322; *see also April Enters.*, *supra*, 147 Cal. App. 3d at 823 ("[defendant's limitations] argument in this case fails . . . because they confuse two different theories of action."). Here, Defendants confuse allegations from the contract case *against the U.S.-subsidiary* with allegations in this case *against Defendants*, which focus on the fraudulent scheme, including by both affirmative misrepresentation and concealment, perpetrated by Defendants using their U.S.-subsidiary as their weapon. On this record, the Court should deny Defendants' motion.

## 2. M-S Fund's Claim of Equitable Estoppel and Tolling Should Proceed to Trial.

"Equitable estoppel, also termed fraudulent concealment, halts the statute of limitations when there is active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiffs claim is filed, to prevent the plaintiff from suing in time." *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir.2006) (internal quotations omitted). "In order to establish fraudulent concealment, the complaint must show: (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry." *Baker v. Beech Aircraft Corp.*, 39 Cal. App. 3d 315, 321 (1974).

"Under either California or federal authority, the plaintiff must plead with particularity the facts which give rise to the claim of fraudulent concealment." *Conerly v. Westinghouse Elec.*

-21-

*Corp.*, 623 F.2d 117, 120 (9th Cir.1980); *accord Guerrero,* 442 F.3d at 707 ("The plaintiff must demonstrate that he relied on the defendant's misconduct in failing to file in a timely manner and must plead *with particularity* the facts which give rise to the claim of fraudulent concealment" (emphasis added)).  As set forth above, Defendants fraudulently concealed key facts from MSF (including that Mr. Ma lacked authority and never held a board seat) and affirmatively misrepresented others (including that Mr. Ma, did, in fact possess authority to execute these contracts).  MSF discovered these facts in January 2019 when Defendants' lawyers prepared and filed a declaration on behalf of Defendants' CFO (Changqing Hu), and there's literally nothing MSF could have done to discover them earlier (recall that even Mr. Ma believed he had authority).

Defendants (and their U.S.-subsidiary) repeatedly represented that Mr. Ma had authority to execute these contracts and, at least up until January 28, 2019, acted in accordance with those representations.  But Defendants now ask the Court to throw out MSF's entire case by granting, in essence, summary judgment on their limitations defense.  "Whether estoppel is justified in a given case is a question of fact."  *United States v. Garan*, 12 F.3d 858, 860 (9th Cir. 1993) (citing and quoting *Culver City v. State Bd. Of Equalization*, 29 Cal. App. 3d 404, 405 (1973)); *see also Vu v. Prudential Prop. & Cas. Ins. Co*., 26 Cal.4th 1142, 1153 (2001) ("whether [plaintiff's] reliance was reasonable depends on a myriad of factual questions").  Given the conflicting facts in this case, which confusion is exacerbated by Defendants' fraudulent scheming and destruction of evidence, MSF's estoppel and tolling claims should proceed to trial.

### C.  If the Court is Inclined to Grant Defendants' Motion, Leave to Amend is Warranted.

A plaintiff pleading the "discovery rule" must allege facts showing "the time and surrounding circumstances of the discovery and what the discovery was."  *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1472 (2014).  MSF has carried this burden.  *See*, *e.g.*, FAC, ¶¶77-78.  Nevertheless, when a court grants a Rule 12(c) motion, leave to amend should be freely given if it is possible that further factual allegations will cure any defect.  *See Somers v. Apple, Inc*., 729 F.3d 953, 960 (9th Cir. 2013); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In assessing whether a case should be dismissed with prejudice and without leave to amend, a court should

consider five factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint. *Lawson v. JPMorgan Chase Bank, N.A.*, No. C14-5133 RJB, 2014 WL 12561148, at *5 (W.D. Wash. Apr. 16, 2014); *Cline v. Reetz-Laiolo*, 329 F.Supp.3d 1000, 1026 (N.D. Cal. 2018) (granting Rule 12(c) motion on statute of limitations grounds, but with leave to amend so that plaintiff could bolster her allegations of fraudulent concealment; noting that "A statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence."), *citing Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).

Here, Defendants can point to no bad faith or undue delay on MSF's part, and similarly can point to no prejudice they'd suffer by having to finally defend this case on the merits. Moreover, while the Court has already determined that MSF has adequately alleged fraudulent concealment [*see* ECF #45, denying Defendants' Second Motion to Dismiss for failure to satisfy Rule 9(b)],[13] if the Court needs MSF to more specifically allege *that the statute of limitations should be tolled* because Defendants' fraudulent concealment prevented MSF from timely discovering their fraudulent scheme, those are allegations which MSF can easily assert in good faith. And while the Court has already permitted one amendment [*see* ECF #32], that amendment was required to more specifically allege Defendants' own misconduct in California to establish personal jurisdiction over them (versus relying entirely on an alter ego theory) and had nothing to do with the statute of limitations. Because leave to amend would obviously not be futile, the Court should grant MSF leave to amend if it is inclined to grant Defendants' Motion.

### D. If the Court is Inclined to Grant Defendants' Motion, Plaintiff Requests an Opportunity to Conduct Limited Discovery and Submit Further Briefing Pursuant to Rule 56(d).

If the Court is considering granting Defendants' Motion, MSF requests an opportunity to take limited discovery from Defendants, who have yet to produce their initial disclosures

---

[13]/ *See*, for example, FAC at ¶95 ("Defendants intentionally concealed their position that Mr. Ma lacked authority, generally, to bind Talesun USA, and specifically to bind Talesun USA to the Standstill Agreement.").

