UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MARTIFER-SILVERADO FUND I, LLC,**<br><br>　　Plaintiff,<br><br>　vs.<br><br>**ZHONGLI SCIENCE AND TECHNOLOGY GROUP CO., LTD. AND SUZHOU TALESUN SOLAR TECHNOLOGY CO., LTD.,**<br><br>　　Defendants. | Case No. 4:19-CV-4243-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: Dkt. No. 78 |

　　Currently pending before the Court is defendants' motion for judgment on the pleadings as to all claims in the operative First Amended Complaint ("FAC"). (Dkt. Nos. 33, 78.) Defendants are China-based corporation Zhongli Science and Technology Group Co., Ltd. ("Zhongli") and its direct subsidiary Suzhou Talesun Solar Technology Co., Ltd. ("Suzhou"). Plaintiff Martifer-Silverado Fund I, LLC (the "Fund") has sued defendants for fraud based on conduct from 2012 and 2013. The gravamen of the motion is that plaintiff knew or should have discovered its claims during that time frame, and therefore the filing of this action in 2019 renders it time-barred.

　　Having carefully reviewed the pleadings and the briefing on the motion, and for the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.[1]

---

[1] Defendants request that the Court take judicial notice of the complaints filed by plaintiff in the action brought against non-parties Talesun Solar USA, Ltd. And Zhongli New Energy USA Co., LLC in San Francisco Superior Court, No. CGC-16-556139. (Dkt. No. 78-1, Request for Judicial Notice ("RJN").) Although plaintiff objects to judicial notice of the truth of the allegations contained therein, it does not object to the Court taking judicial notice of the existence of these documents. Finding that the existence of these pleadings in the state action are not subject to reasonable dispute, the Court hereby takes judicial notice of the original complaint filed on December 22, 2016, the first amended complaint failed on April 20, 2017, the second amended complaint filed on October 3, 2018, and the third amended complaint failed on February 7, 2019. (RJN, Exs. A–D.)

## I. BACKGROUND

The FAC alleges as follows:

Plaintiff Martifer-Silverado Fund I, LLC (the "Fund") is a Delaware-incorporated limited liability corporation engaged in the development of a pipeline of utility-scale solar projects. (FAC ¶ 6.) Defendant Suzhou is primarily engaged in the manufacture and sale of solar panels. (*Id.* ¶ 9.) Suzhou itself is the parent corporation of non-party Talesun Solar USA, Ltd. ("Talesun"). (*Id.* ¶ 11.) Talesun commonly referred to defendants Zhongli and Suzhou as "HQ." (*Id.* ¶ 10.) The FAC refers to defendants as the "Parents," as will this order. According to the Fund, Talesun was strictly a "marketing conduit" for the Parents, as its central purpose was to distribute their solar panels throughout the United States. (*Id.* ¶ 12.)

In May 2012, Talesun "approached" the Fund about the "Parents' interest in purchasing [its] ownership rights in commercial-grade solar power projects" in California. (*Id.* ¶ 22.) Eric Ma, Talesun's general manager, provided the Fund with a letter of intent for the purchase in August 2012, touting "strong financial capability of Talesun backed by Zhongli Sci-Tech Group [a]s an insurer for the payment." (*Id.* ¶ 23.) Without any meaningful financials of its own, Talesun offered Zhongli's revenues as proof of its financial backing and represented that it would "use its own capital to fund the project acquisition" but that "[i]f necessary, Zhongli Group can provide a Corporate Guaranty for the payment." (*Id.* ¶ 24.)

Later in August, Talesun delivered a second letter of intent expanding the portfolio of project companies for a total purchase price of $30,600,000. (*Id.* ¶ 25.) The second letter of intent contained the same representations and warranties concerning Talesun's financial capabilities and also included a 30-day exclusivity provision during which the Fund agreed to forgo other potential opportunities for Talesun's payment of $500,000. (*Id.* ¶ 27.) However, the Parents, not Talesun, made the $500,000 exclusivity deposit. (*Id.* ¶ 28.)[2]

As part of the due diligence process, Talesun provided the Fund with the Parents' financial reports, "suggesting that [they] would serve as a better indicator of Talesun USA's available

---

[2] Talesun also was not able make a required $175,000 deposit for professional services related to preserving energy tax credits without "applying for such funds from HQ." (FAC ¶ 29.)