1    although this case is more than two years old.  When a party opposing a summary judgment

2    motion shows that it cannot present facts essential to justify its opposition, "the court may: (1)

3    defer considering the motion or deny it; (2)  allow time to obtain affidavits or declarations or to

4    take discovery; or (3)  issue any other appropriate order."  Fed. Rule Civ. P. 56(d).  Rule 56(d) is

5    designed to prevent the opposing party from being "railroaded" by a premature motion for

6    summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Rivera-Torres v. Rey–*

7    *Hernández*, 502 F.3d 7, 10 (1st Cir. 2007).  Thus, courts should continue or deny a summary

8    judgment motion to allow discovery where one or more of the following factors are present:

9    • the summary judgment motion is made earlier in the litigation before relevant
     discovery is completed;
10
     • the case involves complex facts requiring additional discovery;
11
     • material facts are within the exclusive knowledge of the moving party;
12
     • discovery requests seeking material information are outstanding to the moving
13     party; or

14   • the motion raises new and unanticipated issues.

15   *Garrett v. San Francisco*, 818 F.2d 1515, 1518–1519 (9th Cir. 1987); *Trask v. Franco*, 446 F.3d

16   1036, 1042 (10th Cir. 2006) ("movant's exclusive control of information is a factor favoring

17   relief" under Rule 56(d)).  Most of these factors are satisfied here.

18        Defendants filed this Motion early, before any discovery in this case has occurred.  *See*

19   *Jolly v. Eli Lilly & Co*., 245 Cal.3d 1103 (1988) ("While resolution of the statute of limitations

20   issue is normally a question of fact, where the uncontroverted facts **established through**

21   **discovery** are susceptible of only one legitimate inference, summary judgment is proper.")

22   (emphasis added).  In fact, as of the filing of this opposition, Defendants have yet to serve their

23   Initial Disclosures although the case is nearly two years old.  Frid Decl., ¶34.  Each defendant is

24   now obligated to respond to ten specific Requests for Production of Documents geared towards

25   uncovering further evidence of their scheme to defraud MSF, including:

26   • All COMMUNICATIONS RELATING TO the TRANSACTION
     DOCUMENTS, including without limitation internal COMMUNICATIONS and
27     COMMUNICATIONS with M-S FUND, SILVERADO POWER, TALESUN
     USA (including Eric Ma and Xu Chen), Suzhou Talesun Solar Technology Co.,
28     Ltd., and China Nuclear Power Group;

-24-

- ALL DOCUMENTS and COMMUNICATIONS RELATING TO YOUR contention that Eric Ma did not possess authority to execute the TRANSACTION DOCUMENTS or STANDSTILL AGREEMENT;

- ALL non-privileged COMMUNICATIONS to or from Eric Ma RELATING TO either SILVERADO POWER, M-S FUND, or the TRANSACTION DOCUMENTS; and

- ALL DOCUMENTS RELATING TO YOUR destruction of DOCUMENTS and COMMUNICATIONS RELATED TO the TRANSACTION DOCUMENTS, including without limitation ALL DOCUMENTS and COMMUNICATIONS RELATING TO YOUR decision to change out all of YOUR corporate servers at some point following January 2013 without making any back-ups.

*See* Frid Decl., ¶37, Exhibit 30 and Exhibit 31. These documents, to the extent they weren't destroyed in furtherance of Defendants' scheme to defraud, are in Defendants' exclusive possession, and will certainly shed light on the issues now before this Court (*i.e.*, whether they concealed *additional* material facts from MSF, the communications between Mr. Ma and Defendants concerning this transaction, whether Defendants intended to perform under any of the relevant agreements, whether they have perjured themselves by now claiming Mr. Ma lacked authority to pursue this deal in the first place, etc.). And it would be manifestly unjust to grant Defendants' JOTP without first giving MSF the opportunity to depose both Mr. Qi and Mr. Wang, Defendants' executive leaders who executed the key documents preceding the MIPA.

Given these circumstances, MSF should be given a fair opportunity to review Defendants' relevant documents and take 2 depositions before any summary judgment motion is granted. Accordingly, if the Court is inclined to grant Defendants' Motion, KGF requests an opportunity to complete this pertinent discovery and submit further briefing in support of this Opposition. *Continental Maritime v. Pacific Coast Metal Trades*, 817 F.2d 1391, 1395 (9th Cir. 1987) ("Ordinarily, summary judgment should not be granted when there are relevant facts remaining to be discovered, but the party seeking a continuance bears the burden to show what specific facts it hopes to discover that will raise an issue of material fact."). Granting of such a motion is particularly appropriate where the identified information is the subject of outstanding requests. *VISA Int'l Serv. Ass'n v. Bankcard Holders*, 784 F.2d 1472, 1475 (9th Cir.1986).

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' JOTP outright, or else treat it as a motion for summary judgment and either deny it, or grant MSF's request for discovery pursuant to Rule 56(d).  Nevertheless, if the Court is inclined to grant the motion as presented, it should do so with leave to amend.

DATED:  July 19, 2021                    **ONGARO PC**

                                         By:  ___/s/ *David R. Ongaro*_____
                                                  David R. Ongaro

                                         Attorneys for Plaintiff
                                         MARTIFER-SILVERADO FUND I, LLC

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO**

 At the time of service,  I was over 18 years of age and not a party to this action.  I am employed in the County of San Francisco, State of California.  My business address is 1604 Union Street, San Francisco, CA 94123.

 On <u>July 19, 2021</u>, I served a true copy of the following document described as**:**

 **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

 **DECLARATION OF EUGENE B. FRID IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND MOTION FOR DISCOVERY UNDER RULE 56(D)**

 **PLAINTIFF'S OPPOSITION TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

on the interested parties in this action as follows:

 **BY E-FILING:** By electronically serving the document(s) listed above via CM/ECF on the recipients designed on the Transaction Receipt located on the CM/ECF website.

 I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

 Executed on July 19, 2021, at San Francisco, California.


       */s/ Christine M. Gill*
        Christine M. Gill