2

capital." (*Id.* ¶ 34.) Indeed, when the Fund attempted to obtain consent from the California utilities to transfer the project companies, the utilities insisted upon reviewing the Parents' financials since Talesun had no meaningful financials of its own. (*Id.* ¶ 39.)

Following a Fund member's trip to Australia to meet the Parents' chairman in October, the parties began negotiating the terms of the purchase agreement for the solar project companies. (*Id.* ¶ 35.) According to the Fund, the Parents controlled the negotiations. For example, although the Parents engaged their own counsel for the transaction, "it became clear during negotiations that [Talesun's counsel] Reed Smith LLP was negotiating on behalf of the Parents as they could make no decisions or commitments without the Parents' approval." (*Id.*) When the Fund asked Talesun whether it was interested in purchasing additional project companies, Mr. Ma stated that "he would need to check with the Parents as to their interest." (*Id.* ¶ 38.) Mr. Ma also informed the Fund that since Zhongli is a public company in China, its board would have to approve a purchase of this size. (*Id.* ¶ 40.) Moreover, Mr. Ma "reported that he had received additional instructions from the Parents as to when they could issue the required letter of credit and fund the required purchase price." (*Id.* ¶ 42.) Ultimately, before designating Talesun to serve as buyer of the new project, the Parents had formed two other subsidiaries for this purpose. (*Id.* ¶¶ 36–37.) Finally, on November 27, Mr. Ma informed the Fund that Zhongli's board approved the deal. (*Id.* ¶ 44.)

On November 28, 2012, Talesun and the Fund executed the Master Membership Interest Purchase Agreement ("MIPA") for the sale and purchase of 36 distinct solar project companies. (*Id.* ¶¶ 15, 45.) Three particular representations made during the course of negotiations are relevant here. **First**, Talesun represented and warranted that it "had the authority and power to enter into the MIPA and to perform its obligations without obtaining any further consent or approval from any third party." (*Id.* ¶ 46.) **Second**, Talesun represented and warranted that it "had sufficient liquid capital (or committed sources of capital) to permit it to timely perform its obligations under the MIPA, that its performance was not subject to any financing contingency, and that it knew of no circumstances or conditions that could reasonably be expected to prevent the contract's performance." (*Id.* ¶ 47.) **Third**, Mr. Ma, who signed the MIPA on behalf of Talesun, provided the Fund with an officer's

3

certificate which confirmed that he was a "duly elected or appointed, qualified and acting officer" who had "been authorized to execute and deliver" the MIPA. (*Id.* ¶ 48.)[3]

Talesun allegedly breached the MIPA when it failed to make the required initial closing payment of $546,160 under the MIPA. (*Id.* ¶ 49.) The Parents only authorized a wire payment of $500,000, and Talesun stated that it could not pay the additional $46,160. (*Id.*)[4] As the parties attempted to salvage the transaction, Mr. Ma informed the Fund on December 26 that Frank Qi, an executive officer of both Suzhou and Talesun, was working with "our financing department" to resolve issues with Talesun's ability to perform under the MIPA. (*Id.* ¶ 53.) The Fund understood Mr. Ma to refer to the Parents' financing department as Talesun had none. (*Id.*) Talesun then provided the Fund with Suzhou's financials. (*Id.* ¶ 57.) The Fund "reviewed and relied on these financials as an inducement to enter into the Standstill Agreement," which Mr. Ma executed on Talesun's behalf on December 31, 2012. (*Id.* ¶¶ 15, 57, 59.) Mr. Qi confirmed that "Talesun HQ top management has fully understood these projects and [is] ready for start-up project movement." (*Id.* ¶ 59.)

Talesun allegedly breached the Standstill Agreement when it failed to make the required payments thereunder. (*Id.* ¶¶ 61–66.) When pressed about the same, "Mr. Ma admitted he had 'no update from HQ.'" (*Id.* ¶ 62.) "On January 10, 2013, when it became clear that the Parents had no intention of performing under the Standstill Agreement," Mr. Ma introduced the Fund to another investor, stating that his "intention [was] to help reduce the losses." (*Id.* ¶ 64.) In the following months, Talesun's representatives conveyed the Parents' feedback on terms of the proposed settlement to resolve the parties' dispute. (*Id.* ¶¶ 67–72.)

---

[3] Attached to the officer's certificate was a board resolution from Talesun stating that the MIPA and other transaction documents "are hereby ratified, confirmed and approved in all respected (sic) on behalf of the Company; and that the officers of the Company, including without limitation Eric Ma, Ph.D. in his capacity as General Manager of the Company, be, and they hereby are, authorized and empowered, on behalf of the Company, to execute and deliver, and to carry out and perform the obligations of the Company under the Purchase Agreement [and related documents]." (FAC ¶ 48.)

[4] That same day, Talesun stated "it was just a 'front face' for the entire transaction" when SoCal Edison demanded new due diligence materials (since the Parents had swapped in Talesun as purchaser in the deal). (FAC ¶ 50.)

4

The Fund alleges that the Parents conspired to form Talesun as a "front facing" shell to shield themselves from liability. (*Id.* ¶¶ 1–2.) However, the Fund also alleges that it did not learn about the Parents' fraudulent scheme until after it brought the state court action against Talesun in December 2016 to recover under the MIPA. (*Id.* ¶ 73; RJN, Ex. A.)[5] Specifically, during discovery in the state action, Talesun's representatives "confirmed," among other things, that "the Parents exercised pervasive control over Talesun USA, dictating every facet of the subsidiary's business" and that "the Parents controlled Talesun USA to such a degree as to render the subsidiary a mere instrumentality of the Parents." (FAC ¶ 73.) Furthermore, in January 2019, Changqing Hu, Talesun's chief financial officer and board member as well as an officer of the Parents, submitted a declaration "asserting for the first time that Mr. Ma possessed neither express nor implied authority to bind Talesun USA to anything (including the MIPA)." (*Id.* ¶ 77.) Thereafter, the Fund filed the instant action on July 24, 2019, alleging counts of fraudulent inducement (Count 1), fraudulent concealment (Count 2), negligent misrepresentation (Count 3), and conspiracy (Count 4).

## II. LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A court may grant judgment on the pleadings where there are no issues of material fact and the moving party is entitled to judgment as a matter of law when taking the allegations in the pleadings as true. *Gregg v. Haw. Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (citation omitted). This standard is "functionally identical" to the standard for determining a motion to dismiss under Rule 12(b)(6). *Id.* Accordingly, a court need not accept as true factual allegations that are conclusory or conclusions of law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citation omitted). "As with a Rule 12(b)(6) motion to dismiss, a court granting judgment on the pleadings pursuant to Rule 12(c) should grant leave to amend even if no request for leave to amend has been made, unless it is clear that amendment would be futile." *Finley v. Capital One*, No. 16-CV-01392-YGR, 2017 WL 1365207, at *2 (N.D. Cal. Apr. 14, 2017) (citation and internal quotation marks omitted). When ruling on a motion for judgment on the

---

[5] The third amended state complaint also alleges claims for breach of the Standstill Agreement as well as a Letter Agreement executed on August 30, 2013. (RJN, Ex. D.)

pleadings, a court may consider documents that the pleadings incorporate by reference, as well as matters that are subject to judicial notice. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citation omitted). The court "need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" attached to the complaint. *Id.*

### III. ANALYSIS

The Parents move for judgment on the pleadings as to all claims on the ground that they are time-barred. Here, each of the claims are premised upon the Parents' allegedly fraudulent conduct that occurred between August 2012 and January 2013, more than six years before the Fund filed this action in July 2019.

The face of the pleadings suggests that all claims are barred by the three-year statute of limitation which governs them.[6] "Generally speaking, a cause of action accrues at the time when the cause of action is complete with all of its elements." *Fox v. Ethicon Endo–Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (citing *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999)) (internal quotation marks omitted). However, "[a]n important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* at 807. A "plaintiff discovers the cause of action when [it] at least suspects a factual basis, as opposed to a legal theory, for its elements, even if [it] lacks knowledge thereof–when, simply put, [it] at least 'suspects . . . that someone has done something wrong' to [it]." *Norgart*, 21 Cal. 4th at 397–98 (1999) (quoting *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (1988)). "Once the plaintiff has a suspicion of wrongdoing . . . [it] must decide whether to file suit or sit on [its] rights." *Jolly*, 44 Cal. 3d at 1111. In other words, the limitations period begins once "the plaintiff has notice or information of circumstances to put a reasonable person on inquiry . . . ." *Id.* at 1110–11 (citation and internal quotation marks omitted).

In order for the discovery rule to delay the accrual of a cause of action, a complaint must "specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence." *Fox*, 35 Cal. 4th at 808 (citation omitted).

---

[6] Under California law, claims for fraud and misrepresentation are governed by a three-year statute of limitations. Cal. Code Civ. Proc. § 338(d). Each of the Fund's claims sound in fraud and thus has the same statute of limitations.

6

Thus, it is the Fund's burden to demonstrate that the discovery rule should postpone the accrual of its claims. Although "[t]he resolution of a statute of limitations defense is typically a factual question for the trier of fact," *San Francisco Unified School Dist.*, 37 Cal. App. 4th 1318, 1325 (1995), the limitations issue may be resolved as a matter of law. *See, e.g.*, *Hip Hop Beverage Corporation v. Michaux*, 729 F. App'x 599, 600 (9th Cir. 2018) (affirming grant of dismissal for judgment on the pleadings for failing to provide specificity necessary to invoke the delayed discovery rule and with prejudice); *see also* Wright & Miller, *Federal Practice and Procedure: Civil* § 1368 (3d ed.) ("If the affirmative defense clearly is established in the pleadings, as, for example, when a statute of limitations defense is apparent on the face of the complaint and no question of fact exists, then a judgment on the pleadings may be appropriate.").

In evaluating whether the Fund was on notice of the facts constituting its claims such that the discovery rule applies here, the Court first considers the claims' factual predicates. Specifically, the FAC alleges:

> Through their U.S. subsidiary Talesun USA, Zhongli [ ] and [Suzhou] made a number of affirmative representations which were intended to induce [the Fund] to enter into the Agreements, including that (a) Talesun USA had the authority and power to enter into the MIPA, (b) Talesun USA could perform its obligations under the MIPA without obtaining any further consent or approval from any third party, (c) Talesun USA had sufficient liquid capital (or committed sources of capital) to permit it to timely perform its obligations under the MIPA, (d) Talesun USA's performance was not subject to any financing contingency, (e) Talesun USA knew of no circumstances or conditions that could reasonably be expected to prevent the performance under the MIPA, and (f) Mr. Ma had full authority to execute the MIPA, Standstill and Letter Agreements on behalf of Talesun USA.
>
> Defendants also intentionally concealed their position that Mr. Ma lacked authority, generally to bind Talesun USA, and specifically to bind Talesun USA to the Agreements. Defendants also intentionally concealed their position that neither Mr. Ma nor Talesun USA could conduct material business in the U.S. without Chairman Wang's authorization and approval.

(FAC ¶¶ 87–88 (Count 1); *see also id.* ¶ 95 (Count 2), ¶ 102 (Count 3), ¶ 107 (Count 4).) Thus, the Court categorizes the alleged misrepresentations as follows: (1) Talesun was authorized to conduct business on its own (misrepresentations (a) and (b) and the second concealed fact); (2) Talesun could

perform its obligations under the agreements (misrepresentations (c), (d), and (e)); and (3) Mr. Ma was authorized to execute the agreements (misrepresentation (f) and the first concealed fact).

The Parents argue that the FAC shows that the Fund knew or should have least suspected that Talesun was neither authorized to enter into the agreements nor sufficiently funded at the time of the alleged breach in January 2013. The Fund responds that it was not until discovery in the state action when it first learned from the January 2019 declaration that Mr. Ma lacked authority to execute the agreements. Thus, the Parents focus only on the first two categories of alleged misrepresentations, while the Fund addresses only on the third.

With respect to the first two categories of misrepresentations, the FAC demonstrates that, by the time of the breach in January 2013, the Fund had numerous reasons to suspect that Talesun could neither transact on its own nor perform its contractual obligations, notwithstanding any representations to the contrary. Indeed, based on the Fund's own allegations, Talesun repeatedly required its Parents' approval and financial backing throughout the transaction. Thus, the true capabilities of Talesun (or lack thereof) should have been reasonably apparent at the time the contracts were breached in light of the Parents' role in the transaction. Nowhere in the FAC does the Fund allege why it could not have discovered these facts sooner or how it exercised reasonable diligence in trying to do so. Nor does the Fund allege specifically when or how it eventually learned that these representations were false. Instead, the Fund conflates its recent discovery of Mr. Ma's lack of authority with its first learning of defendants' alleged fraudulent scheme. However, the former does not preclude the Fund from suspecting that Talesun was a shell corporation used by the Parents, as the Fund's own pleadings convey. Accordingly, because the Fund had "reason to at least suspect that a type of wrongdoing has injured them," *Fox*, 21 Cal. 4th, at 807, and because the Fund has alleged no facts indicating that it could not have made earlier discovery of Talesun's legal and financial incapabilities, its assertion of the discovery rule fails with respect to these theories. Because such claims, as alleged, are barred by the statute of limitations, the motion for judgment on the pleadings is **GRANTED** on this basis.

However, with respect to the third category of misrepresentations, the FAC alleges that "[a]t no point prior to 2019 had Talesun . . . claimed that Mr. Ma lacked authority to bind [it] or to enter

8

into the MIPA or Standstill Agreement . . . ." (FAC ¶ 78.) Indeed, Mr. Ma maintained that he was so authorized during his July 2018 deposition (*id.* ¶ 75), consistent with his and the Parents' conduct up until Hu's declaration filed in January 2019. This is enough to show that until then, the Fund did not know, nor had any reason to suspect, that Mr. Ma lacked authority to execute the agreements. Thus, it cannot be said, as a matter of law, that the Fund was not diligent, that it acted unreasonably, or that a diligent investigation would have resulted in earlier discovery of claims based on this alleged misrepresentation. The Parents unpersuasively conflate representations about Talesun's ability to contract on its own with those about Mr. Ma's authority to bind Talesun, but these matters are distinct. Moreover, the Parents do not explain how the Fund could have possibly discovered that Mr. Ma lacked authority to bind Talesun, despite representations to the contrary. Because the pleadings do not demonstrate that the Fund could have reasonably discovered this fact earlier than the time that it did, the claims upon which this misrepresentation is based did not begin to run until January 2019 and were therefore timely filed. Accordingly, the Court **DENIES** the motion with respect to the theory based on the misrepresentation about Mr. Ma.

## IV. CONCLUSION

In sum, based on the allegations in the FAC, the Court finds as a matter of law that, by January 2013 at the latest, the Fund should have suspected that Talesun could neither transact on its own nor perform its obligations under the agreements at issue.[7] Any opposing inference drawn from the allegations would be unreasonable, and thus, judgment on the pleadings is appropriate with respect to these theories on the ground of untimeliness. However, the Court cannot find as a matter of law that the Fund should have discovered Mr. Ma's lack of authority sooner. Accordingly, the motion for judgment on the pleadings is:

- **GRANTED** as to each claim to the extent that they are based on misrepresentations relating to Talesun's inability to act on its own or perform its contractual obligations, and
- **DENIED** as to each claim to the extent that they are based on misrepresentations relating to Mr. Ma's authority to bind Talesun.

---

[7] Accordingly, the Court need not convert this motion into one for summary judgment, as the Fund requests. Further, in light of the foregoing, the Court need not address the Fund's additional arguments in opposition that its "claim of equitable estoppel and tolling should proceed to trial."

9

Although it is doubtful that the Fund can allege more facts to support the application of the discovery rule with respect to the former, the Court **DISMISSES** those theories **WITHOUT PREJUDICE**. However, counsel is reminded of their Rule 11 obligations. The Court hereby **SETS** a compliance deadline for **January 21, 2022**. No later than **January 14, 2022**, the parties are directed to meet and confer and file a joint statement proposing a revised schedule, including the date by which they shall exchange their initial disclosures. If compliance is complete, the compliance deadline shall be taken off calendar.

This Order terminates Docket Number 78.

**IT IS SO ORDERED.**

Dated: **December 20, 2021**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**